IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

THE CHARTER OAK FIRE INSURANCE
COMPANY, et al.                          :

    v.                                   :   Civil Action No. DKC 09-0100

:

AMERICAN CAPITAL, LTD., et al.
                                         :

**MEMORANDUM OPINION**

Defendant American Capital, Ltd. ("American Capital") is a
fund that invests in other companies. One of its purported
investments, Defendant Scientific Protein Laboratories, LLC
("SPL"), was allegedly involved in the sale and distribution of
a tainted drug. Now, American Capital and SPL find themselves
embroiled in several lawsuits in several courts. American
Capital wants its insurers, Plaintiffs The Charter Oak Fire
Insurance Company ("Charter Oak") and Travelers Property
Casualty Company of America ("Travelers"), to defend and
indemnify those suits. The insurers resisted and filed this
action, wherein they seek to rescind or reform the relevant
insurance contracts and ask the court to declare that neither
insurer is required to defend or indemnify Defendants in the
underlying suits.

American Capital and its co-defendants in this case have
now filed a partial motion to dismiss. (ECF No. 49). The

issues are fully briefed and the court now rules, no hearing being deemed necessary. *See* Local Rule 105.6. For the reasons that follow, Defendants' motion will be granted in part and denied in part.

## I. Background

### A. Factual Background[1]

### 1. The Policies

From 2006 to 2009, American Capital purchased three primary insurance policies and three umbrella insurance policies from Charter Oak and Travelers (the "Policies"). (ECF No. 44, Am. Compl. ¶¶ 15-20). The Policies cover general commercial liability over three one-year periods, each beginning on June 14: (1) 2006 to 2007, (2) 2007 to 2008, and (3) 2008 to 2009. (*Id.* ¶¶ 15, 18). Charter Oak issued the primary policies, which each carry liability limits of $1 million per occurrence and $2 million aggregate. (*Id.* ¶¶ 15, 16). Travelers issued the umbrella policies, which contain varying limits on liability: the 2006-2007 umbrella policy provided $10 million in limits, while the 2007-2008 and 2008-2009 policies provided $20 million in limits. (*Id.* ¶¶ 18, 19, 113). The Policies list American Capital as the Named Insured.

---

[1] The facts herein are drawn from Plaintiffs' first amended complaint. (ECF No. 44, Am. Compl.).

Like most insurance contracts, the Policies included certain limitations and exclusions. Some of these provisions are particularly relevant in this action. One provision, for instance, provides that "[n]o person or organization is an insured with respect to the conduct of any current or past . . . joint venture . . . that is not shown as a Named Insured in the Declarations." (*Id.* ¶ 89). The Policies limit coverage to injuries that occurred during the policy period and were unknown to American Capital before that period. (*Id.* ¶ 101-102). Only American Capital and those entities over which American Capital maintained "ownership or majority interest on the effective date of the policy" are insureds (*id.* ¶¶ 106-107), and the Policies do not cover partnerships, joint ventures, or limited liability companies (*id.* ¶¶ 108-109). Nor do they cover injuries occurring before or more than 180 days after the acquisition or formation of a subsidiary. (*Id.* ¶¶ 108-109). The umbrella policies contain an "other insurance" clause, which states that the policy does not apply wherever "any other valid and collectible insurance" is available. (*Id.* ¶ 113).

The Policies also impose certain obligations on American Capital. In particular, the Policies require American Capital to notify Plaintiffs of any claims arising under the Policies. (*Id.* ¶¶ 110-112). In addition, the Policies contain a "no

action" clause, which forbids any insured from "voluntarily mak[ing] a payment, assum[ing] any obligation, or incur[ing] any expense, other than for first aid, without [Plaintiffs'] consent." (*Id.* ¶ 93).

### 2. The Underlying Lawsuits

American Capital has sought insurance coverage for itself and its purported subsidiaries for two classes of lawsuits.

The first and most important class is a group of lawsuits concerning heparin.[2] In those suits, American Capital and SPL have been forced to defend several claims that stem from "deaths and injuries from allegedly tainted heparin." (*Id.* ¶ 21). In particular, the lawsuits assert that one or more ingredients of certain heparin, including its active pharmaceutical ingredient, were tainted or contaminated during processing in China. (*Id.*). Changzhou SPL Company, Ltd., a joint venture between SPL and Tech-Pool Bio-Pharma Company, oversaw this processing. (*Id.* ¶ 23). Once processing in China was complete, the heparin was purportedly shipped to the United States to be finished by Baxter International, Inc. and Baxter Healthcare Corporations

---

[2] "Heparin is a drug that is used to prevent the formation of clots within the blood of humans." (ECF No. 44, Am. Compl., ¶ 21).

("Baxter"). (*Id.* ¶ 24). It was then distributed for patient use. (*Id.*).

More than 100 heparin lawsuits were filed against American Capital and/or SPL before April 10, 2009, when American Capital stopped forwarding heparin lawsuits to Plaintiffs. (*Id.* ¶ 21). Since that time, even more lawsuits have been filed. (*Id.* ¶ 25).

According to the insurers, American Capital sought coverage for itself and SPL, as it says SPL is an American Capital subsidiary. (*Id.* ¶ 3). Plaintiffs decline to provide coverage to either party because American Capital failed to advise them that it sought coverage for SPL when it renewed its policies with Plaintiffs in 2007 and 2008, or at any other time. (*Id.* ¶¶ 27, 82).

The insurers argue that American Capital's exact interest in SPL is unclear, and that American Capital has "equivocate[d] on whether SPL and other companies are or are not subsidiaries of American Capital." (*Id.* ¶ 85). The complaints in the underlying lawsuits "variously allege that SPL is a subsidiary of, solely owned by, or majority owned by American Capital, and/or that American Capital is the parent of SPL." (*Id.* ¶ 22). American Capital has responded "inconsistently" to these allegations while concurrently arguing that SPL is a subsidiary

of SPL Acquisition Corporation. (*Id.*). SPL Acquisition Corporation has in turn represented that it has no parent. (*Id.*).

In addition to the heparin lawsuits, this case concerns coverage for one other type of lawsuit. American Capital and another of its purported subsidiaries, Defendant SMG, have been named as defendants in a lawsuit involving injuries to a spectator at an Ohio sports arena. (*Id.* ¶ 28). During an event at Nationwide Arena, a falling sheet of glass allegedly struck the spectator, knocking her unconscious. (*Id.*). The plaintiff in that case maintains that American Capital is the parent company of SMG. (*Id.* ¶ 29).

American Capital and SMG originally requested defense and indemnity from Plaintiffs for the arena injury case, but have since withdrawn that request. (*Id.* ¶¶ 30–31). Plaintiffs nevertheless include the lawsuit in their amended complaint because "American Capital has not disavowed its position that it is owed coverage for lawsuits relating to entities that it did not disclose to Charter Oak and Travelers." (*Id.* ¶ 31). The arena injury lawsuit is evidence, Plaintiffs say, that American Capital "never intended to obtain liability insurance with respect to other entities." (*Id.*).

