IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

------------------------------------------------------------------
                                            )
The Charter Oak Fire Insurance Company,     )
et al.,                                     )
                                            )
          Plaintiffs/Counter-defendants,    )
                                            )
          v.                                )          Civ. No.:  8:09-CV-0100-DKC
                                            )
American Capital, Ltd., et al.,             )
                                            )
          Defendants/Counter-claimants.     )
                                            )
------------------------------------------------------------------

**DEFENDANTS' REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF RULE 12(B)(6)
MOTION TO PARTIALLY DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT**

Plaintiffs certainly did not need an answering brief numbering more than 20 pages simply to identify an allegation – *any allegation* – in the Second Amended Complaint ("SAC") giving the date when they first concluded that the alleged representation that American Capital had "no subsidiaries as of June 2006" was false.  If such an allegation could actually be found in the SAC, Plaintiffs could have accomplished that task in a single page that simply provided the numeral of the paragraph making that disclosure.  In fact, the only "discovery date" referenced in the SAC is "December 2008," but that is *not* given as the date when Plaintiffs concluded that American Capital had made any statement of fact that was false.  Rather, that is the date given for when Plaintiffs allegedly "came to believe . . . that American Capital *might seek coverage* [for] portfolio companies."  That "discovery," under the theory of the SAC, was Plaintiffs' trigger for  bringing its "mutual mistake" *reformation* claim, which is premised on the notion that American Capital had entered into, and would abide by, a "prior agreement" that American

Capital would "not seek" coverage of claims against any company besides American Capital itself.

Plaintiffs' *rescission* claim, however, is premised on their admittedly "alternative" theory that if, as American Capital alleges, the "prior agreement" neither exists nor trumps the actual terms of the policies – some of which, at least, undisputedly promise coverage to American Capital's "subsidiaries" and non-subsidiary portfolio companies in which American Capital holds an economic "majority interest" – those policies should be "rescinded" on the basis that they were induced by a "false representation" of fact.  While the SAC alleges that as of the 2011 date of the SAC, Plaintiffs had concluded that multiple "false representations" had been made prior to January 2009, the SAC does *not* allege when Plaintiffs discovered the *first* of those alleged rescission-entitling misrepresentations.  Plaintiffs also do not dispute that in their original complaint, filed in January 2009, they claimed rescission based on only one *pre-contract* representation that they had concluded, as of that date, to be false, namely, the checkmark in the "June 2006" "application" indicating that American Capital had "no subsidiaries" as of June 2006.   Nor do Plaintiffs deny in their answering papers that the "no subsidiaries" misrepresentation was the only pre-contract misrepresentation that Plaintiffs had discovered as of January 2009 – just as Plaintiffs alleged was the case in their original complaint.

Thus, to answer the question of when Plaintiffs *first* learned of a misrepresentation that allegedly entitles Plaintiffs to rescission, Plaintiffs' SAC needed to state how long before they sued for rescission in January 2009 that they concluded *that American Capital was not subsidiary-free in June 2006*.   Because Plaintiffs have failed to meet the pleading burden imposed by this Court (and others) to affirmatively allege when they first learned of any rescission-entitling misrepresentation, Plaintiffs' rescission claim must be dismissed, with prejudice.

**ARGUMENT**

Plaintiffs do not dispute the numerous authorities Defendants cited to support the principle of law that there should be no further opportunities to re-plead after a party has failed to meet prior re-pleading mandates.  Opening Br.[1] at 9 (citing Supreme Court, Fourth Circuit, U.S. District Court (Maryland) and other federal cases supporting this proposition).  Instead, Plaintiffs elect, as they must, to agree that their rescission claim must survive or fail strictly on the basis of whether the SAC cures the prompt action deficiency previously identified by the Court.

On that basis, Plaintiffs' rescission claim plainly fails.

**I.      THE NEWLY-ADDED ALLEGATIONS IN THE SAC FAIL TO DISCLOSE WHEN PLAINTIFFS FIRST LEARNED OF AN ALLEGEDLY RESCISSION-ENTITLING MISREPRESENTATION**

While Plaintiffs' January 2009 complaint alleged their discovery of only one contract-inducing misrepresentation made prior to Plaintiffs' issuance of the insurance policies – that American Capital had "no subsidiaries" as of June 2006 – the SAC is silent as to *how long before January 2009* Plaintiffs made this discovery.  And, if Plaintiffs discovered any other misrepresentations prior to January 2009, the SAC, like the January 2009 complaint before it, stands mute on that issue.

