IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:
THE CHARTER OAK FIRE COMPANY,
et al.                              :

    v.                         :    Civil Action No. DKC 09-0100

:
AMERICAN CAPITAL, LTD., et al.
:

**AMENDED MEMORANDUM OPINION**

Presently pending and ready for review in this insurance coverage dispute are: (1) a motion for summary judgment filed by Plaintiffs Charter Oak Fire Insurance Company ("Charter Oak") and Travelers Property Casualty Company of America ("Travelers") (ECF No. 510); (2) a cross-motion for summary judgment filed by Defendants American Capital, Ltd. ("American Capital") and Scientific Protein Laboratories LLC ("SPL") (ECF No. 514); and (3) motions to seal filed by Charter Oak and Travelers (collectively, the "Plaintiffs") (ECF Nos. 524; 525; 526). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, both motions for summary judgment will be granted in part and denied in part. Plaintiffs' motions to seal will be granted.

**I.   Background**

**A.   Factual Background**

Numerous prior opinions contain some recitation of the facts. (*See* ECF Nos. 42; 64; 77; 92; 170; 184; 267; 378; 492). However, because the record is now more thoroughly developed, a recitation of facts is required. Additional facts will be discussed in the analysis section.

This insurance coverage dispute involves two insurance company Plaintiffs and an investment fund, Defendant American Capital. In August 2006, American Capital made an investment in a company called SPL Acquisition Corp. ("SPL Acquisition").[1] (ECF No. 510-1, at 15). Defendant SPL is entirely owned by SPL Acquisition. (ECF No. 510-5, at 29). Although American Capital did not own any stock in Defendant SPL, it did own a majority non-voting interest in the holding company, SPL Acquisition, which owned Defendant SPL. (ECF Nos. 514-108; 514-109; 514-110).

Beginning in 2008, American Capital and SPL (collectively, the "Defendants"), became involved in more than 100 suits pertaining to an allegedly defective drug, heparin. The heparin complaints generally alleged that SPL and/or American Capital sold contaminated heparin. (*See, e.g.*, ECF Nos. 514-10; 514-11). The heparin was provided to SPL by Changzhou SPL Co.

---

[1] SPL Acquisition was previously named "SPL Holdings."

("Changzhou"), a Chinese joint venture between SPL and a Chinese company that has been producing heparin since 2004.  (ECF Nos. 510-1, at 11; 510-4, at 3; 510-5, at 56).   Some of the complaints mentioned Changzhou, and some focused solely on American Capital and SPL.   The complaints all generally assert that the contaminated heparin was distributed by SPL.  (*See* ECF No. 514-1, at 21-23).   These complaints allege injuries during the 2006, 2007, and 2008 policy periods.  (*Id.* at 21).   Between January and March 2008, Baxter Healthcare Corporation ("Baxter"), a company to which SPL sold heparin, and SPL recalled their heparin products in the United States.  (ECF No. 510-4, at 7).   The allegedly contaminated heparin was produced in 2006 and 2007.  (*Id.*).

American Capital first purchased liability insurance from Plaintiffs in June 2006.   It purchased a primary policy from Charter Oak each year through the 2008-2009 coverage year as well as an "umbrella policy" from Travelers each year.  (ECF No. 510-1, at 12).   American Capital was the named insured in each of these policies.  (ECF No. 510-9; 510-10; 510-11; 510-12; 510-13; 510-14).   The policies insured American Capital, its "'executive officers,' [] directors," and stockholders.  (*E.g.*, ECF No. 510-9, at 87).   In addition, the primary policies covered, for a limited time period, "[a]ny organization [American Capital] newly acquire[s] or form[s], other than a

3

partnership, joint venture or limited liability company, and over which [American Capital] maintain[s] ownership or majority interest . . . if there is no other similar insurance available to that organization." (*Id.* at 88). Other relevant provisions include:

- "No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured." (*Id.* at 89).
- "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [Traveler's] consent." (*Id.* at 90).
- An exclusion for injuries "for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement" unless liability would have existed "in the absence of the contract or agreement." (*Id.* at 81).

In February 2008, SPL Acquisition purchased multiple liability insurance policies from insurance companies other than Plaintiffs. (ECF No. 510-1, at 17).

On August 12, 2008, American Capital provided Travelers with notice of the underlying heparin lawsuits, but did not formally request that Travelers defend the suits. (ECF Nos. 510-1, at 19; 510-40). Travelers acknowledged receipt and opened a claim for the heparin lawsuits. (ECF No. 514-8). Travelers also attempted to obtain more information about the heparin lawsuits and a possible defense, but American Capital did not provide the requested information. (ECF Nos. 510-48; 510-49; 510-50). When American Capital ultimately responded to

4

Travelers, it noted that it was hoping to be dismissed from the underlying suits and "prefer[ed] not to allocate resources at this time to discussing those coverage issues" raised by Travelers. (ECF No. 510-47). On November 24, 2008, following some back and forth between Travelers and American Capital, the two parties agreed that, if a request for defense was made, November 24, 2008 would be the date from which costs would be covered by Travelers. (ECF Nos. 510-1, at 22; 510-54, at 6). On December 12, 2008, Travelers sent a letter to American Capital's attorney memorializing the agreement, stating that:

> Travelers, [American Capital], and SPL agree that Monday, November 24, 2008, shall be the tender date for the Heparin Lawsuits . . . if (or when) [American Capital] decides to tender such Heparin Lawsuits on its and/or SPL's behalf to Travelers for possible defense and indemnity and if Travelers agrees or it ultimately is determined that Travelers has a duty to defend any such suits. In such event, Travelers agrees that it will not assert that costs incurred on or after November 24, 2008 in defending the Heparin Lawsuits are not covered since the suits were not tendered until after November 24, 2008, and in exchange, [American Capital] and SPL agree that they will not seek reimbursement of defense costs incurred prior to November 24, 2008.

(ECF No. 510-54, at 13).

Throughout late 2008, American Capital and SPL were involved in negotiations for a Confidential Settlement and Cost-Sharing Agreement ("Agreement") with Baxter, which was finalized

on December 2, 2008.  (ECF No. 510-57).  Travelers did not consent to the Agreement, which was provided to Travelers on December 29.  (ECF No. 514-1, at 33).  The Agreement functioned, in part, as a joint defense agreement specifying that Kirkland & Ellis, LLP "shall undertake to jointly represent and defend [American Capital, SPL, and Baxter] in the Heparin Litigation," and Dechert, LLP "shall undertake to jointly represent [American Capital, SPL, and Baxter] as special settlement counsel to explore and, if possible, effectuate settlements of the claims . . . in the Heparin Litigation."  (ECF No. 510-57 ¶ 3.1).  The Agreement also specified that costs occurring after December 2, including legal fees, "costs of settlements of claims and/or lawsuits in the Heparin Litigation" and "costs of satisfying final, non-appealable judgments for compensatory damages awarded" in the heparin lawsuits were "joint costs."  (*Id.* ¶ 5.1(b)).  The Agreement specified that Baxter was responsible for the first $20 million in joint costs and SPL was responsible for the next $15 million.  (*Id.* ¶¶ 5.3(i)-(ii)).

On January 14, 2009, American Capital and SPL requested that Travelers provide a "coverage determination . . . apropos of [the] tender date agreement."  (ECF No. 510-54, at 20).  Two days later, Travelers sent a letter to American Capital denying coverage (ECF No. 514-5) and filed this suit for declaratory judgment.  Travelers contends that the first time American

Capital and SPL "expressly requested" that Travelers defend the heparin lawsuits was in an email on February 17, 2009. (ECF Nos. 510-1, at 25; 510-61).