### 3.   American Capital's Allegedly False Representations

Plaintiffs aver that neither American Capital nor any one of its subsidiaries is entitled to coverage under the Policies because American Capital made certain "material and intentional" false representations.   (*Id.* ¶ 84).   Among other things, American Capital purportedly made several misrepresentations in its insurance applications.   For example:

- American Capital submitted insurance applications in 2006 and 2008 indicating that it had no subsidiaries, even though it now seeks coverage for subsidiaries (*id.* ¶¶ 32, 34);

- American Capital acquired SPL in 2006, but answered "no" on its 2008 insurance application when asked whether it had acquired any operations in the past five years (*id.* ¶ 37);

- American Capital had been named as a defendant in at least one heparin lawsuit before submitting its 2008 insurance application, but nevertheless answered "no" when asked whether there had been any product liability loss in the last three years (*id.* ¶ 40);

- In early 2008, heparin and heparin's active pharmaceutical ingredient were recalled, but American Capital answered "no" on its 2008 insurance application when asked whether any products had been recalled (*id.* ¶ 43);

- American Capital answered "no" in one or more insurance applications when asked whether it sold, distributed, or used foreign products as components, even though the heparin was processed in China (*id.* ¶ 46);

- American Capital admitted in heparin lawsuits that the allegedly tainted heparin was processed by a joint venture, but answered "no" on one or more of its insurance applications when asked whether it had been active or was currently active in any joint ventures (*id.* ¶ 49); and

- American Capital did not provide details of pending heparin lawsuits in its 2008 application, even though it was asked to give details "of all liability claims exceeding $10,000, or occurrences that might give rise to such claims" (*id.* ¶ 52).

The alleged misrepresentations are not limited to American Capital's insurance applications. For example, when it purchased policies for the 2006-2007 period, American Capital submitted a summary of all claims paid and pending against it between June 2004 and June 2006. (*Id.* ¶ 58). The loss summary did not show any "premises/operations liability claims paid or pending," and American Capital did not submit a loss summary for any entity other than itself. (*Id.* ¶¶ 58-59).

American Capital also submitted Commercial General Liability Exposure Schedules each time it sought or renewed coverage. (*Id.* ¶ 61). These schedules identified only offices of American Capital, gave a risk classification of "office," and did not state any risk based on manufacturing or sales. (*Id.* ¶¶ 65-67.) The Schedules did not identify any subsidiaries or other owned entities of American Capital, including SPL. (*Id.* ¶¶ 68-69). American Capital did not identify SPL as an exposure on the Schedules after it acquired SPL in 2006. (*Id.* ¶¶ 72-73, 76-77).

Finally, Plaintiffs note that American Capital asked to update the Location Schedule of the Declarations Page of the

2007-2008 policy to include new American Capital offices. (*Id.* ¶ 79). American Capital did not include SPL's offices in that update. (*Id.* ¶ 80).

### 4. The Baxter Settlement

Plaintiffs allege also that American Capital settled with Baxter, its co-defendant in several of the heparin lawsuits, even though it was prohibited from doing so. On October 23, 2008, Plaintiffs sent American Capital a letter reminding it not to enter into a settlement without Plaintiffs' express written consent. (*Id.* ¶ 92). The letter also reserved Plaintiffs' rights to disclaim coverage if American Capital entered such a settlement without consent. (*Id.*).

Despite these admonitions, American Capital and SPL entered into one or more settlements with Baxter on December 2, 2008. (*Id.* ¶ 94). Under the settlement agreements, SPL promised to make payments to Baxter. (*Id.*). In addition, SPL and American Capital jointly agreed to assign any insurance benefits from the 2007-2008 insurance policy to Baxter. (*Id.*). Plaintiffs assert that neither American Capital nor SPL notified Plaintiffs of the settlement or asked Plaintiffs to approve it. (*Id.* ¶¶ 95-96).

### B. Procedural Background

Plaintiffs filed a five-count complaint on January 16, 2009. (ECF No. 1, Compl.). That complaint sought to rescind

the Policies, alternatively asked to reform the Policies based on mutual or unilateral mistake, asserted a claim of unjust enrichment, and asked the court to declare that Plaintiffs do not owe Defendants a duty to defend or indemnify in the heparin or arena injury lawsuits.

Defendants filed an answer on April 17, 2009. (ECF No. 5). Defendants also asserted several counterclaims, including their own request for declaratory relief, an allegation of bad faith, and two claims for breach of contract. (ECF No. 5 ¶¶ 106-56). Defendants filed a first amended answer and counterclaims with Plaintiffs' consent on June 10, 2009. (ECF No. 19). On July 10, 2009, Defendants filed a motion for judgment on the pleadings (ECF No. 24). In a memorandum opinion dated February 2, 2010, the court granted Plaintiffs leave to file a first amended complaint, which dropped the unjust enrichment count and left four counts. (ECF No. 42). The motion for judgment on the pleadings was therefore denied as moot and the process started anew. (*Id.*). Two months later, on April 1, 2010, Defendants filed the presently pending motion to dismiss. (ECF No. 49).[3]

---

[3] Some months ago, the parties requested the court to defer resolution of this motion while they engaged in settlement discussions, eventually with the assistance of a magistrate judge. The court has been informed that those efforts have ended, unfortunately with no settlement.

## II. Standard of Review

Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). A motion to dismiss pursuant to Rule 12(b)(6) is meant to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Ordinarily, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Nevertheless, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal citations omitted).

In its determination, the court must consider all well-pled allegations in a complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir.

1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). The court need not accept, however, unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Iqbal*, 129 S.Ct. at 1950, or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'" *Iqbal*, 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

The complaint also includes allegations of fraud and mistake, which require a higher showing to survive a motion to dismiss. Rule 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." "Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *Harrison*, 176 F.3d at 784 n.6 (quoting Fed.R.Civ.P. 9(b)). Not

all the claims alleged in the complaint include fraudulent behavior or mistake. Only those claims that require an essential showing of fraud must meet the higher standard of Rule 9(b). *See, e.g., Balt. Cnty. v. Cigna Healthcare*, 238 F.App'x. 914, 921-22 (4th Cir. 2007).

The parties submitted many documents in connection with this motion. Generally, "extrinsic evidence should not be considered at the 12(b)(6) stage." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004). Nevertheless, a court may consider an extrinsic document if "it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity." *Id.* (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). The court may also "take judicial notice of matters of public record." *Sec'y of State For Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). At the same time, oblique references in the complaint to an extrinsic document are not enough to justify considering that document. *In re Acterna Corp. Sec. Litig.*, 378 F.Supp.2d 561, 571 (D.Md. 2005).[4]

---

[4] The volume of exhibits may suggest that this motion be converted into one for summary judgment. Neither party requests conversion and, given the lack of discovery, the court will

## III. Analysis

### A.  Choice of Law

The court must first determine which state's law governs this dispute.  The parties raise this dispute only in arguing over whether the Maryland or Pennsylvania parol evidence rule applies, but the question is actually relevant to all the claims.  The answer is that Maryland law governs.