The SAC's newly-added allegations relate to Plaintiffs' "discovery" in late 2008 that American Capital might make a *claim for coverage* under the policies for lawsuits against American Capital and two (non-subsidiary) "portfolio companies" of American Capital, SPL and SMG.  As Plaintiffs do not dispute, the new allegations fail to aver that Plaintiffs concluded in late 2008 that American Capital *had subsidiaries* as of (or even after) June 2006.  As the SAC judicially admits, all that Plaintiffs concluded on the subject of the nature of American Capital's

---

[1] "Opening Br." refers to Defendants' Memorandum of Law in Support of Rule 12(b)(6) Motion to Partially Dismiss Plaintiffs' Second Amended Complaint (ECF No. 72-1).

corporate affiliations was that SPL and SMG were *not* subsidiaries of American Capital, as American Capital has always acknowledged.[2]

Plaintiffs do not dispute that the newly-added allegations aim to establish that Plaintiffs' *reformation* claim was brought "promptly."  Nor do they dispute that these admittedly "alternative" claims must have different prompt-action triggers.  It is undisputed that Plaintiffs' reformation claim is premised on the allegation that the parties made a "prior agreement" that American Capital would not enforce any express promises of coverage in the policies that would ultimately issue to the extent such policies promised coverage for conduct of anyone besides American Capital itself.[3]  Plaintiffs allege that they brought their reformation claim because American Capital was "seek[ing] coverage" both for "SPL and other portfolio companies" (SAC, ¶ 103) – which, as American Capital agrees, was an obvious indication that American Capital was relying on the policies' actual terms and not on the supposed "prior agreement" "not to seek" coverage for any entity besides American Capital.[4]

---

[2] As Plaintiffs affirmatively allege in the SAC, they did *not* conclude that SPL's affiliation with American Capital was as a subsidiary of American Capital; rather, they concluded that SPL was *not* a subsidiary of American Capital (because it merely was a "portfolio company" of American Capital).  (SAC, ¶¶ 100, 103).  Similarly, the new allegations respecting SMG allege merely that Plaintiffs concluded that SMG was a "portfolio company" of American Capital (SAC, ¶ 101), a characterization which Plaintiffs do not use to denote a "subsidiary" (SAC, ¶¶ 103, 126-128 (alleging that SPL is a "portfolio company" but not a "subsidiary")).

[3] This alleged "prior agreement," of course, makes no sense.  Are Plaintiffs alleging that they intended to include coverage for other entities owned by American Capital as long as American Capital agreed not to make use of that coverage?  Such an agreement is highly implausible and, in all likelihood, unenforceable.  Or, are Plaintiffs alleging that American Capital never formed the subjective intent to secure coverage for its subsidiaries or any of its portfolio companies?  If so, those facts would not negate the coverage that Plaintiffs nevertheless included in their policies.  It is American Capital's position that only if Plaintiffs can prove that they entered into an express agreement with American Capital to affirmatively *exclude* such coverage from the policies would reformation be permissible.  But, alas, the credibility of the allegation of a "prior agreement" not to "seek" coverage of claims made against one or more insureds is for another day.

[4] As Plaintiffs acknowledge in the SAC, and do not dispute in their brief, the policies' *actual* terms provide coverage not only for "subsidiaries," but also for any non-subsidiary portfolio
*(footnote continued on next page)*

Indeed, Plaintiffs do not argue – and cannot argue – that the SAC alleges that they learned from American Capital's act of "seeking" coverage for claims against SPL and SMG in late 2008 that American Capital "had subsidiaries" as of (or after) June 2006.  Plaintiffs also do not argue that any "contract-inducing misrepresentation" *besides* the "no subsidiaries" checkmark was discovered prior to January 2009, much less that they learned the falsity of any such "other" "contract-inducing misrepresentation" prior to their discovery of the "no subsidiaries" misrepresentation.  Thus, Plaintiffs effectively concede that their earliest discovery of an allegedly rescission-entitling misrepresentation occurred when they concluded – whenever that may have been – that American Capital was not subsidiary-free as of June 2006.  Although the January 2009 complaint establishes that Plaintiffs had reached this conclusion by the time that complaint was filed (as that is what that complaint affirmatively alleged), nothing in the SAC discloses *how long before January 2009* Plaintiffs reached that conclusion.  Without that disclosure, it is impossible to tell from the SAC whether Plaintiffs acted promptly after their *first* discovery of any rescission-entitling misrepresentation.