**B.  Procedural History**

Plaintiffs commenced this action by filing a complaint on January 16, 2009. (ECF No. 1). Eventually, a Second Amended Complaint was filed on March 29, 2011. (ECF No. 67). The Second Amended Complaint contains four counts: Rescission of Insurance Contracts against American Capital (Count I); Reformation due to Mutual Mistake (Count II), Reformation due to Unilateral Mistake (Count III), and Declaratory Relief concerning the duty to defend or indemnify as to all Defendants (Count IV). The Third Amended Counterclaim (ECF No. 380) contains fourteen counts: Declaratory Judgment that the unilateral rescission of policies was without legal basis as to Charter Oak regarding the 2006 primary policy (Count I), as to Travelers regarding the 2006 umbrella policy (Count II), as to Charter Oak regarding the 2007 primary policy (Count III), as to Travelers regarding the 2007 umbrella policy (Count IV), as to Charter Oak regarding the 2008 primary policy (Count V), and as to Travelers regarding the 2008 umbrella policy (Count VI), Breach of contract against Charter Oak concerning its duty to defend with regard to the 2007 primary policy (Count VII), against Travelers with regard to the 2007 umbrella policy (Count

VIII), against Charter Oak as to the 2006 primary policy (Count IX), as to Travelers regarding the 2006 umbrella policy (Count X), as to Charter Oak regarding the 2008 primary policy (Count XI), and as to Travelers regarding the 2008 umbrella policy (Count XII), a Statutory tort claim for lack of good faith against both Charter Oak and Travelers (Count XIII), and a Common law tort claim for promissory fraud against both Charter Oak and Travelers (Count XIV).

On April 16, 2015, Plaintiffs filed the pending motion for summary judgment. (ECF No. 510). On May 21, Defendants filed the pending cross-motion for summary judgment, along with their response in opposition to Plaintiffs' motion. (ECF No. 514). Plaintiffs filed a response in opposition (ECF No. 516), and Defendants replied (ECF No. 523). On August 13, 2015, Plaintiffs filed the pending motions to seal portions of the summary judgment record as well as portions of the motion to seal. (ECF Nos. 524; 525; 526). Defendants filed a response in opposition (ECF No. 531), and Plaintiffs replied (ECF No. 532).

Plaintiffs seek summary judgment on count IV of their complaint (declaratory judgment as to duty to defend), and on all counts of the counterclaim. Defendants seek dismissal or judgment on all counts in the complaint as well as summary judgment on all counts of their counterclaim.

**II.  Summary Judgment Standard of Review**

A court may enter summary judgment only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Emmett v. Johnson,* 532 F.3d 291, 297 (4th Cir. 2008).  Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.,* 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir. 2003) (*quoting* former Fed.R.Civ.P. 56(e)).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney,* 327 F.3d 307, 314 (4th Cir. 2003).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Liberty Lobby,* 477 U.S. at 249-50 (citations omitted).  At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion.  *Scott v. Harris,* 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, LLC,* 630 F.3d 351, 354 (4th Cir. 2011).  The court must deny both motions if it finds there is a genuine dispute of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Charles A. Wright, et al., *Federal Practice & Procedure* § 2720 (3d ed. 1998).

Plaintiffs argue that (1) neither American Capital nor SPL can recover sums paid by the other or by Baxter, (2) neither SPL nor American Capital is an "insured" with respect to the heparin claims, and neither is covered with respect to the conduct of a joint venture; (3) the settlement abrogates any obligation to provide coverage, (4) coverage is unavailable for known losses and under the umbrella policies; and (5) Maryland law limits or bars the claims for damages.

Defendants contend (1) that the joint venture exclusion does not preclude the possibility of coverage; (2) Plaintiffs are liable for lack of good faith; (3) the duty to defend extends to SPL; (4) specific coverage extends to all policies; (5) the settlement cannot preclude a duty to defend before its execution and does not do so afterwards either; (6) the

10

contractual liability exclusion does not apply; (7) the claims for rescission and reformation cannot retroactively preclude the duty to defend; (8) Plaintiffs' claims for reformation and promissory fraud fail as a matter of law; (9) the reformation claim should be dismissed; and (10) the motion regarding damages is premature and without basis.

## III. Declaratory Judgment and Breach of Contract: Plaintiffs' Duty to Defend

Maryland law governs the parties' dispute over interpretation of the insurance policies. (*See* ECF No. 64, at 24). In Maryland,

> [Courts] construe an insurance policy according to contract principles. *Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.*, 398 Md. 529, 540 (2007). Maryland follows the objective law of contract interpretation. *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 166 (2003). Thus, "'the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract.'" *Long v. State*, 371 Md. 72, 84 (2002) (quoting *Slice v. Carozza Props., Inc.*, 215 Md. 357, 368 (1958)). "When the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used." *Sy-Lene*, 376 Md. at 167 (citation omitted). "Unless there is an indication that the parties intended to use words in the policy in a technical sense, they must be accorded their customary, ordinary, and accepted meaning." *Lloyd E. Mitchell, Inc. v. Md. Cas. Co.*, 324 Md. 44, 56-57 (1991) (citations omitted). Although

> Maryland does not follow the rule that insurance contracts should be construed against the insurer as a matter of course, any ambiguity will be "construed liberally in favor of the insured and against the insurer *as drafter of the instrument*." *Dutta v. State Farm Ins. Co.*, 363 Md. 540, 556-57 (2001) (emphasis in original) (citation omitted).

*Maryland Cas. Co. v. Blackstone Intern. Ltd*, 442 Md. 685, 694-95 (2015). Determining whether an insurer has a duty to defend under an insurance policy is a two-step process. *Nautilus Ins. Co. v. REMAC Am., Inc.*, 956 F.Supp.2d 674, 680 (D.Md. 2013) (citing *St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187 (1981)). "First, the policy must be reviewed to determine the scope of, and any limitations on, coverage." *Id.* (citations omitted). "As the second step in the duty-to-defend inquiry, the allegations of the underlying complaint must be analyzed to determine whether they would potentially be covered under the subject policy." *Id.* (citing *Pryseski*, 292 Md. at 193; *Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 103-04 (1995)); *see also Blackstone*, 442 Md. at 695 (noting that even if the underlying complaint "does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a potentiality that the claim could be covered by the policy"). "In Maryland, the duty to defend is broader than the duty to indemnify. Whereas a company has a duty to defend its insured for all claims that are potentially

12

covered under an insurance contract, the duty to indemnify, *i.e.*, pay a judgment, attaches only upon liability." *Penn. Nat'l Mut. Cas. Ins. Co. v. city Homes, Inc.*, 719 F.Supp.2d 605, 611-12 (D.Md. 2010) (citations and internal quotation marks omitted).

The parties provide differing interpretations of the applicable law, primarily based on whether extrinsic evidence is relevant to various aspects of their dispute. For instance, Plaintiffs contend that "[f]or purposes of both defense and indemnity, SPL's status as an insured depends on the true facts." (ECF No. 510 at 22, citing *Payne v. Erie Ins. Exch.*, --- A.3d ---, 2015 WL 1412698 (Md. 2015); *Universal Underwriters Ins. Co. v. Lowe*, 761 A.2d 997, 1008 & n.13 (Md. Ct. Spec. App. 2000)). Defendants, on the other hand, cite to *Cornerstone Title & Escrow, Inc. v. Evanston Ins. Co.*, 555 F.App'x 230, 234-36 (4th Cir. 2014), and *Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98 (1995), and argue that extrinsic evidence is not relevant in this instance because the "'exception' to the exclusive pleading rule is not for the benefit of insurers (to enable new ways to deny a defense), it is for the benefit of *insureds* (to establish the potentiality of a covered judgment independent of the underlying allegations.)." (ECF No. 514 at 45). The *Cochran* court stated that:

> Although we have held that an insurer may
> not use extrinsic evidence to contest
> coverage under an insurance policy if the
> tort suit complaint establishes a
> potentiality of coverage; we have not had
> occasion to determine whether an insured may
> rely on extrinsic evidence to establish a
> potentiality of coverage when the insurance
> policy and the allegations in the complaint
> do not establish a potentiality of coverage.
> *See Brohawn* [*v. Transamerica Ins. Co.*], 276
> Md. [396,] 408 [1975].