### 1.  General Choice of Law Principles

In a federal diversity case such as this one, the court must apply the choice of law rules of the forum state, *i.e.*, Maryland.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  In the first instance, Plaintiffs and Defendants disagree on whether Maryland tort or contract choice of law principles apply.

All the claims relate to the validity of the Policies or the scope of their coverage.[5]  The amended complaint, including

---

treat the motion as one under Rule 12(b)(6) and consider *only* materials that fit within one of the above-described categories.

[5]  Because all the claims fall within the same fundamental dispute - a dispute as to the validity of the policy or the meaning of its terms - the court does not need to go issue by issue and determine whether different substantive bodies of law apply. *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 620-21 (2007).  That concept, called dépeçage, is implicated only where "choice-influencing considerations differ as they apply to the different issues." *Id.* at 620 (quoting *Buchanan v. Doe*, 246 Va. 67, 71 (1993)).

the rescission claim, does not state a claim for "fraudulent inducement of an insurance contract" (ECF No. 49-1, at 42), which is an entirely different cause of action. This is a dispute over the interpretation and scope of a contract. Thus, Maryland contract choice of law principles apply. *See, e.g.*, *Hsue Tung v. Peters*, No. AW-09-576, 2009 WL 5206627, at *3 (D.Md. Dec. 23, 2009) (applying Maryland contract choice of law principles in action for rescission).

In contract actions, Maryland courts "apply the substantive law of the place where the contract was made." *Cont'l Cas. Co. v. Kemper Ins. Co.*, 173 Md.App. 542, 548 (2007) (citing *Cooper v. Berkshire Life Ins. Co.*, 148 Md.App. 41, 55 (2002)). "A contract is made in the place where the last act occurs necessary under the rules of offer and acceptance to give the contract a binding effect." *Id.* (quoting *Cooper*, 148 Md.App. at 55). When dealing with an insurance policy, the *locus contractu* "is the state in which the policy is delivered and the premiums are paid." *Id.* (quoting *Aetna Cas. & Sur. Co. v. Souras*, 78 Md.App. 71, 77 (1989)); *see also AXA Equitable Life Ins. Co. v. Anderson*, No. CCB-09-1380, 2010 WL 2302341, at *2 (D.Md. June 4, 2010) (same).

Normally the locations of delivery and payment are easy to determine. Here, however, there is disagreement. Defendants

argue that delivery occurred in Pennsylvania because (1) Plaintiffs delivered the Policies to McKee Risk Management Inc., the insurance producer for the Policies, in Pennsylvania; and (2) Defendants mailed their premium payments to McKee's Pennsylvania location. (ECF No. 49-1, at 34-35). Plaintiffs want discovery to determine where delivery and payment happened. (ECF No. 52, at 27).

## 2. *Renvoi*

The parties disagree over a moot point. Under the doctrine of *renvoi*, Maryland law applies – even assuming that Pennsylvania was the place of delivery and payment under Maryland choice of law principles. Renvoi means that:

> . . . when the forum court's choice-of-law rules would apply the substantive law of a foreign jurisdiction to the case before the forum court, the forum court may apply the whole body of the foreign jurisdiction's substantive law including the foreign jurisdiction's choice-of-law rules. If, in applying renvoi principles, the foreign jurisdiction's conflict of law rules would apply the forum's law, this reference back of the forum to its own laws is called a remission.

*Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 574 (1995) (citations omitted). Maryland courts apply a limited *renvoi* exception to traditional contract choice of law principles and employ Maryland substantive law when two conditions are met:

16

> 1) Maryland has the most significant
> relationship, or, at least, a substantial
> relationship with respect to the contract
> issue presented; and
>
> 2) The state where the contract was entered
> into would not apply its own substantive
> law, but instead would apply Maryland
> substantive law to the issue before the
> court.

*ARTRA Grp.*, 338 Md. at 579.

Here, Maryland has a substantial interest in the litigation given that American Capital maintains its principal place of business in Bethesda, Maryland. (ECF No. 44, Am. Compl. ¶ 10). *Cf*. *Pink v. A.A.A. Highway Express, Inc.*, 314 U.S. 201, 211 (1941) ("The interpretation and legal effect of policies of insurance entered into by the inhabitants of [a state] . . . are peculiarly matters of local concern."). Thus, the only question is whether Pennsylvania would in fact apply Maryland law.

At present, under Pennsylvania choice of law principles, the first step "is to determine whether a conflict exists between the laws of the competing states." *Budtel Assocs., LP v. Cont'l Cas. Co.*, 915 A.2d 640, 643 (Pa.Super. 2006). If no conflict exists, Pennsylvania would apply its own law. That is not the case here, particularly in the context of the rescission claim. In Pennsylvania, the parol evidence rule bars "consideration of prior representations concerning matters covered in the written [integrated] contract, even those alleged

to have been made fraudulently, unless the representations were fraudulently *omitted from the contract."* *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1300 (3[d] Cir. 1996) (citing *HCB Contractors v. Liberty Place Hotel Assoc.*, 539 Pa. 395, 398-99 (1995)). Maryland courts take a more permissive approach:

> [The parol evidence rule's] name has distracted attention . . . from the real issues that are involved which may be any one or more of the following: (1) Have the parties made a contract? (2) Is that contract void or voidable because of illegality, fraud, mistake, or any other reason? (3) Did the parties assent to a particular writing as the complete and accurate integration of that contract? . . . In determining these issues, or any one of them, there is no parol evidence rule to be applied. On these issues, no relevant evidence, whether parol or otherwise is excluded. No written document is sufficient, standing alone, to determine any one of them.

*Whitney v. Halibut, Inc.*, 235 Md. 517, 527 (1964) (citations and quotations omitted). Even when a contract contains an integration clause, Maryland – in contrast to Pennsylvania – allows a party to use parol evidence contradicting express contractual terms where the other party acted fraudulently. *See Greenfeld v. Heckenbach*, 144 Md.App. 108, 132-35 (2002). Pennsylvania's more restrictive rule clashes with the Maryland approach, which creates a genuine conflict.

18

Defendants characterize the present situation as a "false conflict" because they believe that only Pennsylvania has an interest in the application of its law. (ECF No. 54, at 16). Pennsylvania courts have indeed found a false conflict "exists when only one state has an actual interest in applying its law." *3039 B Assocs., Inc. v. Lexington Ins. Co.*, No. 09-1079, 2010 WL 3431623, at *3 (E.D.Pa. Aug. 27, 2010). And admittedly, Pennsylvania has an interest in not allowing contracts created in that state to be sullied by the excessive use of parol evidence. But Maryland has a competing interest in applying its own law because at least one insured, American Capital, has its principal place of business in the state. Maryland may not wish its residents to benefit from the type of misleading or deceitful behavior alleged here. *Cf. Life Partners, Inc. v. Morrison*, 484 F.3d 284, 296 (4th Cir. 2007) (noting that a state has an interest in "ensuring . . . that its residents not defraud insurance companies").

Having established that a genuine conflict exists, a Pennsylvania court would next determine "which state has the greater interest in the application of its law." *Budtel Assocs.*, 915 A.2d at 643. This approach requires the court to "apply the law of the state having the most significant contacts or relationships with the contract and not the underlying tort."