Plaintiffs insinuate that they should be given special dispensation from the pleading requirement because American Capital cannot establish "prejudice" by the delay between the date that Plaintiffs learned that American Capital was not subsidiary-free and the date they filed their rescission claim in January 2009.  Plaintiffs' argument proves too much.  As this Court admonished Plaintiffs in its March 11 ruling, American Capital cannot even attempt to establish prejudice without Plaintiffs first making the required prompt action disclosure:

> Lacking any allegation of when Plaintiffs discovered the facts underlying their claim, the court cannot determine if Plaintiffs have alleged that they acted promptly.  It is also impossible to assess whether Defendants suffered any prejudice from the delay.  *Benjamin v. Erk*, 138 Md. App.

company in which the named insured holds an economic "majority interest" (or which meets the policy's definition of "additional insured").  Opening Br. at 12 n.9; SAC, ¶¶ 126, 128.

459, 483 (2001) (stating promptness "is determined, in large part, by whether the period has been long enough to result in prejudice." (quoting *Cutler v. Sugarman Org., Ltd.*, 88 Md. App. 567, 578 (1991)).

(ECF No. 64 at 37-38).

## II.    PLAINTIFFS' REMAINING ARGUMENTS ARE DIVERSIONARY AND SHOULD BE IGNORED

For purposes of determining that Plaintiffs' SAC fails to satisfy the prompt action pleading requirement, the Court need read no further.  In their brief, however, Plaintiffs make multiple arguments that have nothing whatsoever to do with the issue of whether the SAC contains allegations that meet this Court's pleading requirements.  Plaintiffs' obfuscation is an implicit admission that if the Court were to train attention on the singular and straightforward question at hand, Plaintiffs' calculated refusal to answer that question will be fully exposed. Nonetheless, to the extent that the Court seeks to know American Capital's response to Plaintiffs' erroneous forays, American Capital addresses many of those diversions below.

First, Plaintiffs argue that American Capital's insistence that Plaintiffs disclose when they learned of the *fact* that American Capital had subsidiaries is an "admission" that American Capital did have subsidiaries that represents a reversal of position on this issue.  American Capital, however, has never denied that it had a subsidiary in 2006; rather, American Capital has denied that it ever made a contrary representation in 2006.  It is American Capital's position, the Court will recall, that the purported "application" identified by Plaintiffs was never reviewed or completed by American Capital, and that Plaintiffs did not obtain the purported "application" from American Capital or Marsh, the entity that Plaintiffs maintain is American Capital's broker.

American Capital has also consistently maintained that the nature of its affiliations with the companies in which it has acquired an economic interest were detailed in the public filings it made between early 2006 (for the year ending December 2005) and early 2009 (for the year ending December 2008) – filings which are linked to the American Capital website for

which the "2006 application" sought an internet address. *See*
http://ir.americancapital.com/phoenix.zhtml?c=109982&p=irol-sec (the "SEC Filings" sub-tab of
the "Investor Relations" tab of American Capital's website).[5]

---

[5] The falsity of Plaintiffs' reversal-of-position contention is established by the content of
American Capital's public filings, which indisputably state how American Capital regarded its
corporate affiliations. In American Capital's 2006 Form 10-K (for year-ended Dec. 31, 2005),
American Capital explained that as a matter of law, an "exception" had been triggered that
allowed for American Capital's classification of certain companies as "subsidiaries":

> "Under the investment company rules and regulations pursuant to Article 6 of
> Regulation S-X and the AICPA Audit and Accounting Guide for Investment
> Companies, we are precluded from consolidating any entity other than another
> investment company. An exception to this general position occurs if the
> investment company has an investment in an operating company that provides
> services to the investment company. Our consolidated financial statements
> include the accounts of our operating companies, ACFS and ECFS."

>                 *        *        *

> "[Thus,] [o]ur consolidated taxable operating subsidiaries [are] ACFS and
> ECFS."