*Cochran*, 337 Md. at 107.  It cautioned, however, that:

> In holding that an insured may establish a
> potentiality of coverage under an insurance
> policy through the use of extrinsic
> evidence, we note that an insured cannot
> assert a frivolous defense merely to
> establish a duty to defend on the part of
> his insurer. Only if an insured demonstrates
> that there is a reasonable potential that
> the issue triggering coverage will be
> generated at trial can evidence to support
> the insured's assertion be used to establish
> a potentiality of coverage under an
> insurance policy.

*Id.* at 111.

Rather than engage in arguing generalities under the law, the better approach is to discuss the specific issues presented in this case.

### A.   Coverage of SPL

Plaintiffs argue that SPL's status as an insured depends on the true facts.  Defendants contend that, under *Cochran*, an insurer must offer a defense where it has determined from the extrinsic facts uncovered in its investigation that the

underlying suit creates a potential of a covered judgment against the entity seeking coverage. They also argue that Plaintiffs made a judicial admission that SPL was covered; that, at the time it made its decision to deny coverage, SPL was an affiliate of American Capital; and that the underlying suit alleged that the relationship was one of parent or majority interest holder. They argue that, until there is a judicial determination resolving the nature of the affiliation, Plaintiffs owed a duty to defend and are liable for predetermination defense costs. As will be seen, the situation is not as clear as either party wishes.

1. **2006-2007 Primary Policy**

Plaintiffs argue that SPL, an LLC, is not covered under the 2006-2007 primary policy under the "newly acquired" provision in the policy, which excludes newly acquired or formed "partnership[s], joint venture[s], [and] limited liability compan[ies]."[2] (ECF No. 510-9, at 88). In addition, the policy covers any newly acquired organization "if there is no other similar insurance available to that organization." (*Id.*). During the 2006-2007 policy year, SPL was covered by separate insurance. (ECF No. 510-18, at 17). Defendants do not move for summary judgment under this policy and concede that the 2006-

---

[2] It is undisputed that American Capital acquired its interest in SPL during the period when the 2006-2007 primary policy was in effect.

2007 primary policy does not cover SPL.  (ECF No. 514-1, at 73).

Accordingly, summary judgment will be granted in favor of

Plaintiffs regarding coverage of SPL under the 2006-2007 primary

policy on Counts I and IX of Defendants' counterclaim.

   2. **2007-2008 and 2008-2009 Primary Policies and 2006-2007
   Umbrella Policy**

   The key provision in the 2007-2008 and 2008-2009 primary

policies notes that the policies cover "any organization, other

than a partnership or joint venture, over which [American

Capital] maintain[s] ownership or majority interest on the

effective date of the policy." (ECF Nos. 510-10, at 99; 510-11,

at 106).  Similarly, the 2006-2007 umbrella policy extends

coverage to any newly acquired organization, "other than a

partnership or joint venture . . . over which [American Capital]

maintain[s] ownership or majority interest." (ECF No. 510-12,

at 16).  Defendant SPL was owned entirely by SPL Acquisition

(previously SPL Holdings).  (ECF No. 510-5, at 29).  American

Capital, in turn, owned a majority of SPL Acquisition's

preferred stock and non-voting common stock. (ECF No. 514-110).

Plaintiffs contend that American Capital's ownership of non-

voting shares of SPL Acquisition was not a sufficient ownership

interest to bring Defendant SPL into coverage under the

policies. (ECF No. 510-1, at 33).  Plaintiffs also assert that

it would be absurd for the court to find that American Capital's

investments, of which it allegedly has nearly 200, to be covered by the policies. (*Id.* at 34). Defendants counter that American Capital's role was one of "parent" or "majority interest" holder. (ECF No. 514-1, at 63). They also contend that the policies only cover portfolio companies over which American Capital maintains a majority interest (ECF No. 514-1, at 70), of which there are apparently "dozens" (ECF No. 510-1, at 25).

The parties quarrel over accusations of who knew what when. These accusations may be appropriate for the discussion regarding good faith and fraud, but the issue for coverage is fundamentally one of contractual construction to determine if the policies cover SPL based on its actual relationship with American Capital. The parties do not dispute the facts underlying the relationship between American Capital and SPL as described in the preceding paragraph. The parties vigorously dispute, however, whether this corporate structure means that American Capital maintains a "majority interest" relationship over SPL. The term "majority interest" is not defined in the policies and, in this context, is ambiguous, as reasonable people could disagree over its meaning and scope, as evidenced by the parties' differing interpretations and applications here.

In Maryland,

> If there is ambiguity, the Court reviews extrinsic evidence to determine the parties' intent, including dictionaries, the

> history of the parties' negotiations, the parties' conduct and an interpretation of the term used by one of the parties before the dispute arose. *Holland v. Psychological Assessment Res., Inc.,* 482 F.Supp.2d 667, 673-74 (D.Md. 2007); *Ohio Cas. Ins. Co. v. Chamberlin,* 172 Md.App. 229, 241, 914 A.2d 160, 167 (Md.Spec.App. 2007). If extrinsic evidence is dispositive of the term's meaning, the Court may grant summary judgment. *Holland,* 482 F.Supp.2d at 674. However, if after resorting to extrinsic evidence there is a genuine dispute with respect to interpretation, summary judgment is improper and the trier of fact decides the proper interpretation. *Id.; see Bd. of Educ. of Charles County v. Plymouth Rubber Co.,* 82 Md.App. 9, 26, 569 A.2d 1288, 1296 (Md.Spec.App. 1990) ("Only when there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application . . . is the contract submitted to the trier of fact for interpretation.").

*Ambling Mgmt. Co. v. Univ. View Partners, LLC*, 581 F.Supp.2d 706, 712-13 (D.Md. 2008). Because the term is not defined and both parties offer plausible interpretations based on the policies' plain language, extrinsic evidence must be examined.

The parties' discussion regarding coverage of SPL under the policies focuses primarily on the terms "ownership" and "subsidiary," but little analysis is devoted to the term "majority interest." Plaintiffs' primary argument proceeds thusly: if the court determines that American Capital held a majority interest in SPL, it would, by necessity, mean that it also held a majority interest in dozens, if not hundreds, of other companies in which it had invested. Plaintiffs assert

that an absurd result follows from the determination that the policies covered all these companies, particularly when some, such as SPL, maintained their own liability insurance. They also argue that the premiums charged would be unreasonably low for general liability insurance for the operations of American Capital's portfolio companies. Defendants counter that Plaintiffs are ignoring the plain language of the policy, and are essentially reading the term "majority interest" out. They contend that if "majority interest" requires direct ownership, then that term is superfluous. A reasonable person reading this language could believe either party's interpretation is correct. Based on the evidence presented, there remains a "bona fide ambiguity" and dispute as to whether the parties intended the "majority interest" clause to apply to the sort of indirect majority interest American Capital maintained over SPL.

Furthermore, under Maryland's two-part test, the allegations in the underlying complaints in the heparin lawsuits cannot convert SPL into a covered insured if the policies do not actually provide coverage. Before determining if the underlying complaints potentially give rise to a covered suit, "the policy must be reviewed to determine the scope of, and any limitations on, coverage." *Nautilus*, 956 F.Supp.2d at 680 (citations omitted). Here, as described above, a factual dispute remains whether the policies do in fact cover SPL.