*Nationwide Mut. Ins. Co. v. West*, 807 A.2d 916, 921 (Pa.Super. 2002) (citing *Caputo v. Allstate Ins. Co.*, 495 A.2d 959 (Pa.Super. 1985)).

Pennsylvania determines the most significant relationship using the approach found in the Second Restatement of Conflicts of Laws. *See Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d 223, 233 (3[d] Cir. 2010) (applying Pennsylvania choice of law principles); *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 232 (3[d] Cir. 2007) (same). Section 193 of the Restatement applies specifically to insurance policies and provides that "the principal location of the insured risk" should be the chief consideration. *Id.* at 233. That rule is not especially useful, however, "if the policy covers a group of risks that are scattered throughout two or more states." *Id.* (quoting Restatement (Second) Conflict of Laws § 193 cmt. b). Here, the Policies list a Maryland address for the named insured, American Capital. (*See* ECF No. 49-8, Ex. D, at 4). That might indicate that Maryland is the principal location of the insured risk. *See, e.g.*, *Rouse Co. v. Fed. Ins. Co.*, 991 F.Supp. 460, 463 (D.Md. 1998) (citing inclusion of a company's Maryland address in the insurance contract as evidence of principal location of insured risk). On the other hand, Plaintiffs provided Commercial General Liability Exposure Schedules reflecting that

the Policies covered locations in at least nine different states. (*See* ECF No. 52-4, Ex. 1.2, at 2; ECF No. 52-5, Ex. 1.3, at 2; ECF No. 52-6, Ex. 1.4, at 2). Therefore, Section 193 does not resolve the issue.

When the geographic diversity of the covered risk renders Section 193 "generally inapplicable," Pennsylvania courts look next to the Second Restatement provision governing general contracts, Section 188(2). *Hammersmith*, 480 F.3d at 233. That provision lists five relevant contacts: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* When applying these factors, the court does not undertake "[a] simple tally of the contacts . . . because an undifferentiated application of the formula to all situations would yield unjust results in too many circumstances." *United Brass Works v. Am. Guarantee & Liab. Ins. Co.*, 819 F.Supp. 465, 470 (W.D.Pa. 1992).

Just as in Maryland, "[t]he place of making an insurance contract is the place of delivery, where delivery is the last essential act." *Crawford v. Manhattan Life Ins. Co. of New York*, 221 A.2d 877, 880 (Pa.Super. 1966). Again, Defendants

contend delivery occurred in Pennsylvania because the Policies were delivered to their "producer," McKee, in that state. Yet under Pennsylvania law, if a company sends a policy to its agent for delivery to the insured, the place of delivery is the place where the *insured* receives the policy, not the agent. *Crawford*, 22 A.2d at 881. Even if this were not the case, a Pennsylvania court might presume delivery occurred at the residence of the insured – in Maryland – given the murky state of the facts concerning delivery at this time. *Hammersmith*, 480 F.3d at 233. Regardless, this factor weighs in favor of Maryland law.

The parties did not submit any evidence concerning the place of negotiation. This factor weighs in favor of neither Maryland nor Pennsylvania law.

The third factor, the place of performance, looks to where the policyholder paid premiums to the insurer. *Specialty Surfaces*, 609 F.3d at 233. In the case of promises to indemnify and defend, a court might also consider where the insurer's duty would arise, *i.e.*, where the underlying litigation is taking place. *Id.* Again, this factor is unhelpful. The best evidence available regarding payment indicates that American Capital made payment from some unspecified location (perhaps Maryland, perhaps Pennsylvania, or perhaps somewhere else entirely), to the producer (in Pennsylvania), who then forwarded payment to

Plaintiffs (in Connecticut). (ECF No. 23 ¶ 81). As for the underlying litigation, the heparin lawsuits arose all over the country, with many of them currently being handled in a multidistrict litigation proceeding in the U.S. District Court for the Northern District of Ohio. *See In re Heparin Prods. Liab. Litig.*, No. 1:08-hc-60000-JGC (N.D.Ohio filed June 6, 2008). None of these facts point to Pennsylvania or Maryland as the more appropriate forum.

The location of the subject matter looks to the principal place of insured risk. As has already been explained, the risk is spread over a broad geographic area. Therefore, "this factor is neutral." *Hammersmith*, 480 F.3d at 234.

As to the parties' locations, only the producer of the Policies (McKee) and one of the potential additional insureds (SMG) are located in Pennsylvania. (ECF No. 32 ¶¶ 20, 23, 25, 26; ECF No. 44, Am. Compl. ¶ 12). Both Plaintiffs are incorporated in Connecticut and have their principal places of business there. (ECF No. 44, Am. Compl. ¶¶ 8-9). SPL is a Delaware limited liability company with a principal place of business in Wisconsin. (*Id.* ¶ 11). American Capital is incorporated in Delaware and has a principal place of business in Maryland. (*Id.* ¶ 10). Given that the central parties to the Policies (*i.e.*, the named insured and the insurers) are from

23

Maryland and Connecticut, this factor suggests Maryland law should apply over Pennsylvania law. *See Gen. Star Nat'l Ins. Co. v. Liberty Mut. Ins. Co.*, 960 F.2d 377, 379 (3[d] Cir. 1992) (applying Pennsylvania choice of law principles and finding that Pennsylvania would have "little interest" in protecting an insured from another state by means of regulating the conduct of an insurer from another state).

Taking all these factors together, a Pennsylvania court would apply Maryland law. Under Pennsylvania choice of law, the place of contracting took place in Maryland. That, combined with the presence in this state of the only named insured listed in the Policies, reflects that Maryland has the more substantial interest in applying its law. The matter would be remitted to Maryland; Maryland law therefore applies.

**B.   Rescission**

Plaintiffs seek to rescind the Policies because Defendants allegedly made a variety of misrepresentations in procuring them. Defendants seek to dismiss this claim on three bases: (1) the parol evidence rule bars claims that rely on extra-contractual representations; (2) the separation of insureds clause bars any rescission against SPL; and (3) Plaintiffs have inadequately pled promptness. (*See* ECF No. 49-1).

### 1.  The Parol Evidence Rule

Defendants contend that the parol evidence rule bars Plaintiffs' claim for rescission, which Defendants suggest is based on pre-contractual statements or agreements.  (ECF No. 49-1, at 33-51).  Defendants read a "Changes" provision in the Policies as a merger/integration clause that forecloses any consideration of pre-contractual representations absent evidence of fraud.[6]  (ECF No. 49-1, at 44).  They maintain that Plaintiffs' claims fail because they do not establish fraud.