*See* Annual Report of American Capital Strategies, Ltd. for year ended Dec. 31, 2005 (Form 10-
K), at 94, 115 (Mar. 14, 2006) (http:
//www.sec.gov/Archives/edgar/data/817473/000119312506053259/d10k.htm). The report went
on to separate the companies in which American Capital held an economic interest into two
categories – "subsidiaries" and "portfolio companies." And, within the latter category, the report
broke-out subcategories based on, *inter alia*, the level of American Capital's ownership interest.
*Id.* at 95. Similar reports were issued in each later year (*see* Annual Report of American Capital
Strategies, Ltd. for year ended Dec. 31, 2006 (Form 10-K) (Mar. 1, 2007)
(http://www.sec.gov/Archives/edgar/data/817473/000119312507044440/d10k.htm); Annual
Report of American Capital, Strategies, Ltd. for year ended Dec. 31, 2007 (Form 10-K) (Feb. 29,
2008) (http://www.sec.gov/Archives/edgar/data/817473/000119312508043109/d10k.htm)),
culminating with the 2009 report (for year-ended Dec. 31, 2008) showing that American Capital
still held one operating subsidiary, ACFS. *See* Annual Report of American Capital, Strategies,
Ltd. for year ended Dec. 31, 2008 (Form 10-K), at 134, (Mar. 2, 2009)
(http://www.sec.gov/Archives/edgar/data/817473/000119312509042520/d10k.htm).

SEC filings are judicially noticeable for establishing the fact of the filer's position on the subject
reported in the filing. *In re PEC Solutions, Inc. Securities Litigation*, 418 F.3d 379, 390 (4th Cir.
2005).

Thus, American Capital *always* has maintained that if Plaintiffs truly received, read and relied on the documents they call the 2006 and 2008 applications before issuing any policy – facts which American Capital always has denied – Plaintiffs would have known that American Capital was a "buyout" company that publicly reported its holdings of both "portfolio companies" *and* "subsidiaries."   Indeed, even the purported 2006 "application" (i) explicitly states that American Capital is a "buyout" company and (ii) incorporates by reference the full content of its website and, thus, American Capital's public filings (which detail these facts).[6]

As for Plaintiffs' assertion that American Capital never acknowledged that it was affiliated with any other company until its motion to dismiss was partially denied, suffice it to say that in its original and first amended counterclaims, both of which were filed before any Rule 12 Motion was made in this case, American Capital specifically identified ACFS, which was American Capital's only operating subsidiary after 2006, as "a company wholly-owned by American Capital."  (ECF No. 5 (original counterclaims), ¶¶ 38-39; ECF No. 19 (first amended counterclaims), ¶¶ 48-49).  In any event, an argument that Plaintiffs' First Amended Complaint ("FAC") failed *to allege* an element of a rescission ("false representation") speaks only to what *Plaintiffs alleged* in the FAC, an issue that American Capital has not addressed on this SAC-based motion and had no reason to address, given the Court's determination of that issue.

<u>Second</u>, Plaintiffs seek to divert attention from the merits by arguing that this Court should take judicial notice of certain public filings made by American Capital for purposes of showing how American Capital regarded the nature of its economic interest in other companies.

---

[6] Similarly, American Capital's statement that the checkmark in the application indicating that American Capital had "no subsidiaries" was "obviously" errant is perfectly consistent with American Capital's position that Plaintiffs have known from day one, from sources other than the "application," that American Capital was not a subsidiary-free company.   It remains American Capital's position that Plaintiffs (i) specifically proposed and priced subsidiaries-based coverage, and (ii) had coverage-related dealings with ACFS and ECFS.

Ironically enough, the only side to object to this Court taking judicial notice of American Capital's public filings for this purpose is *Plaintiffs'* side.   In their answering brief here, Plaintiffs assert that for purposes of determining how American Capital distinguished between "subsidiaries" and "portfolio companies," the Court should not consider the official public reports that explain that very distinction because those reports were only filed with the SEC and not in a court.   Putting aside the fact that the Fourth Circuit has held that this Court may take judicial notice of SEC filings,[7] the resolution of this "judicial notice" issue will not determine the issue at hand, *i.e.*, when *Plaintiffs* first concluded that American Capital's holdings included "subsidiaries."   Indeed, Plaintiffs deny that they were aware of either the SEC filings or the other-court filings prior to January 2009.   The relevant question is when *prior to January 2009* Plaintiffs first concluded that American Capital had subsidiaries as of June 2006.

Third, Plaintiffs argue that any knowledge they had in 2006 and 2007 that ACFS and ECFS were subsidiaries of American Capital would be inconsequential, even though this fact would establish that Plaintiffs have known all along that the "no subsidiaries" checkmark was errant and that, in fact, they did *not* issue policies in reliance on the notion that American Capital was a corporation with "no subsidiaries" (as Plaintiffs have been arguing to this Court from day one).   Still, Plaintiffs were obligated by this Court's ruling to state when they gained this knowledge.   There is no exception for making a disclosure that Plaintiffs unilaterally deem to be inconsequential.   If Plaintiffs have an argument that their pre-January 2009 knowledge that ACFS and/or ECFS were subsidiaries of American Capital somehow is inconsequential, the time to make that argument is in later motion practice where the separate issue of the *import* of what Plaintiffs learned shall be addressed.   For now, Plaintiffs were required only to state *when* they first learned that fact (which they assiduously refuse to do).