Defendants also assert that Plaintiffs made a "judicial admission" in their original January 2009 complaint that American Capital's relationship with SPL triggered the majority interest clause. (*See* ECF No. 514-1, at 60). Plaintiffs counter that any admission in their initial complaint is not binding because subsequent Rule 15 amendments removed the alleged admission. (ECF No. 516, at 25 (citing *West Run Student Housing Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 171 (3[d] Cir. 2013) (recognizing that "judicial admissions may be withdrawn by amendment"))). In their reply brief, Defendants appear to concede this point, but contend that the admission "remains an evidentiary admission of what [Plaintiffs] believed, under Federal Rule 11, at the time the statement was made" in January 2009. (ECF No. 523, at 22). Although the Fourth Circuit has not definitively held that judicial admissions may be withdrawn by amendment, the Third Circuit noted that at least five circuits allow such a practice. *West Run*, 712 F.3d at 171-72; *see also Potts v. Potts*, No. WDQ-13-1986, 2014 WL 4060031, at *8 n.30 (D.Md. Aug, 13, 2014) (noting that statement in an initial complaint was not binding because the "allegations [had] been removed in the amended complaint"). Moreover, "the court is not bound by a party's conception of the legal effect of certain facts." *Danner v. Int'l Freight Sys. Of Washington, LLC*, 855 F.Supp.2d 433, 459 n.36 (D.Md. 2012) (internal

20

quotation marks omitted) (quoting *Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 265 n.2 (4th Cir. 2004)). Plaintiffs' alleged admission in their initial complaint was regarding the legal effects of American Capital's relationship with SPL and is not binding on Plaintiffs. Accordingly, summary judgment is not appropriate as to whether SPL is a covered insured under the policies.[3]

3. **2007-2008 and 2008-2009 Umbrella Policies**

The 2007-2008 and 2008-2009 umbrella policies provide that the policies cover the named insured "American Capital" and "any subsidiary thereof." (*See, e.g.*, ECF No. 510-12, at 27). Plaintiffs argue that SPL was not a subsidiary under the "common meaning" of the term. Plaintiffs contend that the common meaning of "subsidiary" is: "a company wholly controlled by another that owns more than half of its voting stock," "a company controlled by another company which owns most of its shares," "one which is controlled by another corporation by reason of the latter's ownership of at least a majority of the shares of the capital stock," or "one in which another corporation (i.e. parent) owns at least a majority of the

---

[3] Plaintiffs also argue that they have not breached the umbrella policy because a "defense obligation can arise under the Umbrella Policies . . . only if [coverage under the] Primary Policies [is] exhausted." (ECF No. 510, at 46). This argument is not applicable to the 2006-2007 umbrella policy because SPL has no coverage under the 2006-2007 primary policy.

shares, and thus control." (ECF No. 510-1, at (quoting *Comptroller v. Crown Cent. Petroleum Corp.*, 52 Md.App. 581, 593 (1982) (citations and internal quotations marks omitted))). Defendants focus on the fact that Plaintiffs have previously called SPL a subsidiary of American Capital, but they do not address the underlying question whether SPL actually was a subsidiary, bringing it under coverage of the umbrella policies.

Unlike the term "majority interest," the term "subsidiary" is unambiguous and narrower. In addition to the definitions Plaintiffs cite from *Crown*, "subsidiary" is defined in the Maryland Code as "any corporation of which stock having a majority of the votes entitled to be cast is owned, directly or indirectly, by the corporation." Md. Code Ann., Corps & Ass'ns § 3-801(n). All commonly used meanings of "subsidiary" invoke ownership and control. Each party makes allegations as to how the other has labeled the relationship between SPL and American Capital, but neither adequately discusses or cites to the record to demonstrate whether SPL actually was a subsidiary. Therefore, the question of whether American Capital exercised the requisite control over SPL to create a subsidiary relationship is disputed and unclear from the record.

Plaintiffs also contend that there is no claim under the umbrella policies because a "defense obligation can arise under the Umbrella Policies . . . only if [coverage under the] Primary

22

Policies [is] exhausted." (ECF No. 510, at 46). Defendants counter that Plaintiffs' denial of a defense under the primary policies triggered a duty to defend under the umbrella policies. (ECF No. 514-1, at 73). The umbrella policies state in relevant part that Plaintiffs "will have no duty to defend any claim or 'suit' that any other insurer has a duty to defend." (*E.g.*, ECF No. 510-13, at 13). The umbrella policies do, however, provide coverage for damages "payable under [other polices] but which are not payable by a policy . . . because: (1) Such damages are not covered; or (2) The 'underlying insurance' has been exhausted by the payment of claims." (*Id.*). Here, a dispute remains whether Plaintiffs had a duty to defend under the primary policies and whether the primary policies cover alleged damages. Accordingly, Plaintiffs are not entitled to summary judgment on the counts in Defendants' counterclaim regarding coverage under the umbrella policies.

**B. Joint Venture Clause**

The policies provide: "No person or organization is an insured *with respect to the conduct of any* current or past partnership, *joint venture* or limited liability company that is not shown as a Named Insured."[4] (*E.g.*, ECF No. 510-9, at 89 (emphases added)). Plaintiffs argue that this clause

---

[4] American Capital is the only named insured in each policy. (*See* ECF Nos. 510-9; 510-10; 510-11; 510-12; 510-13; 510-14).

effectively removes the heparin lawsuits from coverage under the policies because the allegedly defective heparin was created by Changzhou, the joint venture.   Defendants counter that the clause does not remove coverage because the heparin lawsuits "created the potential for a judgment against American Capital and/or SPL for liability with respect to the conduct of SPL's own Wisconsin operations, . . . independent of any liability associated with Changzhou." (ECF No. 514-1, at 52).   Defendants assert that all of the suits allege SPL itself was negligent or strictly liable, and some do not even reference the joint venture.

Under the two-step standard for determining a duty to defend, the key inquiry is whether the underlying heparin complaints allege an injury that occurred "with respect to the conduct" of the joint venture.   If there is no potential that the complaints allege conduct separate from the joint venture, then Plaintiffs are correct that they have no duty to defend. Otherwise, the joint venture clause does not relieve them of the duty.

The term "with respect to" typically is defined broadly. Merriam-Webster's Collegiate Dictionary defines "with respect to" as "concerning," "with reference to," or "in relation to." Merriam-Webster's Collegiate Dictionary 1061 (11th ed. 2012). Courts have noted that such a phrase "is not necessarily tied to

the concept of a causal connection" and is "broader in scope than the term 'arising out of.'" *See, e.g.*, *Coregis Ins. Co. v. Am. Health Foundation, Inc.*, 241 F.3d 123, 128-29 (2[d] Cir. 2001). In Maryland, the term "arising out of," which is narrower than "with respect to," has been interpreted "'to mean originating from, growing out of, flowing from, or the like.'" *Beretta U.S.A. Corp v. Fed. Ins. Co.*, 117 F.Supp.2d 489, 493-94 (D.Md. 2000) (quoting *N. Assurance Co. V. EDP Floors, Inc.*, 311 Md. 217 (1987)). Thus, because of the broad nature of the joint venture exclusion, Plaintiffs do not have a duty to defend the heparin lawsuits unless there is a potential for judgment against Defendants completely unrelated to heparin originating with Changzhou. Even if the cause of action alleged were negligence or strict products liability against SPL and American Capital, the joint venture clause excludes the heparin lawsuits from coverage if the underlying liability relates, in any way, to heparin received from Changzhou. *See M Consulting and Export, LLC v. Travelers Cas. Ins. Co.*, 2 F.Supp.3d 730, 740 (D.Md. 2014) (citing cases for the proposition that it is the substance of the underlying claim and not a plaintiff's characterization or theory of liability that controls).

Many of the complaints do not mention Changzhou or include any reference to a joint venture. (*See, e.g.*, ECF Nos. 514-11; 514-14). In addition, the depositions of two SPL executives

show that the contaminated SPL potentially came from a source other than Changzhou.  For example, Dr. Yan Wang, Vice President of Business Development and Research at SPL, stated that he could not confirm that all the contaminated heparin came from Changzhou because lot 1035, one of the two contaminated lots, "came from multiple sources," including an independent Chinese supplier.  (ECF No. 510-3, at 19-20).  In fact, Dr. Wang confirmed that Changzhou "did not have possession of any [lot] 1035 product."  (*Id.* at 15).  Similarly, Mr. David Strunce, President and CEO of SPL, confirmed that lot 1035 was purchased from three suppliers, none of which were Changzhou.[5]  (ECF No. 510-5, at 25).