### a.  The Relevance of the Parol Evidence Rule

Contrary to Defendants' protestations, the parol evidence rule is irrelevant in this context.  Maryland courts have held that parol evidence may "be used to contravene the legal existence of a contract" because the application of the parol evidence rule "presupposes the existence of a legally effective written agreement."  *Cochran v. Norkunas*, 398 Md. 1, 15 n.6 (2007) (citing cases).  Plaintiffs seek to rescind the policy as *void ab initio* because of Defendants' purported misrepresentations.  *See Mut. Benefit Ins. Co. v. Lawrence*, 189 F.Supp.2d 298, 302 (D.Md. 2002) ("[I]nsurance policies may be

---

[6]  The "Changes" provision reads:  "This policy contains all the agreements between you and us concerning the insurance afforded." (*See, e.g.*, ECF No. 52-19, at 9; ECF No. 52-20, at 17).

voided *ab initio* when an insurer issued a policy in reliance on a material misrepresentation in the application.") (quoting *Fitzgerald v. Franklin Life Ins. Co.*, 465 F.Supp. 527, 534 (D.Md. 1979)); *accord Bryant v. Provident Life & Accident Ins. Co.*, 22 F.Supp.2d 495, 497 (D.Md. 1998). "A void contract 'is not a contract at all.'" *Julian v. Bounassissi*, 414 Md. 641, 666 (2010) (quoting Restatement (Second) of Contracts § 7). A contract that never came into existence cannot implicate the parol evidence rule. *Tricat Indus., Inc. v. Harper*, 131 Md.App. 89, 108, (2000) ("Parol evidence is admissible, therefore, to show that a writing never became effective as a contract."); *see also Kronenberg v. Katz*, 872 A.2d 568, 592 n.45 (Del.Ch. 2004) (listing "learned authorities" in agreement).

The existence of a merger/integration clause in each of the Policies does not change the outcome. As the Maryland Court of Special Appeals explained:

> Notwithstanding that a writing appears to be a complete integration of the terms of an agreement between the parties, "parol evidence" is admissible to prove that the writing was executed for another reason altogether, and therefore lacked legal effect. Indeed, in that circumstance, the evidence in question is not "parol evidence." It is not being offered to vary the terms of an integrated writing. Rather, it is being offered to show that the writing does not constitute a contract at all.

26

*Catholic Univ. of Am. v. Bragunier Masonry Contractors, Inc.*,
139 Md.App. 277, 300 (2001) (citations omitted). In other
words, if a contract carries no legal effect from the start, a
court should treat the integration clause included within the
contract as equally worthless.

> **b.    The *Creamer* Approach**

Defendants raise one case that might suggest that the parol
evidence rule is relevant. In *Creamer v. Helferstay*, 294 Md.
107, 118 (1982), the Court of Appeals of Maryland held that
"[t]he parol evidence rule precludes the granting of relief for
unintentional representations preceding the contract which
conflict with the terms of the contract." Thus, under the
*Creamer* approach, a party seeking rescission based on a
misrepresentation must establish that (1) the representation
involved "fraud or other intentional culpable conduct" or (2)
the representation does not contradict the terms of the
contract. *Id.* at 117.

Even if the *Creamer* approach is relevant in an action
alleging that an integrated insurance contract is void *ab
initio*,[7] Plaintiffs have sufficiently alleged that Defendants'

---

[7]    *Creamer* is not an insurance case. Thus, its
reluctance to allow parol evidence may have been animated by its
unwillingness to expand what is, at least outside the insurance

misrepresentations were fraudulent. A fraudulent misrepresentation encompasses five elements: (1) "a false representation was made," (2) "its falsity was either known to the maker or . . . the representation was made with such reckless indifference to the truth as to be equivalent to actual knowledge of falsity," (3) "the representation was made for the purpose of defrauding the plaintiff," (4) "the plaintiff not only relied on the representation but had a right to rely on it and would not have done the thing from which the injury arose had the misrepresentation not been made," and (5) "the plaintiff actually suffered damage directly resulting from the misrepresentation." *Swinson v. Lords Landing Vill. Condo.*, 360 Md. 462, 476 (2000). Defendants maintain that Plaintiffs' amended complaint fails to plead facts establishing when a false representation was made (and how it was false), how Plaintiffs relied upon those representations, and that the false misrepresentations were intentionally made. The first amended complaint states facts adequate to establish each of the three contested elements.

---

context, "somewhat extraordinary relief." *Ryan v. Brady*, 34 Md.App. 41, 49 (1976).

First, the amended complaint adequately pleads when and how the alleged misrepresentations were made.[8] A plaintiff must specify "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Keeney v. Larkin*, 306 F.Supp.2d 522, 527 (D.Md. 2003) (quoting *Harrison*, 176 F.3d at 784). But the rule does not "require[] [Plaintiffs] to plead 'detailed evidentiary matter' in order to survive a motion to dismiss." *Keeney*, 306 F.Supp.2d at 528. Instead, "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784.

The first amended complaint makes Defendants aware of the "particular circumstances" constituting the alleged fraud. In a section of the first amended complaint titled "False Representations by American Capital," Plaintiffs outline each alleged misrepresentation. The first amended complaint provides

---

[8] Although Defendants characterize this question as a "reliance" issue, it really goes towards the first element of the elements of fraud: establishing that a fraudulent misrepresentation was made.

dates, points to relevant documents, and specifies the particular answers that are purportedly false. (*See, e.g.*, ECF No. 44, Am. Compl. ¶¶ 34, 37, 40, 43, 46, 49, 52, 55, 58). *See also, e.g.*, *supra* Part I.A.3. The first amended complaint provides that American Capital made each of these representations. And the first amended complaint provides the particular pre-discovery facts that, if true, would render the representations false.[9] (*See, e.g.*, ECF No. 44, Am. Compl. ¶¶ 33, 37, 40, 43, 46, 49, 52, 55); *see also, e.g.*, *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 295 (2[d] Cir. 2010) (finding falsity where facts established that "no reasonable interpretation of the question" could lead the insured to conclude that it answer provided was complete and truthful). Such allegations are enough. *See, e.g.*, *Giannaris v. Cheng*, 219 F.Supp.2d 687, 695 (D.Md. 2002) (finding complaint sufficiently pled fraudulent misrepresentation where descriptions placed defendants on notice

---

[9]    Defendants contend in their reply brief that Plaintiffs "fail to allege any facts . . . which, if credited, would establish that any statement in the '2006 application' was a false misrepresentation of [American Capital's] understanding as to any matter there in." (ECF No. 54, at 12). Because Defendants raised this falsity argument only on reply, the court will not consider it. *Cf. Hunt v. Nuth*, 57 F.3d 1327, 1338 (4th Cir. 1995). Regardless, the above discussion makes clear that Defendants' argument on this point is wrong.

of the subject of dispute, even where complaint did not include "actual quotations or precise details").

Second, the first amended complaint adequately pleads reliance. The complaint states that Plaintiffs relied on Defendants' representations to calculate "liability exposures and the scope of the insurance [American Capital] allegedly sought." (ECF No. 44, Am. Compl. ¶¶ 2, 3). The first amended complaint also explains what would have happened had American Capital made accurate representations:

> If American Capital had provided truthful information that it had subsidiaries and/or that it sought coverage for other entities, or had disclosed any of the other matters identified above, Charter Oak and Travelers would not have issued insurance to American Capital, would have charged significantly greater premiums to American Capital, and/or have issued insurance on terms that foreclosed coverage for liability relating to other entities.