---

[7] *See* note 5, *supra*.

Fourth, Plaintiffs assert that American Capital cannot rely on Plaintiffs' admission that they were aware that American Capital was a "buyout" company and of a website that linked to the SEC filings detailing American Capitals' affiliations for purposes of establishing what the "insurer should have known." Opp. Br. at 13.   But this motion is not about whether Plaintiffs "should have" concluded that American Capital had subsidiaries in June 2006.   This motion is about when Plaintiffs *did* first reach that conclusion, as they alleged they had concluded in their January 2009 complaint.

Fifth, Plaintiffs re-argue a legal proposition they raised in their moving papers but which this Court did not address in its March 11 decision – that an insured owes a duty to volunteer information to the insurer, which the insurer never deemed important enough to ask about in the procurement or renewal process.   Opp. Br. at 9.   While American Capital previously has contested this dubious proposition, the issue is entirely irrelevant to whether the SAC contains allegations indicating when Plaintiffs first concluded that American Capital had subsidiaries.

Sixth, Plaintiffs repeatedly re-publish the allegations from the *First* Amended Complaint (*e.g.*, Opp. Br. at 9-10), even though those allegations have been found *not* to allege prompt action.   Thus, nothing in that pleading can help Plaintiffs here.   Plaintiffs' re-publication of those allegations is to suggest that by the Court's partial denial of American Capital's motion to dismiss the FAC, the Court *agrees with* those allegations.   Of course, a ruling denying a motion to dismiss means only one thing: that the complaint, given its most liberal construction, *states* a claim.   Moreover, the Court specifically stated that the arguments presented by American Capital as to why Plaintiffs' alleged reliance on the 2006 application was "implausible" were not rejected by the Court; rather, they were arguments for determination on a "motion for summary judgment."   (ECF No. 64 (Opinion) at 32).

Seventh, Plaintiffs make a *de facto* request for reconsideration of this Court's ruling by their assertion that *Goodman v. Poland*, 395 F. Supp. 660 (D. Md. 1975), suggests that the "prompt action" requirement is not stringently administered in this District. In fact, *Goodman* states exactly the opposite: "[the prompt action] principle *is* stringently administered," and that this must be so because "rescission is a radical remedy." 395 F. Supp. at 674 (emphasis added). In any event, *Goodman* does *not* reject the proposition of law adopted by this Court (and other courts) that the plaintiff must disclose, in it its complaint, when it first concluded that a material contract-inducing misrepresentation had been made to it. Without knowing that date, it is *impossible* to administer, stringently or not, the prompt action requirement. (ECF No. 64 (Opinion) at 37-38).

## CONCLUSION

For the reasons set forth above and in their opening memorandum, Defendants respectfully request that the Court grant the Motion and dismiss with prejudice Count I of Plaintiffs' Second Amended Complaint.

Dated: July 21, 2011                                    Respectfully submitted,

                                                        DICKSTEIN SHAPIRO LLP


                                        By:    /s/ *Andrew M. Weiner*
                                               John W. Schryber (Bar #17686)
                                               Andrew M. Weiner (Bar #15081)
                                               1825 Eye Street, NW
                                               Washington, DC 20006
                                               Phone: 202-420-2200
                                               Fax: 202-420-2201
                                               Email: SchryberJ@DicksteinShapiro.com
                                               Email: WeinerA@DicksteinShapiro.com

                                               Counsel for Defendants/Counter-claimants
                                               American Capital, Ltd., Scientific Protein
                                               Laboratories LLC and SMG

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 21st day of July, 2011, a true copy of the foregoing

Defendants' Reply Memorandum of Law in Further Support of Rule 12(b)(6) Motion to Partially

Dismiss Plaintiffs' Second Amended Complaint was filed with the Clerk of Court using the

CM/ECF system, which will send notification of such filing to the following email addresses:

> Roger S. Warin, Esq.
> Paul Janaskie, Esq.
> Steptoe & Johnson LLP
> 1330 Connecticut Avenue
> Washington, DC  20036
> rwarin@steptoe.com
> pjanaskie@steptoe.com
>
> *Counsel for Plaintiffs/Counter-defendants*

> /s/ *Andrew M. Weiner*
> Andrew M. Weiner