Accordingly, the joint venture exclusion does not preclude coverage of the heparin lawsuits or relieve Plaintiffs of a potential duty to defend.  Thus, Plaintiffs have failed to show that the joint venture exclusion presents a triable issue of fact *vis a vis* Plaintiffs' duty to defend American Capital. While other provisions may obviate any duty to defend, the joint venture exclusion does not.

---

[5]  Plaintiffs baldly assert that none of the allegedly contaminated heparin from sources other than Changzhou was administered to patients.  (ECF No. 510-1, at 16).  This assertion, however, is not adequately supported by the record. Rather, the exhibits Plaintiffs cite support the notion that the allegedly contaminated heparin potentially came from a source other than Changzhou.  (*See* ECF Nos. 510-3; 510-4; 510-22).

C.    **Effect of Defendants' Agreement with Baxter**

Each policy states that "[n]o insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [the insurer's] consent." (*See, e.g.*, ECF No. 510-9, at 90). Plaintiffs contend that Defendants' agreement with Baxter violated this provision, thereby voiding any coverage the policies provided Defendants. Defendants first argue that Plaintiffs are liable for the Agreement costs because they incorrectly denied coverage and the duty to defend already attached. (ECF No. 514-1, at 74-77). Defendants also argue, in the alternative, that the Agreement does not void the policy; instead they argue that, at the most, Plaintiffs are relieved from paying the Agreement costs themselves.

Defendants are correct that Plaintiffs' duty to defend, if any, crystalized when the underlying heparin claims were made. *See Sherwood Brands, Inc. v. Hartford Acc. And Indem. Co.*, 347 Md. 32, 44 (1997). Plaintiffs did not have an opportunity to breach their duty to defend, however, until they actually denied coverage on January 16, 2009. *Id.* at 46 ("A duty to defend is not breached until the insurer is notified of the claim and then, without legal justification, declines to undertake defense."). Defendants attempt to stretch precedent to argue that, under *Sherwood*, Plaintiffs are liable for all prior

litigation   expenses   if   they   incorrectly   denied   coverage. However, *Sherwood* provides for reimbursement of costs made "*as a result of*" the improper denial of coverage, that is, because of the insurer's breach of its duty to defend. *Id.* at 50 (emphasis added).   For   example,   Plaintiffs   may   be   liable   if   they improperly denied coverage *and then* Defendants entered into the Agreement, because Plaintiffs had breached their duty *prior* to the Agreement.   Here, Defendants "voluntarily [made] a payment" without Plaintiffs' consent *before* any alleged breach occurred. The Agreement was not the *result* of Plaintiffs' alleged breach because   no   potential   breach   had   yet   happened.   Defendants' conclusory assertions that Plaintiffs denied a defense before the Agreement simply are not supported by the record.   The denial, and therefore potential breach, did not occur until January 16, 2009.  (ECF No. 514-5).

Defendants assert that the Agreement mitigated Plaintiffs' potential   exposure.   Even   if   the   Agreement   did   mitigate potential exposure, it also "cut[] off [Plaintiffs'] right to 'investigate, defend, control, or settle' [the] suit" other than as proscribed by the Agreement. *See Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 104-05 (4th Cir. 2013) (quoting *Prince George's County v. Local Gov't Ins. Trust*, 388 Md. 162, 190 (2005)).  The Fourth Circuit has held that Maryland law   dictates   that   insurers   are   not   obligated   to   make   such

28

payments made without their consent. *Id.* In addition, the amount owed under the Agreement was not merely for costs spent defending the heparin lawsuits; it included future joint defense costs spent according to the provisions of the Agreement and the settlement of issues unrelated to Plaintiffs. Defendants' argument that the Agreement did not violate the voluntary payments clause because it did not settle any of the underlying Heparin suits is unpersuasive. The plain language of the policies provides that Plaintiffs are not liable for *any* voluntary payments made without their consent. (*See, e.g.*, ECF No. 510-9, at 90). The provision is not limited only to payments made to settle the underlying suits. Accordingly, the policies do not require that Plaintiffs pay the costs of the Agreement. The Agreement does not, however, void the entire policy because it is not a *breach* of the voluntary payment provision. The provision does not *ban* voluntary payments, but instead mandates that the insured, rather than the insurer, cover the cost of such voluntary payments. (*Id.*). Plaintiffs may ultimately be liable for costs arising from the heparin lawsuits other than Defendants' agreement with Baxter, and the Agreement does not, by itself, relieve Plaintiffs of a potential duty to defend.

The policies also exclude coverage for injuries "for which the insured is obligated to pay damages by reason of the

assumption of liability in a contract or agreement." (ECF No. 510-9, at 81). Similar to the voluntary payment provision, this provision relieves Plaintiffs of their duty to pay the costs of the Agreement, but does not void coverage altogether. Further, because the policies provide that the contractual liability exclusion does not apply to damages "[t]hat the insured would have in the absence of the contract or agreement," the contractual liability provision is likely narrower than the voluntary payment provision and is of little importance here. (*Id.*). Accordingly, Plaintiffs are not liable for the costs of the Agreement, but Defendants' entry into the Agreement did not void the policies or relieve Plaintiffs of a potential duty to defend.

   **D.  Known Bodily Injury Provision**

   The policies contain a provision that excludes coverage for injuries when "the insured or authorized 'employee' knew, prior to the policy period, that the 'bodily injury' . . . occurred." (ECF No. 510-11, at 86). The policies define "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from these at any time." (*See, e.g.*, *id.* at 97). Plaintiffs argue that this provision in the 2008-2009 primary and umbrella policy excludes the heparin lawsuits because SPL clearly knew about the alleged contamination prior to the start of the policy period, which was June 14, 2008.

(ECF No. 510-1, at 46).   Defendants counter that this provision is not applicable because it only excludes coverage if Defendants knew about bodily injury to a particular individual prior to the policy period.   (ECF No. 514-1, at 72).

The scope of the parties' disagreement on this issue is actually rather small.   Many of the heparin complaints, including the original multidistrict litigation action, were filed before the 2008-2009 policy and allege injuries that would fall under earlier policies.   (*See* ECF No. 516, at 42).   In addition, because Baxter and SPL recalled the allegedly contaminated heparin in early 2008, it is unlikely that many, if any, injuries occurred during the time covered by the 2008-2009 policies.   That said, Defendants' reading of the provision is correct.   Its plain meaning bars coverage only of a specific bodily injury that was known by Defendants prior to the policy date.   Plaintiffs have provided no evidence that Defendants knew, before the start of the 2008-2009 policy period, of any injuries for which they are seeking coverage under the 2008-2009 policies.

**E.   Conclusion**

For the foregoing reasons, partial summary judgment will be entered in favor of Plaintiffs as to Count IV of the Second Amended Complaint (declaratory judgment) with respect to coverage of SPL under the 2006-2007 Primary Policy and as to

Counts I and IX of the Third Amended Counterclaims (declaratory judgment and breach of contract for the 2006-2007 primary policy).   In addition, the joint venture clause does not relieve Plaintiffs of their duty to defend.   Other claims within Count IV of the Second Amended Complaint remain.   Counts II through VIII and X through XII of the Third Amended Counterclaim also remain.

## IV.  Plaintiffs' Rescission and Reformation Claims

### A.   Rescission

Defendants move for summary judgment on Count I of the Second Amended Complaint, which seeks to rescind the policies based on Defendants' purported misrepresentations that it was not seeking coverage for subsidiaries or other entities, such as SPL.   (ECF No. 1 ¶¶ 137-141).   Ultimately to succeed on their rescission claim, Plaintiffs must show that they:

> [I]ssued a policy in reliance on a material misrepresentation in the application. Materiality is determined by considering whether, given the circumstances of the case, the information omitted could reasonably have affected the determination of the acceptability of the risk. The misrepresentation must actually have been relied on in issuing the policy or setting the premium in order for it to be material. . . . The materiality of a misrepresentation can be determined [at summary judgment] as a matter of law when the evidence is clear and convincing, or uncontradicted.