(*Id.* ¶ 86). The amended complaint states outright that Plaintiffs relied on the alleged misrepresentations.[10] (*Id.* ¶ 119 ("American Capital's misrepresentations, concealments, omissions, and otherwise false presentation of material facts to

---

[10]    The language of the Policies supports that allegation. The Polices contain a "Representations" clause that states that Plaintiffs "issued this policy in reliance upon [American Capital's] representations." (*See, e.g.*, ECF No. 52-19, at 94; ECF No. 52-20, at 19).

Charter Oak and Travelers . . . were relied upon by Charter Oak and Travelers.")). It is axiomatic that an insurance company relies on statements made during the application process to determine the scope and nature of coverage.

Defendants cite several pieces of extraneous evidence in an attempt to show that Plaintiffs' reliance on the insurance applications was unjustified or otherwise implausible. For example, Plaintiffs cite an affidavit from a risk evaluator for Plaintiffs, the signature lines of various policy applications, certain missing application forms, American Capital's website, and "Answers.com." (ECF No. 49-1, at 48-50; ECF No. 54, at 28). This is a motion to dismiss, not a motion for summary judgment. As such, it is not appropriate to wrestle with these types of factual issues at this stage.

Third, and finally, the complaint pleads facts establishing intent. Plaintiffs' complaint alleges that Defendants' misrepresentations were intentional. (ECF No. 44, Am. Compl. ¶¶ 2, 4, 84, 118). They support this allegation by pleading a course of conduct in which American Capital repeatedly and consistently concealed its subsidiary obligations, even in response to specific inquiries from Plaintiffs. "[A] legal inference of fraud is permissible from the conduct of the parties." *Fuller v. Horvath*, 42 Md.App. 671, 685 (1979); *see*

*also Garcia v. Foulger Pratt Dev., Inc.*, 155 Md.App. 634, 685 (2003) ("Malice, fraud, deceit and wrongful motive are oftenest inferred from acts and circumstantial evidence. They are seldom admitted and need not be proved by direct evidence." (quotations omitted)). Given the repeated misrepresentations Defendants allegedly made and the vast array of information they allegedly omitted, one could infer that something more than an innocent mistake or misunderstanding was afoot. This is particularly so when the named insured, American Capital, is a sophisticated party that likely understands that even an innocent misrepresentation in an application can invalidate an insurance policy *in toto*. *Jackson v. Hartford Life & Annuity Ins. Co.*, 201 F.Supp.2d 506, 512 (D.Md. 2002) (stating principal that material misrepresentations in applications void insurance policies, even when made in good faith). Moreover, the intended result from such representations would be obvious: American Capital would pay lower premiums because its disclosed risk exposure would be smaller.

### 2. The "Separation of Insureds" Clause

Defendants and Plaintiffs both argue at great length about the effect of a "separation of insureds clause" in the

Policies.[11]  Defendants argue that, even if one assumes that American Capital made actionable misrepresentations, the separation of insureds clause bars rescission against SPL because it did not itself make any misrepresentations.  (ECF No. 45-1, at 53).  Plaintiffs respond that the clause was only meant to clarify that the term "insured" as used in an exclusion means the insured claiming coverage.  (ECF No. 52, at 44).

The parties' long discussion on this issue is perplexing, given that the amended complaint does not actually assert a claim for rescission against SPL.  The amended complaint only states that "Charter Oak and Travelers are entitled to rescission of the insurance contracts *with American Capital*." (ECF No. 44, Am. Compl. ¶ 121 (emphasis added)).  The effect of any such rescission – particularly on parties other than American Capital – is therefore not an issue properly addressed

_____

[11]  A severability clause is "[a] provision that keeps the remaining provisions of a contract . . . in force if any provision of that contract . . . is judicially declared void." *Black's Law Dictionary* (8th ed. 2004).  In the insurance context, "[t]he purpose of severability clauses is to treat each entity covered under the policy as if each were insured separately." *St. Katherine Ins. Co. Ltd. v. Ins. Co. of N. Am., Inc.*, 11 F.3d 707, 710 (7th Cir. 1993); *accord Litz v. State Farm Fire & Cas. Co.*, 346 Md. 217, 229 (1997).  The clause in this case reads, in relevant part: "Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the First Named Insured, this insurance applies . . . [s]eparately to each insured against whom claim is made or "suit" brought." (*See, e.g.*, ECF No. 52-19, at 94).

at this stage, when a rescission claim against SPL is nowhere to be found in the first amended complaint.

### 3. Promptness

Defendants further maintain that Plaintiffs did not act promptly in enforcing their rescission claim. (ECF No. 49-1, at 51-53). According to Defendants, the contradictions found in the 2006 insurance application should have placed Plaintiffs on notice of the misrepresentation. (*Id.*). Moreover, Defendants contend that Plaintiffs "repeated[ly] affirm[ed] . . . the parties' respective duties owing under the Policies." (*Id.*).

Plaintiffs characterize this as an attempt to invoke the doctrines of waiver and ratification. Waiver and ratification are both affirmative defenses.[12] *Attorney Grievance Comm'n of Maryland v. Siskind*, 401 Md. 41, 65 (2007); *W.A.K. ex rel Karo v. Wachovia Bank, N.A.*, No. 3:09CV575-HEH, 2009 WL 3669721, at *1 (E.D.Va. Nov. 9, 2009). As such, the burden of pleading and establishing either of them rests on the defendant. *McNeill v. Polk*, 476 F.3d 206, 220 n.3 (4th Cir. 2007). Typically, a determination that "promptness" is an affirmative defense rather

---

[12] "Waiver connotes the voluntary relinquishment of a known right." *Souter v. State Mut. Life Assurance Co.*, 273 F.2d 921, 925 n.6 (4th Cir. 1960). Ratification in this case refers to "[a] person's binding adoption of an act already completed but . . . not done in a way that originally produced a legal obligation." *Black's Law Dictionary* (8th ed. 2004).

35

than an element of Plaintiffs' case would sound the death knell for the argument, as the Fourth Circuit has cautioned that affirmative defenses are rarely appropriate to consider at this stage in the case:

> [A] motion to dismiss filed under Federal Rule of Procedure 12(b)(6). . . generally cannot reach the merits of an affirmative defense . . . But in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6). This principle only applies, however, if all facts necessary to the affirmative defense *"clearly appear[] on the face of the complaint."*

*Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)).

In this case, however, promptness is not an affirmative defense and is in fact an element of any claim for rescission:

> [I]n the general area of rescission it appears that the requirement of prompt action is an element of the plaintiff's case, and the burden is upon the rescinding party to show that he acted promptly in seeking rescission. The basis for placing this burden upon the rescinder is not addressed to the issue of liability, but stems from the drastic nature of the relief sought by the plaintiff, and it should be borne in mind that, failing rescission, the avenue of damages is still open to him.

*Johns Hopkins Univ. v. Hutton*, 488 F.2d 912, 916 (4th Cir. 1973);

*accord Finch v. Hughes Aircraft Co.*, 57 Md.App. 190, 244 (1984)

("A plaintiff seeking rescission must demonstrate that he acted

promptly after discovery of the ground for rescission.").