*Mutual Ben. Ins. Co. v. Lorence*, 189 F.Supp.2d 298, 302 (D.Md. 2002) (quoting *N. Am. Specialty Ins. Co. v. Savage*, 977 F.Supp. 725, 728 (D.Md. 1997)) (citations and internal quotation marks omitted).  Plaintiffs must also show that they acted promptly in seeking rescission after learning of "the facts that would *justify* rescission." (ECF No. 77, at 9 (quoting *Monumental Life Ins. Co. v. U.S. Fid. & Guar. Co.*, 94 Md.App. 505, 541 (1993) (emphasis in original))).

Defendants' argument that Plaintiffs are "trying to reframe [their] rescission claim completely" by focusing on alleged misrepresentations regarding coverage of other entities in general rather than on the question of whether American Capital had subsidiaries (ECF No. 523, at 32) ignores Plaintiffs' clear allegations that American Capital made "misrepresentations . . . that it was not seeking coverage for other entities." (ECF No. 67 ¶ 138).  In addition, Defendants' focus on the alleged misrepresentation regarding subsidiaries ignores many other alleged misrepresentations contained in the record. (*See* ECF No. 516, at 61-62).  The crux of Plaintiffs' argument is that American Capital made material misrepresentations to hide the fact that it was seeking coverage not only for itself, but also for at least some of its portfolio companies, such as SPL. Accordingly, the appropriate focus is on the totality of the alleged misrepresentations.

Plaintiffs assert that the record shows multiple misrepresentations made by Defendants, including: (1) indicating on its insurance application that American Capital had no subsidiaries, had not acquired any operations in the last five years, was not involved in any joint ventures, and did not sell, distribute, or use as components foreign products (ECF No. 516-10, at 3, 13, 34); and (2) continually providing loss and exposure information only for American Capital operations, and not those of its portfolio companies, including SPL (see ECF Nos. 516, at 61-62; 516-21, at 6-7).  Plaintiffs contend that, in reliance on these misrepresentations, they devised American Capital's insurance policy, including its premiums, to cover only American Capital itself.  Plaintiffs assert that, had Defendants not misrepresented the scope of coverage they sought, Plaintiffs would have charged higher premiums or included additional language explicitly excluding the portfolio companies from coverage.  (ECF No. 516, at 72).

Defendants argue that Plaintiffs did not file their rescission claim "promptly" after learning of facts that would justify rescission.  Plaintiffs counter that they acted promptly after concluding that American Capital would seek coverage on behalf of SPL.  Viewing the facts in the light most favorable to the nonmovants, Plaintiffs did not have a "concrete indication" that Defendants would seek coverage for SPL under the policies

until, at the earliest, November 12, 2008. (*See* ECF No. 523, at 34). Prior to this date, Plaintiffs had no concrete indication that SPL, in addition to American Capital, would seek coverage under the policies because American Capital was a named defendant in all the suits that had been noticed. (*See* ECF No. 514-1, at 32). Although an insurer is required to act promptly, "it is entitled to a reasonable time within which to investigate the matter" before it must rescind. *Savage*, 977 F.Supp. at 732. There is evidence that Plaintiffs acted promptly and diligently in trying to obtain additional information from American Capital regarding the heparin lawsuits as soon as they received notice of the suits, and that they filed their rescission claim approximately two months later. (*See* ECF Nos. 510-48; 510-49; 510-50). "The Fourth Circuit has found a delay of two months between discovering a reason for rescission and the date of actual rescission acceptable." *Savage*, 977 F.Supp. at 732 (citing *Thomas v. Prudential Ins. Co. of Am.*, 104 F.2d 480, 483 (4th Cir. 1939)). Defendants have not shown as a matter of law that any delay here was unreasonable in light of American Capital's apparent lack of responsiveness and the relatively complex nature of American Capital's relationship with SPL. Accordingly, Defendants are not entitled to summary judgment on Count I of the complaint.

35

B.     **Reformation**

Defendants also move for summary judgment on Plaintiffs' reformation claims (Counts II and III), which seek reformation of the insurance policies due to mutual mistake or unilateral mistake.[6]   Plaintiffs assert that the parties intended the policies to provide coverage only for American Capital and not for its portfolio companies, such as SPL.  (ECF No. 1 ¶¶ 142-146).  In Maryland, for a party to obtain reformation of an insurance policy, "it is necessary that it appear, by appropriate proof, that a valid agreement exists, and that by reason of fraud, or by mutual mistake on the part of both parties to the agreement, it does not conform to the actual agreement of the parties."  *Am. Cas. Co. of Reading, Pa. v. Ricas*, 179 Md. 627, 634 (1941).  Defendants argue that summary judgment is warranted because the policies comport with the terms intended by the parties, Plaintiffs affirmed the contracts on December 30, 2008, a third party relied on the contract as written, and Plaintiffs' reformation claim is procedurally deficient because it does not contain a redline version of the proposed reformed policies.

---

[6]  Plaintiffs do not oppose Defendants' motion for summary judgment as to reformation due to unilateral mistake. Accordingly, summary judgment will be entered on Count III of the complaint.  *See Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 393-95 (4th Cir. 1994).

A genuine dispute of material fact remains as to the extent of coverage intended by the parties.   Thomas McHale, Senior Vice President of Finance at American Capital, asserted in his deposition that he had always understood the policies to cover American Capital's portfolio companies.  (ECF No. 514-134, at 4-5).   The record contains evidence, however, supporting Plaintiffs' contention that the parties intended the policies to cover only American Capital.   For example, Defendants did not provide Plaintiffs with any information regarding SPL or other portfolio companies (ECF No. 516, at 77), and employees in American Capital's treasury department described that SPL might only be covered by a "loophole" in the policy (ECF No. 516-17, at 3).  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

Defendants' other arguments are not sufficient to warrant summary judgment.   First, Defendants allege that Plaintiffs "affirmed the contracts' subsistence" in a December 30, 2008 e-mail sent to American Capital with regard to its relationship with Nationwide Arena, which was involved in a lawsuit unrelated to the heparin lawsuits.  (ECF No. 514-25).   This e-mail does not affirm the validity of the policies as written, but rather suggests that Plaintiffs were undergoing the same coverage

determination with regard to Nationwide Arena as they were with the heparin lawsuits.  Defendants also assert that Baxter's reliance on the policies precludes reformation.  There is no evidence in the record, however, of Baxter's reliance on the policies, and such a determination is not appropriate at this time.[7]  Finally, Defendants contend that summary judgment is warranted because Plaintiffs did not supply a redline version of their proposed reformations.  Defendants do not cite any authority requiring a party seeking reformation to submit a redline version of a contract.  Rather, Defendants' argument rests on the fact that a party seeking reformation must show "the precise agreement which the parties intended." *See Emanuel v. Ace Am. Ins. Co.*, No. ELH-11-875, 2012 WL 2994285, at *7 (D.Md. July 20, 2012); *Lazenby v. F.P. Asher, Jr. & Sons, Inc.*, 266 Md. 679, 682-84 (1972).  Although a redline version would certainly help a factfinder determine the precise agreement Plaintiffs contend existed, one is not required here. Plaintiffs have made plain their belief that the parties intended the policies to cover only American Capital and any

---

[7] Plaintiffs are also correct that the Restatement (Second) of Contracts § 155 cmt. f, on which Defendants rely, only discourages reformation for "good faith purchases for value" and "[s]uch other third parties . . . who have given value and come within the definition of 'purchaser'" under the Uniform Commercial Code, such as "mortgagees, pledgees and other holders of a security interest."  Baxter does not appear to fall within this definition.

entity that was included in its application and exposure schedule, but not unreported portfolio companies such as SPL. Accordingly, Defendants are not entitled to summary judgment on Count II of the complaint.