The facts alleged do not categorically demonstrate that

Plaintiffs were placed on notice of the purported

misrepresentations by contradictions in the 2006 application, in

part because the first amended complaint does not plead any

facts explaining when Plaintiffs actually did become aware of

Defendants' purported misrepresentations. Lacking any

allegation of when Plaintiffs discovered the facts underlying

their claim, the court cannot determine if Plaintiffs have

alleged that they acted promptly. It is also impossible to

assess whether Defendants suffered any prejudice from any delay.

*Benjamin v. Erk*, 138 Md.App. 459, 483 (2001) (stating promptness

"is determined, in large part, by whether the period has been

long enough to result in prejudice." (quoting *Cutler v. Sugarman

Org., Ltd.*, 88 Md.App. 567, 578 (1991)).[13]

In short, Plaintiffs have not alleged that they acted with

the requisite degree of promptness. Therefore, Plaintiffs'

---

[13]     Defendants cite a variety of communications that they
contend establish Plaintiffs' failure to rescind promptly.  It
would be inappropriate to consider these items on a motion to
dismiss.

rescission claim against American Capital will be dismissed. However, the dismissal will be without prejudice to American Capital's right to file a second amended complaint within 21 days that includes facts showing prompt action.

### C.  Reformation

Plaintiffs' first amended complaint alternatively requests reformation based upon either mutual mistake or unilateral mistake.  (ECF No. 44 ¶¶ 122-32).  According to Defendants, these claims fail for three reasons.  (ECF No. 49-1, at 31-33). First, the first amended complaint does not show that Plaintiffs ever expressed their subjective intentions concerning the agreement.  Second, the mistake claim is implausible because Plaintiffs priced a loss limit for $2 million in products liability coverage.  Third, the complaint does not explain how Plaintiffs took prompt action to correct the mistake.

As the Court of Appeals of Maryland has explained:

> Insurance policies are no different from any other contract when the rules of law governing the reformation of written agreements are to be applied.  To justify the reformation of an insurance policy . . . it is necessary that it appear, by appropriate proof, that a valid agreement exists, and that by reason of fraud, or by mutual mistake on the part of both parties to the agreement, it does not conform to the actual agreement of the parties.

*Am. Cas. Co. of Reading, Pa. v. Ricas*, 179 Md. 627, 634 (1941); *see also Julian,* 414 Md. at 667 n.15 ("[W]hen a competent person signs a contract or disposes of his or her property in the absence of fraud, misrepresentation, mistake, undue influence, or fiduciary relations, the contract will be enforced."). Thus, Plaintiffs must establish either mutual mistake or unilateral mistake paired with wrongdoing, such as fraud, to obtain reformation. A contractual party has no right to reformation merely because he discovers he has made a bad deal. *Jaguar Land Rover N. Am., LLC v. Manhattan Imported Cars, Inc.*, 738 F.Supp.2d 640, 650 (D.Md. 2010).

Mutual mistake occurs "'where there has been a meeting of the minds [] and an agreement actually entered into, but the instrument, in its written form, does not express what was intended by the parties thereto.'" *Kishter v. Seven Courts Cmty. Ass'n, Inc.*, 96 Md.App. 636, 640 (1993) (quoting *Moyer v. Title Guarantee Co.*, 227 Md. 499, 505 (1962)); *accord Cross v. Bragg*, 329 F.App'x 443, 454 (4th Cir. 2009). In this case, the first amended complaint pleads sufficient facts showing that the parties reached a prior agreement that did not include coverage for SPL or SMG. American Capital purportedly represented that it did not have any subsidiaries, provided loss summaries only for American Capital itself, and listed only American Capital

exposures (classified as "office") in the Commercial General Liability Exposure Schedules it provided. (ECF No. 44, Am. Compl. ¶¶ 34, 40-42, 61-75). One might plausibly infer from these actions that American Capital had only itself in mind when it sought coverage. On the other side of the transaction, Plaintiffs allegedly did not charge American Capital a higher premium to account for the increased risks of American Capital's subsidiary businesses.[14] (*Id.* ¶¶ 3, 86). Even if the complaint does not specifically describe instances wherein Plaintiffs expressed their intentions with words, the complaint still contains sufficient facts to support an inference that the parties held a common understanding of what the insurance contract was meant to encompass that was different from the understanding memorialized in the Policies. *See, e.g.*, *Fidelity & Guar. Ins. Co. v. Global Techs., Ltd.*, 117 F.Supp.2d 911, 914-18 (D.Minn. 2000) (reforming insurance policy where lower premiums and insureds' submissions evidenced no intent to

---

[14] Certainly, there is also evidence that rebuts such an inference, such as the fact that Plaintiffs purportedly "priced a loss limit for the 'Products-Completed Operations' hazard." (ECF No. 49-1, at 39). The mere existence of some contrary facts, however, does not render a claim implausible. This is especially so on a motion to dismiss. After all, not even on a motion for summary judgment is a court allowed to resolve conflicts in the evidence. *TFWS, Inc. v. Schaefer*, 325 F.3d 234, 241 (2003) (citations and quotations omitted).

provide additional coverage erroneously included in policy); *Twin City Fire Ins. Co. v. Pittsburgh Corning Corp.*, 813 F.Supp. 1147, 1150 (W.D.Pa. 1992) (same).[15]

The fact that the Policies included Stipulated Forms Schedules does not change the outcome, at least at this stage.[16] (ECF No. 49-1, at 39). Stipulations may be set aside on the same grounds as other contracts. *See, e.g.*, *C&K Lord, Inc. v. Carter*, 74 Md.App. 68, 94 (1988) ("A stipulation has all the binding force of a contract. It will not be set aside absent a showing of good cause such as collusion, fraud, mutual mistake or other grounds that would justify the setting aside of a contract."). If an integrated agreement may be reformed on the basis of mutual mistake, *Annapolis Mall Ltd. P'ship v. Yogurt Tree of Annapolis, Inc.*, 299 Md. 244, 252 (1984), a stipulation can be as well.

The fact that the mistake was repeated in all six of the Policies also does not preclude reformation. (ECF No. 49-1, at 39). The reality is that insurance policies are often renewed

_____

[15] Moreover, Plaintiffs have adequately pled unilateral mistake in the alternative.

[16] The Stipulated Forms Schedules may later prove to be persuasive evidence on the issue of whether there truly was mutual mistake, but the court does not evaluate the evidence at the motion to dismiss stage.

from policy period to policy period on the same terms using standard forms, and parties seem to fail on occasion to review every term of a policy when renewing it. Perhaps for that reason, courts have allowed reformation even where the mistake is repeated. *See, e.g.*, *Caliber One Indem. Co. v. Wade Cook Fin. Corp.*, 491 F.3d 1079, 1083 (9th Cir. 2007) (reforming policy on grounds of mutual mistake where mistake was "unwittingly repeated" in a second policy period); *Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 759 (1993) ("[The policyholder] relies on the fact of the repetition of the alleged mistake to argue that one must infer that there was no mistake. Such an inference is not warranted as a basis for concluding that there is a dispute of material fact as to [the insurer]'s intention."); *see also Byerley v. Odd Fellows' Home of Oregon*, 149 Or. 665, 669 (1935) ("It matters not where the mistake originated, or how often it is reiterated.").