## V.   Defendants' Statutory Lack of Good Faith Counterclaim

Defendants and Plaintiffs cross move for summary judgment on Defendants' statutory lack-of-good-faith counterclaim. Defendants assert this counterclaim under two Maryland statutes, which require an insurer to make "an informed judgment based on honesty and diligence supported by evidence the insurer knew or should have known at the time the insurer made a decision on a claim." Md. Code Ann., Cts. & Jud. Proc. § 3-1701; *see* Ins. § 27-1001(a).  As the undersigned previously noted, the court in *Cecilia Schwaber Trust Two v. Hartford Accident and Indem., Co.*, 636 F.Supp.2d 481, 487 (D.Md. 2009), determined that assessing whether an insurer acted in good faith requires "an evaluation of the insurer's efforts to obtain information related to the loss, accurately and honestly assess this information, and support its conclusion regarding coverage with evidence obtained or reasonably available."  This test has been summarized as requiring an insurer to meet "standards of reasonable investigation, honest assessment, and reasonable explanation." *All Class Const., LLC v. Mut. Ben. Ins. Co.*, 3 F.Supp.3d 409, 418 (D.Md. 2014).  This court considers the following factors

when   determining   if   an   insurer   meets   the   aforementioned
standards:

> [(1)]  efforts  or  measures  taken  by  the
> insurer  to  resolve  the  coverage  dispute
> promptly  or  in  such  a  way  as  to  limit  any
> potential  prejudice  to  the  insureds;  [(2)]
> the  substance  of  the  coverage  dispute  or  the
> weight  of  legal  authority  on  the  coverage
> issue;  [and  (3)]  the  insurer's  diligence  and
> thoroughness  in  investigating  the  facts
> specifically  pertinent  to  coverage.

*Cecilia  Schwaber*,  636  F.Supp.2d  at  487  (citation  and  internal

quotation  marks  omitted).



Defendants   summarize   their   lack-of-good-faith   assertions   as

arguing  that:

> Travelers  (i)  ███████████████████
> ████████████████████████████████████
> ████████████████████████████████████
> █████████████████████  (ii)  could
> not  provide  any  good  faith  explanation  for
> its  ███████████████████;  and  (iii)
> impermissibly  relied  on  extrinsic  evidence
> to  deny  a  duty  to  defend  based  on  joint

> venture grounds even those heparin suits
> that contain no mention whatsoever of a
> joint venture.

(*Id.* at 59-60).   Plaintiffs counter that Defendants have simply

not shown that Plaintiffs "failed to make an 'informed judgment

based on honesty and diligence supported by the evidence the

insurer knew or should have known at the time the insurer made a

decision on a claim.'"   (ECF No. 510-1, at 48 (quoting Md. Code

Ann., Cts. & Jud. Proc. § 3-1701)).   ████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████.[8]

   An improper denial of coverage alone does not show a lack

of good faith.   *See All Class Const.*, 3 F.Supp.3d at 418.   The

question of good faith turns not on what the policies actually

cover, but what the insurer reasonably believed and articulated

they covered at the time of denial.   *See id.; Lanham Servs.,*

*Inc. v. Nationwide Property and Cas. Ins. Co.*, No. PWG-13-3294,

2014 WL 2772227, at *5 (D.Md. June 18, 2014).   In their letter

denying coverage, Plaintiffs informed Defendants that because

---

[8]   Plaintiffs make two additional arguments that can be
addressed quickly.   First, they argue that Defendants' claim
must fail because Plaintiffs are entitled to summary judgment on
the coverage issue.   Although the underlying proposition is
true, *see Cecilia Schwaber*, 636 F.2d at 488 n.6, it is
inapplicable because Plaintiffs' motion for summary judgment on
coverage will, in large part, be denied.   Second, Plaintiffs
continue to argue that § 3-1701 does not apply to this case.
The undersigned has already held otherwise.   (ECF No. 378, at
16-18 (citing *Whiting-Turner Contracting Co. v. Liberty Mut.*
*Ins. Co.*, 912 F.Supp.2d 321, 339 (D.Md. 2012))).

"[t]he heparin lawsuits relate to the conduct of the [joint venture,] . . . the heparin lawsuits fall outside the coverage of the primary and umbrella policies." (ECF No. 514-5, at 3). The letter further stated Plaintiffs' understanding of the facts of the underlying complaints, which was that the allegedly defective heparin was manufactured by Changzhou. (*Id.* at 4).

There remains a dispute of material fact as to whether Plaintiffs' decision to deny coverage was informed, based on honesty and diligence, and supported by evidence that Plaintiffs knew or should have known at the time of the decision. The primary justification Plaintiffs provided in their letter denying coverage was that the joint venture provision precluded coverage. As discussed above, however, many of the underlying complaints did not mention Changzhou or the existence of a joint venture, and actually may not relate to the joint venture.[9] █

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[9] Although the inquiry into a lack of good faith "focuses on the time at which the insurer's decision was made," *All Class Const.*, 3 F.Supp.3d at 416, the fact that discovery has shown that the heparin lawsuits may not be related to heparin from Changzhou further puts into question whether Plaintiff conducted a diligent and thorough investigation of the facts pertinent to coverage.

███████████████████████████████████████████

████████████████████████████████████  Moreover, it is premature to determine, as a matter of law, whether Plaintiffs' coverage determination was made in good faith when the meaning and scope of the provisions, and thus, the "weight of legal authority on the coverage issue," remains unresolved. Accordingly, both Plaintiffs' and Defendants' motion for summary judgment will be denied as to Count XIII of the third amended counterclaim.

## VI.  Defendants' Common Law Tort Claim for Promissory Fraud

Defendants' counterclaim also alleges that Plaintiffs "committed promissory fraud" because Plaintiffs never intended "to perform express contractual promises" set forth in the policies.  Specifically, Defendants assert that the policies, as written, cover American Capital's portfolio companies, but Plaintiffs never intended actually to carry out the provisions of the policies.  (ECF No. 380 ¶¶ 295-300).

Plaintiffs first argue that Maryland public policy prohibits Defendants' promissory fraud claim.  (ECF No. 510-1, at 52-54).  Plaintiffs' argument is based on the principle that it is not appropriate to allow tort remedies for what is essentially a breach of contract action.  Plaintiffs support their public policy argument by relying on a Court of Appeals of Maryland case, *Mesmer v. Maryland Auto. Ins. Fund*, 353 Md. 241

(1999), and one from the United States Court of Appeals for the Fourth Circuit, *Hartz v. Liberty Mut. Ins. Co.*, 269 F.3d 474 (4th Cir. 2001).   In *Mesmer*, the Court of Appeals held that, "a liability insurer breaches no tort duty when, upon learning of a claim, it erroneously denies coverage and refuses to undertake any defense against the claim." 353 Md. at 258.   Similarly, the Fourth Circuit noted that "[t]he Maryland Court of Appeals has repeatedly held that the duty which is owed to an insured for failure to settle a claim sounds in contract and not in tort." *Hartz*, 269 F.3d at 476 (citing *Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639 (1999)).   These cases stand for the proposition that wrongful denial of coverage, absent more, cannot be brought as a tort claim.   *See Mesmer*, 353 Md. at 253 ("'Mere failure to perform a contractual duty, *without more*, is not an actionable tort.'" (citing *Wilmington Trust Co. v. Clark*, 289 Md. 313, 328-29 (1981) (emphasis added)).   Here, Defendants assert more than a mere failure to defend.   Rather, their claim is that Plaintiffs fraudulently entered into the policies with no intention of offering the terms contained within.   As this court has previously stated:

> "[W]hile 'fraud cannot be predicated on statements that are merely promissory in nature, or upon expressions as to what will happen in the future,' . . . 'the existing intention of a party at the time of contracting is a matter of fact' and 'fraud may be predicated on promises made with a

present intention not to perform them.'" *Parker v. Columbia Bank*, 91 Md.App. 346, 360-61 (1992); *Orteck Int'l Inc. v. TransPacific Tire & Wheel, Inc.,* No. DKC-05-2882, 2006 WL 2572474, at *11 (D.Md. Sept. 5, 2006). "The gist of the fraud in such cases is . . . the false representation of an existing intention to perform where such intent is in fact non-existent." *Tufts v. Poore*, 219 Md. 1, 12 (1959); *Hale Trucks of Md., LLC v. Volvo Trucks N.A., Inc.*, 224 F.Supp.2d 1010, 1032 (D.Md. 2002) ("a deliberate misrepresentation of one's existing intentions, where the misrepresentation is material, 'may form the basis for an action in fraud or deceit'"). This is exactly the theory on which Defendants base the promissory fraud counterclaim. Specifically, the proposed fraud counterclaim alleges that at the time Travelers issued the three policies, it did not intend to perform "according to the very terms that Travelers specifically intended to include in the [p]olicies." (ECF No. 285-2 ¶ 301). Defendants further allege in support of this counterclaim that "Travelers' intention was to perform only those promises of coverage that Travelers was not seeking to remove via its 'reformation claim.'" (ECF No. 285-1 ¶ 84).