Finally, Defendants suggest that the reformation claims must be dismissed because Plaintiffs failed to rectify the mistake in a timely fashion. (ECF No. 49-1, at 39-41). Defendants are correct that "[t]he universally recognized rule is that the application for the reformation of a written instrument must be made promptly and that time runs from the discovery of the mistake." *White v. Shaffer*, 130 Md. 351, 351

(1917).  But unlike the rescission claim, promptness is not a *prima facie* element of Plaintiffs' reformation claim.  Rather, this argument relies in substance on affirmative defenses of waiver, laches, and ratification.  As such, Defendants bear the burden of showing that the facts necessary to establish the defense "clearly appear on the face of the complaint."  *Goodman*, 494 F.3d at 464.

There is no suggestion on the face of the complaint that Plaintiffs waived their claims or ratified Defendants' understanding of the Policies.  *See Keeler v. Mayor & City Council of Cumberland*, 928 F.Supp. 591, 594 (D.Md. 1996) ("The complaint cannot be dismissed on the basis of the affirmative defense of waiver, however, when the issue is the legal sufficiency of the plaintiffs' complaint.").  In short, it cannot be said as a matter of law that Plaintiffs waited too long to advance this claim.  Plaintiffs' reformation claims based on mutual and unilateral claims will not be dismissed.

### D.  Declaratory Judgment on the Duty to Defend

Finally, Defendants move to dismiss Plaintiffs' request for declaratory judgment as to the duty defend in four suits they dub the "Representative Suits."[17]  (ECF No. 49-1, at 54-57).  In

---

[17]  The four suits are *Best v. Baxter Healthcare Corp.*, No. 1:09-hc-60042-JGC, MDL Docket No. 1953 (N.D.Ohio); *Heard v.*

addition to dismissal, Defendants also ask that the court declare, as a matter of law, that "the June 2007 Primary Policy requires Charter Oak to fund a defense of the Representative Suits." (ECF No. 49-2, at 1-2). Defendants plan to use this declaration to establish the "'law of the case' as to some or all of the remaining complaints." (ECF No. 49-1, at 4).

In substance, Defendants have asked for their own declaratory judgment on the duty to defend. Judge Blake recently explained the nature of the duty to defend under Maryland law:

> The promise to defend and indemnify the insured is the consideration received by the insured for payment of the policy premiums. In Maryland, the duty to defend is broader than the duty to indemnify. Whereas a company has a duty to defend its insured for all claims that are potentially covered under an insurance contract, the duty to indemnify, *i.e.*, pay a judgment, attaches only upon liability.

*Penn. Nat'l Mut. Cas. Ins. Co. v. City Homes, Inc.,* 719 F.Supp.2d 605, 611-12 (D.Md. 2010) (quotations and internal citations omitted). To determine whether an insurer has a duty to defend a particular case, Maryland courts ordinarily ask two

---

*Baxter Healthcare Corp.*, No. 1:08-hc-60049-JGC, MDL Docket No. 1953 (N.D.Ohio); *Vincent v. Baxter Healthcare Corp.*, No. 1:09-hc-60001-JGC, MDL Docket No. 1953 (N.D.Ohio); and *Glass v. Baxter Int'l*, No. 1:08-hc-60023-JGC, MDL Docket No. 1953 (N.D.Ohio).

questions: "(1) [W]hat is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) [D]o the allegations in the tort action potentially bring the tort claim within the policy's coverage?" *St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187, 193 (1981). While the first question focuses on the "language and requirements of the policy," the second question depends on the allegations in the underlying tort suit. *Id.* Any doubt as to whether the insurer owes a duty to defend should be resolved against the insurer. *Chendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 390 Md. 449, 460 (2006); *accord Litz*, 346 Md. at 231.

Now is not the appropriate time to resolve the duty to defend issue. A district court possesses "broad discretion" in determining how to handle a claim for declaratory judgment. *S. Carolina Dep't of Health & Envtl. Control v. Commerce & Indus. Ins. Co.*, 372 F.3d 245, 260 (4th Cir. 2004). An attempt to determine the duty to defend at this time would be frustrated by a host of complications. *See, e.g.*, *Cloverleaf Enters., Inc. v. Maryland Thoroughbred, Horsemen's Assoc., Inc.*, 730 F.Supp.2d 451, 469 (D.Md. 2010) (concluding "[i]t would be premature to dismiss [a] declaratory judgment count" where the "status of the

contract is unclear"). The Policies might be declared void.[18] If the Policies are not void, their terms may nevertheless change if Plaintiffs succeed on their reformation claim. Defendants might have breached the policies by settling with Baxter. At least one exclusion, the joint venture exclusion, may apply. And it is not even clear at this point whether SPL is an insured under these policies.

Thus, an early declaration would not "serve a useful purpose in clarifying and settling the legal relations in issue, and . . . terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Penn-America Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir. 2004). "Moreover, when the claims for which declaratory relief are requested are so closely intertwined with the nondeclaratory claims, 'judicial economy counsels against dismissing the claims for declaratory judgment relief while adjudicating' the nondeclaratory claims." *Great Am. Ins. Co. v. Gross*, 468 F.3d 199, 210 (4th Cir. 2006) (quoting *Chase Brexton Health Servs., Inc. v. Maryland*, 411 F.3d 457, 466-67 (4th Cir. 2005)). Because later relief could upset any declaration on the duty to defend

---

[18]    Although the court has dismissed the claim for rescission without prejudice, there is a probability that the claim will reappear.

made now, granting Defendants' requested relief also would ignore the mandate that discretionary judgments should "not be exercised to try a case piecemeal," *Doby v. Brown*, 232 F.2d 504, 506 (4th Cir. 1956).

Although it does not provide the binding authority on this issue, the Court of Appeals of Maryland has eloquently stated an additional reason why courts should not dismiss a declaratory judgment claim at an early stage:

> Where a bill of complaint shows a subject matter that is within the contemplation of the relief afforded by the declaratory decree statute, and it states sufficient facts to show the existence of the subject matter and the dispute with reference thereto, upon which the court may exercise its declaratory power, it is immaterial that the ultimate ruling may be unfavorable to the plaintiff. The test of the sufficiency of the bill is not whether it shows that the plaintiff is entitled to the declaration of rights or interest in accordance with his theory, but whether he is entitled to a declaration at all; so, even though the plaintiff may be on the losing side of the dispute, if he states the existence of a controversy which should be settled, he states a cause of suit for a declaratory decree.

*120 West Fayette St., LLLP v. Mayor & City Council of Baltimore City*, 413 Md. 309, 356 (2010) (citations and quotations omitted)). The court will deny Defendants' motion to dismiss the declaratory judgment claim and will make no declaration at

this time concerning Plaintiffs' duty to defend the Representative (or any other) Suits.

## IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss the first amended complaint will be granted in part and denied in part. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