(ECF No. 378, at 19-20). Accordingly, Defendants' promissory fraud claims are not barred by Maryland public policy.[10]

---

[10] In addition, in the years since the two cases cited by Plaintiffs were decided, Maryland created the aforementioned statutory cause of action against insurers for lack of good faith. Md. Code Ann., Cts. & Jud. Proc. § 3-1701. This statutory change further indicates that Maryland public policy does not bar claims such as Defendants' promissory fraud tort claim.

Both parties proceed to debate the substantive merits of Defendants' promissory fraud claim.  In Maryland, the elements of fraud are:

> (1) that the defendant made a false representation to the plaintiff; (2) that its falsity was either known or that the representation was made with reckless indifference as to its truth; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Md. Envtl. Trust v. Gaynor*, 370 Md. 89, 97 (2002).  Plaintiffs move for summary judgment only on the fourth and fifth elements.  Plaintiffs assert they are entitled to summary judgment because, "[i]f the Court finds that the Policies do not in fact provide [the coverage Defendants allege], then there could have been no justifiable reliance as a matter of law."  (ECF No. 510-1, at 53).  As the undersigned discussed in relation to the parties' declaratory judgment and statutory lack of good faith claims, because the precise meaning and scope of the policies remains disputed, summary judgment is not appropriate on this element.  In addition, Plaintiffs allege that Defendants have not adequately shown that they were injured by their reliance on the alleged misrepresentations.  This argument is unavailing because if Defendants are ultimately correct about the other elements, including the scope of the policies' coverage, the alleged

injury is clear.  Without the alleged misrepresentations as to the scope of coverage, Defendants would have procured a different policy that provided the coverage they sought, and the heparin lawsuits would have been covered.  To be clear, success on the other elements is far from a forgone conclusion, Defendants must still prove the extent of the damages proximately caused by the fraud, and Plaintiffs are not liable for the costs of the Agreement.  Plaintiffs are not, however, entitled to summary judgment as a matter of law.

Defendants' argument for summary judgment rests on the allegation that Plaintiffs purposefully misrepresented the scope of the policy in order to defraud Defendants.  The record disputes Defendants' various assertions that Plaintiffs did not intend to honor the terms of the policy.  First, the intent of the parties as to coverage remains disputed.  Second, as discussed throughout this opinion, a factfinder could determine that the record shows the existence of a heated internal dispute over the nature and scope of the policies, not intentional misrepresentation.  What Defendants allege are misrepresentations as to the scope of the policy may be mere factual explanations of the policy's language.  For example, Defendants cite to an e-mail from a Travelers account executive that states that the policies "cover the [general liability] on a comprehensive basis subject to the policy forms.  Therefore we

47

are covering all the operations (subject to the policy limitations and exclusions) of the named insured . . . ." (ECF No. 514-91). Nothing in this e-mail indicates attempted misrepresentation, and it conveys that coverage is limited by the terms of the policies. The meaning and scope of those terms is what is now being disputed. Such a coverage dispute is not enough to show that, as a matter of law, Plaintiffs engaged in promissory fraud. Accordingly, Defendants' motion for summary judgment will be denied.

## VII. Motions to Seal

In addition to the common-law standard for a motion to seal that the court has applied in prior opinions (*See, e.g.*, ECF Nos. 492; 517), a qualified First Amendment right of access "attaches to materials filed in connection with a summary judgment motion." *Doe v. Pub. Citizen*, 749 F.3d 246, 258, 267 (4th Cir. 2014) (citation omitted). This right of access "may be restricted only if closure is 'necessitated by a compelling government interest' and the denial of access is 'narrowly tailored to serve that interest.'" *Id.* at 266 (quoting *In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986) (quoting *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 510 (1984) (internal quotation marks omitted))).

Unfortunately, the parties are, once again, unable to agree on a motion to seal. Plaintiffs move to seal portions of the

summary judgment record that fall into two categories: "(a) records and testimony regarding Travelers' underwriting processes, procedures and actions related to American Capital Policies and (b) records and testimony containing attorney-client communications and work product." (ECF No. 524-1, at 1). Plaintiffs, complying with Local Rule 105.11, have filed the briefs with proposed redactions highlighted (ECF Nos. 524-3 through 524-7), and a list of exhibits proposed for redaction (ECF No. 524-8). They also publicly filed the documents with the proposed redactions. (ECF Nos. 527; 528; 529; 530).

Defendants contend that Plaintiffs have failed to meet their burden of showing that the proposed redactions are narrowly tailored to further a compelling interest, as required under the First Amendment. Although Plaintiffs noted the reason for each proposed redaction, Defendants seek to have Plaintiffs specify with more particularity why each redaction is necessary to protect confidential underwriting processes and procedures or attorney-client communications and work product.

In a prior memorandum opinion the undersigned held that, under the common-law standard, Plaintiffs were justified in redacting "information that pertains to their business processes, underwriting decisions, communications with attorneys, and attorney impressions." (ECF No. 492, at 6-7). Similarly, Plaintiffs have a compelling interest in keeping

sensitive internal underwriting processes and procedures sealed. *See Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*, 95 F.Supp.3d 860, 882-83 (D.Md. 2015) (granting motion to seal at summary judgment stage because releasing the information could cause the party to "suffer significant harm to its business dealings"). Plaintiffs have sufficiently articulated how releasing this internal information could give their competitors sensitive details as to how Plaintiffs evaluate risk and coverage of potential insureds.  Contrary to Defendants' characterization of this material as "routine claims handling materials," the redacted material is plainly the type of sensitive, confidential internal business information that is appropriate to keep under seal.  Plaintiffs also have a compelling interest in maintaining the confidentiality of attorney-client communications and work product.  Plaintiffs continue to have an interest in keeping this information confidential despite its disclosure under seal pursuant to court orders.  (*See, e.g.*, ECF No. 325).  The parties argue over whether Plaintiffs' interest should be framed as attorney-client privilege or a duty of confidentiality, but this distinction is immaterial because both are compelling interests that justify redactions at this time.

Plaintiffs' proposed redactions are relatively limited and reasonable.  Plaintiffs redact only relevant portions of the briefs, leaving the parties' arguments readily discernible from

the redacted versions.   Plaintiffs propose redactions to 90 exhibits, leaving the vast majority of the nearly 300 exhibits publicly available in their entirety.   Accordingly, the court finds, following an independent review of the proposed redactions, that Plaintiffs have demonstrated that the proposed redactions to the summary judgment record are justified.

As before, the undersigned will not endeavor to determine what portions (if any) of this Memorandum Opinion contain information that is under seal.   Rather, the Memorandum Opinion will be filed under seal temporarily, and the parties are directed to review it and within fourteen (14) days suggest *jointly* any necessary redactions that should be made before it is released to the public docket.

## VIII.    Conclusion

For the foregoing reasons, the motions for summary judgment filed by Defendants and Plaintiffs will both be granted in part and denied in part.[11]   Plaintiffs' motions to seal will be granted.   A separate order will follow.

/s/
_____
DEBORAH K. CHASANOW
United States District Judge

---

[11] The parties' discussion regarding the level of damages is premature because issues of liability have not been resolved.