IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

THE CHARTER OAK FIRE COMPANY,
et al.                                           :

    v.                                       :    Civil Action No. DKC 09-0100

:

AMERICAN CAPITAL LTD., et al.
                                                 :

**MEMORANDUM OPINION**

What started as an ordinary relationship between an insured
and its insurer has become, since the notice of the first claim,
anything but.  Primarily at issue in this insurance coverage
case is whether Plaintiffs/Counter-Defendants Charter Oak Fire
Insurance Company ("Charter Oak") and Travelers Property
Casualty Company of America ("Travelers") (collectively,
"Plaintiffs") breached the duty to defend Defendants/Counter-
Plaintiffs American Capital, Ltd. ("American Capital") and
Scientific Protein Laboratories LLC ("SPL") (collectively,
"Defendants") in more than 1,000 underlying lawsuits pertaining
to allegedly contaminated heparin under six insurance policies.[1]
The six insurance policies are: three primary commercial general
liability ("CGL" or "Primary") insurance policies issued by

---

[1] SMG, formerly known as Spectator Management Group, is also
named as a defendant and counter-plaintiff in connection with a
lawsuit against American Capital and SMG unrelated to heparin.
Baxter International Inc. and Baxter Healthcare Corporation
(collectively, "Baxter") are interested parties.

Charter Oak to American Capital for the 2006-2007, 2007-2008, and 2008-2009 coverage years (PTX 163 (2006); PTX 164 (2007); PTX 453 (2008)); and three commercial excess liability ("Umbrella") insurance policies issued by Travelers to American Capital for the 2006-2007, 2007-2008, and 2008-2009 coverage years (PTX 166 (2006); PTX 167 (2007)).[2] A bench trial was held from March 8 to April 18, 2017. The following findings of fact and conclusions of law are issued pursuant to Federal Rule of Civil Procedure 52(a).[3]

For the reasons set forth below, the court finds that: (1) Charter Oak breached its duty to defend American Capital in the heparin litigation under the 2006, 2007, and 2008 Primary

---

[2] The designation "PTX" refers to exhibits offered by Plaintiffs (insurers Charter Oak and Travelers) at trial. "DTX" refers to exhibits offered by Defendants (American Capital and SPL). References to trial testimony are designated by the ECF docket entry of the official transcript and page number.

[3] Rule 52(a) provides, in relevant part, that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court." To comply with this rule, the court "'need only make brief, definite, pertinent findings and conclusions upon the contested matters,' as there is no need for 'over-elaboration of detail or particularization of facts.'" *Wooten v. Lightburn*, 579 F.Supp.2d 769, 772 (W.D.Va. 2008) (quoting Fed.R.Civ.P. 52(a) advisory committee's note to 1946 amendment). Rule 52(a) "does not require the court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient." *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962) (quoting *Carr v. Yokohama Specie Bank, Ltd.*, 200 F.2d 251, 255 (9th Cir. 1952)).

Policies; (2) Travelers breached its duty to defend SPL in the heparin litigation under the 2006 Umbrella Policy, and Charter Oak breached its duty to defend SPL in the heparin litigation under the 2007 and 2008 Primary Policies; (3) Plaintiffs are not entitled to rescission of the policies; (4) Plaintiffs are not entitled to reformation of the policies; (5) American Capital has not proven promissory fraud; and (6) Defendants have not proven that Plaintiffs acted with a lack of good faith. The court will decline to issue declaratory judgments. Accordingly, the court will enter judgment in favor of Defendants as described herein and award damages in the amount of $62,717,069.00 plus interest.

## I.    Factual Background

### A.    The Parties

At all relevant times, American Capital was a publicly traded private equity firm incorporated under the laws of Delaware, with its principal place of business in Bethesda, Maryland.[4] As a registered business development company, it provided "significant managerial assistance" to its "portfolio companies" under the Investment Company Act of 1940, 15 U.S.C. § 80a-2(46)-(48), through its wholly owned domestic consolidated operating subsidiary, American Capital Financial Services

_____

[4] American Capital was formerly known as American Capital Strategies, Ltd. It was recently acquired by Ares Capital Corp. and converted into ACAS, LLC. (ECF No. 601).

("ACFS"). In August 2006, American Capital formed and acquired an interest in SPL Acquisition Corp., which acquired SPL Holdings, LLC, which wholly owned SPL. SPL, which manufactures and distributes active pharmaceutical ingredients ("API") in Waunakee, Wisconsin, was a portfolio company of American Capital.

Charter Oak and Travelers are subsidiaries of The Travelers Companies, Inc. They are incorporated under the laws of the State of Connecticut and maintain their principal place of business in Hartford, Connecticut.

### B. Insurance Purchase and Renewals

More than eleven years ago, American Capital purchased a package of six insurance policies – commercial general liability, excess liability, property, business auto, foreign, and workers' compensation – from Travelers and Charter Oak. Through insurance broker Marsh USA ("Marsh"), American Capital solicited policy proposals for the 2006-2007 term year. In so doing, Marsh sent an undated commercial insurance application form, the "ACORD form," to the McKee Risk Management agency ("McKee"). Pursuant to an underwriting agreement with Plaintiffs, McKee sent application materials regarding American Capital to Plaintiffs to see if they were interested in putting in a quote for its business. Within two days, Plaintiffs prepared a proposal, which they sent to McKee and McKee sent to

Marsh.  Marsh sent Plaintiffs' proposal, along with proposals from two other insurance carriers, to American Capital. American Capital accepted Plaintiffs' proposal, and the policies were bound on June 23, 2006.  The policies were renewed with minimal changes for the 2007-2008 and 2008-2009 coverage years.

### C.  Underlying Heparin Litigation

Heparin is a blood-thinning drug, commonly used in surgeries, which is derived from pig intestines.  SPL manufactured Heparin Sodium, USP.  Under a supply agreement entered into in 2001, it supplied heparin products to Wyeth Pharmaceuticals, Inc.  (*See* DTX 315).  In 2004, Wyeth Pharmaceuticals, Inc. sold its heparin business to Baxter, and SPL and Baxter agreed to an amended supply agreement.

Some, but not all, of the heparin API supplied by SPL to Baxter originated in China.  At all relevant times, a subsidiary of SPL held rights in Changzhou SPL Co., Ltd. ("CZSPL" or the "Changzhou joint venture"), an entity created pursuant to a joint venture agreement between Changzhou Techpool Pharmaceutical Co., Ltd., a Chinese company, and a predecessor of SPL in 1999.  CZSPL obtained crude heparin from consolidators, which combined smaller lots of crude heparin into larger lots.  The consolidators obtained the crude heparin from heparin workshops, which extracted the crude heparin from raw materials obtained from Chinese farms.  From the crude heparin,

CZSPL manufactured Heparin Sodium, USP in China, which it sold to SPL and SPL resold to Baxter. SPL also received crude heparin directly from consolidators and manufactured Heparin Sodium, USP at its Wisconsin facility, which it then sold to Baxter. Baxter finished the heparin and supplied it to hospitals, where the drug was administered to patients.

Following reports of severe patient reactions to heparin, including patient deaths, Baxter and SPL recalled all of their United States heparin products between January and March 2008. Investigations concluded that the heparin had been contaminated by oversulfated chondroitin sulfate. The parties agree that it is now evident that the contaminated heparin which was administered to patients had been sourced through CZSPL. SPL sourced heparin from multiple suppliers, however, and supplied heparin to Baxter that had not been purchased from CZSPL. Some of the non-CZSPL heparin sold by SPL to Baxter had also tested positive for contamination, but was not administered to patients. The source of the contamination in the heparin SPL purchased from CZSPL was traced to the raw materials, which had been contaminated before they were obtained by CZSPL.

The first heparin lawsuits were filed in March 2008. In total, 574 lawsuits against American Capital, SPL, or Baxter were filed in federal court and transferred to a multidistrict litigation before the United States District Court for the

Northern District of Ohio (PTX 628); and 490 lawsuits against American Capital, SPL, or Baxter were filed in state courts, many of which were also consolidated (PTX 631). The "heparin litigation" refers to these 1,064 suits. As calculated by the insurers in this case, American Capital was sued in approximately 68% of the heparin litigation suits. (PTX 628; PTX 631). Only 3% of the heparin litigation suits were brought against Baxter without naming American Capital or SPL. (PTX 628; PTX 631). Some of the suits named CZSPL as a defendant or alleged that the contaminated heparin the patient received had been sourced through the Changzhou joint venture, but many of the complaints did not mention Changzhou or reference a joint venture. Although the heparin products were recalled in early 2008, heparin complaints were filed which alleged injuries during the 2006, 2007, and 2008 policy periods.

### D.  Underlying Nationwide Arena Litigation

On November 24, 2008, American Capital and its portfolio company SMG were sued in an Ohio state court action unrelated to heparin. The suit alleged an injury to a spectator at the Nationwide Arena in Columbus, Ohio, which was managed by SMG, on March 1, 2008. (PTX 471). SMG is a partnership organized under the laws of Pennsylvania that manages sports arenas. American Capital had acquired its interest in SMG in 2007.

## E. Notice and Claims Handling

American Capital first provided notice of the heparin litigation to Plaintiffs on August 20, 2008. It did so through a submission by Marsh, and did not request a coverage determination or tender the suits to Plaintiffs for a defense at that time. Instead, at the suggestion of McKee, Marsh informed Plaintiffs that the heparin complaints were being provided to Plaintiffs for "record purposes only." Plaintiffs acknowledged receipt of the suits, opened a claim for the heparin litigation, and began to investigate coverage. (*See* DTX 618). Throughout September, Plaintiffs investigated American Capital's coverage under their policies "under a full and complete reservation of rights" and requested meetings with its principals. (PTX 550). They also began an investigation into whether there were grounds for rescission of the policies. (*See* DTX 661). On October 8, 2008, American Capital informed Plaintiffs that it was seeking a "no-cost dismissal" of American Capital in the heparin litigation which could moot coverage issues, and accordingly, that it "would prefer not to allocate resources at this time to discussing those coverage issues" with Plaintiffs. (PTX 557). American Capital and Plaintiffs eventually met on November 4, 2008. On November 6, American Capital, through Marsh, provided notice of another heparin suit and requested Plaintiffs' coverage position "as to American Capital, Ltd and any entity

alleged in the pleadings to be a direct or indirect affiliate of American Capital." (PTX 461).

During this time, American Capital, SPL, and Baxter were involved in negotiations to resolve potential conflicts between SPL and Baxter under their supply agreement and allow for a joint defense in the heparin litigation. The three entered into the "Confidential Settlement and Cost-Sharing Agreement" (the "Agreement") and related agreements on December 2, 2008. (PTX 480). The Agreement, which did not settle the underlying heparin litigation, functioned in part as a joint defense agreement. Plaintiffs were informed of the Agreement on December 22, and received a copy on December 29.

Separately, American Capital was served in the unrelated Nationwide Arena lawsuit on December 2, 2008, and provided notice of the suit to Plaintiffs on December 4.

On January 14, 2009, American Capital provided Plaintiffs with a summary of all the heparin complaints pending at that time, and again requested a coverage determination as to it and SPL. (PTX 894). On January 16, Plaintiffs: (1) sent a letter to American Capital providing their "coverage position" on the heparin lawsuits, stating that the heparin lawsuits fell outside the coverage of the Primary and Umbrella Policies (PTX 576); (2) sent a separate letter to American Capital stating that they would provide a defense in the Nationwide Arena lawsuit, subject

to a full and complete reservation of their rights to disclaim defense and indemnity obligations (DTX 607); and (3) filed this declaratory judgment action in federal court, seeking rescission or reformation of the Primary and Umbrella Policies (ECF No. 1). On February 17, Defendants sent an email to Plaintiffs "to confirm that [American Capital] and SPL are demanding a defense from Travelers/Charter Oak to all heparin suits filed against them to date," and noting that Plaintiffs' January 16 coverage position letter did not include all of the companies identified as the actual issuers of the policies. (PTX 588). Plaintiffs sent American Capital a letter on April 10 stating, "Charter Oak and Travelers each has determined that it does not have a duty to defend and indemnify American Capital and SPL with respect to the heparin lawsuits." (DTX 558A). On May 15, Plaintiffs returned the premiums paid by American Capital for the Primary and Umbrella Policies. (PTX 600).

Further facts will be discussed as relevant to the various legal issues.

## II. Procedural Background

### A. Claims and Counterclaims

Plaintiffs commenced this action on January 16, 2009. (ECF No. 1). The operative Second Amended Complaint was filed on March 29, 2011. (ECF No. 67). After summary judgment was entered against Plaintiffs on their claim for reformation due to

unilateral mistake (ECF No. 536), three counts remain: rescission of the six insurance contracts, against American Capital (Count I); reformation of the insurance contracts due to mutual mistake, against American Capital (Count II); and declaratory judgment concerning the duty to defend or indemnify as to all Defendants (Count IV).

Defendants' Third Amended Counterclaims (ECF No. 380) consist of fourteen counts: six declaratory judgment counterclaims that the unilateral rescission of the insurance policies was without legal basis as to Charter Oak regarding the 2006 Primary Policy for coverage of American Capital (Count I),[5] as to Travelers regarding the 2006 Umbrella Policy (Count II), as to Charter Oak regarding the 2007 Primary Policy (Count III), as to Travelers regarding the 2007 Umbrella Policy (Count IV), as to Charter Oak regarding the 2008 Primary Policy (Count V), and as to Travelers regarding the 2008 Umbrella Policy (Count VI); six breach of contract counterclaims concerning the duty to defend against Charter Oak under the 2007 Primary Policy (Count VII), against Travelers under the 2007 Umbrella Policy (Count VIII), against Charter Oak under the 2006 Primary Policy for coverage of American Capital (Count IX), against Travelers under the 2006 Umbrella Policy (Count X), against Charter Oak under

_____

[5] Summary judgment was entered in favor of Plaintiffs regarding coverage of SPL under the 2006 Primary Policy (Counts I and IX). (*See* ECF Nos. 536; 545; 557; 558).

the 2008 Primary Policy (Count XI), and against Travelers under the 2008 Umbrella Policy (Count XII); a statutory tort claim for lack of good faith against Charter Oak and Travelers (Count XIII); and a common law tort claim for promissory fraud by American Capital against Charter Oak and Travelers (Count XIV).

**B.   Motions for Summary Judgment and Supplemental Motion for Summary Judgment**

After more than six years of litigation, the parties filed cross-motions for summary judgment. (ECF Nos. 510; 514). On February 17, 2016, the court granted in part and denied in part both motions. (ECF Nos. 535; 536).[6] Plaintiffs' motion for reconsideration was granted in part on July 1. (ECF Nos. 557; 558). Judgment was entered against Plaintiffs on their claim for reformation due to unilateral mistake and against Defendants regarding coverage of SPL under the 2006 primary policy. (ECF Nos. 536; 545; 557; 558). The court also declared that the policies' joint venture exclusion does not relieve Plaintiffs of a duty to defend American Capital in the heparin litigation and that Defendants' Agreement with Baxter does not relieve Plaintiffs of a duty to defend the heparin litigation. (ECF Nos. 536; 545; 557; 558; *see also* ECF No. 764, at 5-6 (denying Plaintiffs' renewed motion for reconsideration of the joint

_____

[6] An amended memorandum opinion was issued on March 3. (ECF No. 545).

venture exclusion ruling)).  A jury trial was scheduled for the four-week period beginning March 7, 2017.  (ECF No. 565).

On December 16, 2016, Plaintiffs filed a supplemental motion for summary judgment, arguing that Defendants would be unable to prove all or most of their alleged damages.  (ECF No. 584).  Plaintiffs contended that the court's summary judgment opinion precluded the vast majority of Defendants' damages and that defense costs paid by Baxter and monitoring counsel fees were not recoverable under Maryland law.  They asked the court to enter summary judgment for them or calculate nominal damages without a jury.  In denying the motion during a February 28, 2017, pretrial motions hearing, the court clarified that the summary judgment opinion had foreclosed only one of the two methods for calculating damages advanced by Defendants on summary judgment, damages based on the considerations paid by American Capital and SPL in cash or in kind to obtain alternative litigation funding with Baxter.  Defendants were not foreclosed from seeking an appropriate measure of damages available under Maryland law.  (ECF No. 764, at 8-9, 15-16).  Plaintiffs' motion was also denied to the extent it sought to preclude evidence on monitoring counsel fees because they did not show, as a matter of law, that those fees were not recoverable.  (*Id.* at 16).

Additionally, Plaintiffs sought to prevent Defendants from recovering damages for settlements and judgments paid in the heparin litigation under their claims for breach of a duty to defend. (ECF No. 584-1, at 13-14). Defendants argued that their claims should be read to include a claim for a breach of the "narrower, subsumed duty to indemnify." (ECF No. 690, at 72:8-11; *accord* ECF No. 615, at 10-17). Although Plaintiffs' motion was denied, the court rejected this argument, finding that Defendants "never have pled breach of duty to indemnify in this case, and it's too late, too close to trial to revisit that." (ECF No. 764, at 18:16-18; *see id.* at 6-8).[7]

---

[7] In Maryland, "the duty to defend is broader than the duty to indemnify." *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 15 (2004). "Whereas a company has a duty to defend its insured for all claims that are *potentially* covered under an insurance contract, the duty to indemnify, *i.e.*, pay a judgment, attaches only upon liability." *Penn. Nat'l Mut. Cas. Ins. Co. v. City Homes, Inc.*, 719 F.Supp.2d 605, 611-12 (D.Md. 2010) (citations omitted). It is therefore true that "whatever establishes that the insurer 'owes no duty to defend, necessarily also establishes that [the insurer] owes no duty to indemnify.'" (ECF No. 615, at 10 (alteration in original) (quoting *Nautilus Ins. Co. v. REMAC Am., Inc.*, 956 F.Supp.2d 674, 681-82 (D.Md. 2013))). If there is no duty to defend, then there are no claims that are even potentially covered, and there can be no breach of the duty to indemnify. It does not follow, however, that establishing a breach of the duty to defend will establish a breach of the duty to indemnify. *See Warfield-Dorsey Co. v. Travelers Cas. & Sur. Co. of Ill.*, 66 F.Supp.2d 681, 685 n.2 (D.Md. 1999) (rejecting argument that "if the duty to defend issue is decided in plaintiff's favor, defendant also has a duty to indemnify plaintiff for sums paid in settling the underlying action" as "clearly wrong"). Defendants' claim for a breach of the duty to defend is distinct from a claim for a breach of the

Accordingly, Defendants' claim for breach of contract damages was limited to those damages available under Maryland law for a breach of the contractual duty to defend. (*Id.* at 7-8).[8]

## C. Additional Proceedings

Defendants waived their right to a jury four days before trial was scheduled to begin. (ECF No. 767). Accordingly, with Plaintiffs' consent (ECF Nos. 771; 774), a bench trial was held beginning on March 8, 2017.[9] After Plaintiffs completed their case-in-chief, Defendants moved for a judgment on partial findings under Fed.R.Civ.P. 52(c), but the court declined to render judgment until the close of the evidence. After the trial concluded, the court took the matter under advisement and reviewed the pleadings, eleven days of trial transcripts, twenty-nine designated depositions, and admitted exhibits.

Ninety-four pretrial motions were filed. The motions include: twenty-five motions *in limine* (ECF Nos. 578; 581; 587; 590; 593; 595; 598; 606; 614; 638; 640; 641; 642; 645; 647; 653; 655; 657; 659; 662; 664; 666; 668; 669; 672); sixty-five motions to seal (ECF Nos. 580; 583; 585; 589; 594; 596; 600; 603; 605;

---

duty to indemnify, and a breach of the duty to indemnify was not pleaded in the counterclaims.

[8] In light of this determination, Defendants appeared to withdraw their breach of contract claims under the 2007 and 2008 Umbrella Policies. (ECF No. 762). This issue is further discussed below.

[9] Plaintiffs' motion to strike Defendants' jury demand (ECF No. 691) therefore will be denied as moot.

608; 611; 616; 622; 627; 631; 635; 637; 639; 644; 646; 649; 652; 654; 656; 658; 660; 663; 665; 667; 670; 671; 673; 679; 688; 694; 696; 698; 700; 702; 704; 706; 708; 710; 712; 714; 716; 719; 722; 724; 726; 728; 730; 732; 734; 736; 741; 743; 745; 748; 751; 753; 755; 757; 760; 770); Plaintiffs' supplemental motion for summary judgment discussed above (ECF No. 584); Plaintiffs' renewed motion for reconsideration of summary judgment (ECF No. 672); and Plaintiffs' motion to vacate discovery rulings from 2012 and 2013 (ECF No. 677). Plaintiffs also filed a request for judicial notice on a variety of issues on the penultimate day of trial (ECF No. 817), to which Defendants object (ECF No. 820). Finally, Plaintiffs have filed a conditional motion to certify a question of law to the Court of Appeals of Maryland, which has been fully briefed. (ECF Nos. 839; 840; 841). Those necessary to the decision here will be resolved, and the remaining motions will be denied as moot.

The facts of this case are complicated, and there is overlap between the claims and counterclaims. The court will first address Defendants' breach of contract counterclaims and Plaintiffs' declaratory judgment claim, followed by Plaintiffs' rescission claim and Defendants' declaratory judgment counterclaims, Plaintiffs' reformation claim, American Capital's promissory fraud counterclaim, and finally, Defendants' lack of good faith counterclaim.

# III. Findings of Fact and Conclusions of Law

## A. Breach of Contract and Declaratory Judgment

The question at the center of this dispute is whether Plaintiffs owed Defendants a defense in the underlying heparin litigation. Plaintiffs seek a declaration that the policies do not provide defense or indemnity coverage for the heparin lawsuits, the Nationwide Arena lawsuit, or other current or future lawsuits "against American Capital or its purported subsidiaries relating to the subsidiaries, joint ventures, or other entities." (ECF No. 67 ¶ 160). In the Third Amended Counterclaims, Defendants conversely allege that Plaintiffs breached their duty to defend or to fund the defense of the heparin litigation under each of the six policies at issue in this litigation.

### 1. Maryland Contract Law

As previously determined, Maryland law governs the parties' dispute over interpretation of the insurance policies. (ECF No. 64, at 24). In Maryland,

> [Courts] construe an insurance policy according to contract principles. *Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.*, 398 Md. 529, 540 (2007). Maryland follows the objective law of contract interpretation. *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 166 (2003). Thus, "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the

17

contract." *Long v. State*, 371 Md. 72, 84
(2002) (quoting *Slice v. Carozza Props.,
Inc.*, 215 Md. 357, 368 (1958)). "When the
clear language of a contract is unambiguous,
the court will give effect to its plain,
ordinary, and usual meaning, taking into
account the context in which it is used."
*Sy-Lene*, 376 Md. at 167 (citation omitted).
"Unless there is an indication that the
parties intended to use words in the policy
in a technical sense, they must be accorded
their customary, ordinary, and accepted
meaning." *Lloyd E. Mitchell, Inc. v. Md.
Cas. Co.*, 324 Md. 44, 56-57 (1991)
(citations omitted). Although Maryland does
not follow the rule that insurance contracts
should be construed against the insurer as a
matter of course, any ambiguity will be
"construed liberally in favor of the insured
and against the insurer *as drafter of the
instrument*." *Dutta v. State Farm Ins. Co.*,
363 Md. 540, 556-57 (2001) (citation
omitted).

*Md. Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 694-95

(2015). Determining whether an insurer has a duty to defend

under an insurance policy is a two-step process. *Nautilus Ins.

Co. v. REMAC Am., Inc.*, 956 F.Supp.2d 674, 680 (D.Md. 2013)

(citing *St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187

(1981)). "First, the policy must be reviewed to determine the

scope of, and any limitations on, coverage." *Id.* "As the

second step in the duty-to-defend inquiry, the allegations of

the underlying complaint must be analyzed to determine whether

they would potentially be covered under the subject policy."

*Id.* (citing *Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 103-04

(1995); *Pryseski*, 292 Md. at 193); *see also Blackstone*, 442 Md.

at 695 (noting that even if the underlying complaint "does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a potentiality that the claim could be covered by the policy.").

### 2. Primary Policies

Defendants argue that Charter Oak breached its duty to defend American Capital under the 2006 Primary Policy and its duty to defend American Capital and SPL under the 2007 and 2008 Primary Policies.

The material terms of these policies are the same.[10] They bind the insurer to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies," and provide that the insurer has "the right and duty to defend the insured against any 'suit' seeking those damages." (PTX 163, at TRAV0041559). "'Suit' means a civil proceeding in which damages

_____

[10] Plaintiffs' counsel asserted in his closing argument that the 2008 Primary and Umbrella Policies had not been admitted in evidence, and accordingly, that Defendants' claims for breach of these policies (Counts XI and XII) should be dismissed for lack of evidence. (ECF No. 832, at 6). Counsel did not comment on whether Plaintiffs could prove their claims for rescission, reformation, and declaratory judgment concerning the 2008 Policies without the terms of those policies. Regardless, the 2008 Primary Policy was admitted as Plaintiffs' Exhibit 453 through the designated deposition testimony of Marion Rohm without objection (PTX 453; *see* ECF Nos. 830, at 40; 786, at 8; Rohm Dep. at 303:16), and as explained below, it will not be necessary to reach Defendants' claim for breach of the 2008 Umbrella Policy.

because of 'bodily injury' . . . to which this insurance applies are alleged." (*Id.* at TRAV00415789-90). "Bodily injury" is defined by endorsement as "bodily injury, shock, fright, mental injury, disability, mental anguish, humiliation, sickness or disease sustained by a person, including death resulting from any of these at any time." (*Id.* at TRAV0041582). The policies include a $2,000,000.00 general aggregate limit and a $2,000,000.00 products-completed operations aggregate limit, as well as separate limits for personal and advertising injuries, damage to premises, and medical expenses. (*Id.* at TRAV0041555). The "products-completed operations hazard" includes, with exceptions, "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work[.]'" (*Id.* at TRAV0041572). "Your product" is defined as, "Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by: (a) You; (b) Others trading under your name; or (c) A person or organization whose business or assets you have acquired[.]" (*Id.* at TRAV0041573). "Your work" is defined as "(1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations," and includes "(1) Warranties or representations made at any time with respect to the fitness quality, durability, performance or use of 'your work,' and (2)

The providing of or failure to provide warnings or instructions." (*Id*. at TRAV0041573-74).

Each policy lists American Capital as the "Named Insured" on the declarations page. (PTX 163, at TRAV0041481; PTX 164, at TRAV0041662; PTX 453, at AMCA00702513). As "[a]n organization other than a partnership, joint venture or limited liability company" designated in the declarations, American Capital is an insured. (PTX 163 at TRAV0041566). Its executive officers and directors are insureds with respect to their duties as officers or directors, and its stockholders are insured with respect to their liability as stockholders. (*Id*.). The policies include the "XTEND Endorsement," a Travelers' trademark generally included in package policies. (Drennen Dep., at 261:9-18; ECF No. 784, at 80:24-81:3). The XTEND Endorsement "broadens coverage" in several ways, including by expanding the definition of Named Insured. Under the endorsement:

> The Named Insured in Item 1. of the Declarations is as follows:
>
> The person or organization named in Item 1. of the Declarations and any organization, other than a partnership or joint venture, over which you maintain ownership or majority interest on the effective date of the policy. However, coverage for any such organization will cease as of the date during the policy period that you no longer maintain ownership of, or majority interest in, such organization.

(PTX 163, at TRAV0041579). The policies additionally provide that, if the insurer defends an insured against a suit in which an indemnitee of the insured is also named as a party, the insurer will defend the insured's indemnitee if certain conditions have been met. (*Id.* at TRAV0041566).

The policies contain a "Financial Services" exclusion, which states:

> This insurance does not apply to "bodily injury," "property damage," "personal injury" or "advertising injury" arising out of the rendering of or the failure to render financial services by any insured to others. This insurance also does not apply to "bodily injury," "property damage," "personal injury" or "advertising injury" arising out of the selection, investigation, hiring, supervision, training, retention or termination of any person or organization who has rendered or failed to render financial services.

(PTX 163, at TRAV0041597). They also contain what has been referred to in this litigation as the "joint venture exclusion," which provides, under the heading of "Section II - Who Is An Insured," that "[n]o person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations." (*Id.* at TRAV0041568). There are, of course, many additional coverage exclusions and provisions not discussed here, such as exclusions relating to lead, asbestos, and aircraft products.

### a. Coverage of American Capital

There is no question that American Capital would be covered under the Primary Policies as an insured against claims such as those made in the heparin litigation in the absence of an applicable exclusion. American Capital is named as an insured, and the policies provide liability insurance coverage against bodily injury suits, including those alleging bodily injury arising out of products-completed operations. Heparin complaints named American Capital as a defendant in civil suits alleging bodily injury under theories of negligence, strict liability, gross negligence, and failure to warn. (*See, e.g.*, DTX 33 ("*Skidmore* complaint")).[11] These allegations plainly fell within the liability coverage afforded by the Primary Policies, and such suits were brought alleging bodily injuries occurring during each of the policy periods.

### 1) Joint Venture Exclusion

As has been repeatedly explained in this litigation, an insurer's duty to defend turns on the potentiality of a covered judgment against the insured. Plaintiffs' position has been

---

[11] The *Skidmore* complaint alleged that contaminated heparin was administered "prior to, during and immediately following surgery" on or about June 7, 2006, causing an immediate serious allergic reaction that led to the patient's death on July 2, 2006. (DTX 33). The effective date of the 2006 Primary Policy was June 14, 2006. Whether this suit falls outside of coverage because the alleged bodily injury did not occur during the policy period was not raised at trial.

that, if all the contaminated heparin originated with the Changzhou joint venture, then the heparin suits were brought with respect to the conduct of a joint venture not named as an insured in the declarations, CZSPL, and American Capital is not "an insured" for the purposes of those suits under the joint venture exclusion.

Summary judgment was entered against Plaintiffs on this question. Despite the "broad nature of the joint venture exclusion," the court nevertheless concluded that, given the allegations of at least some of the heparin complaints, there was a potential for judgment against Defendants "completely unrelated to heparin originating with Changzhou." (ECF No. 545, at 25-26). Assuming that the joint venture exclusion would preclude coverage if the claims against American Capital were made solely "with respect to the conduct of" a joint venture not named in the declarations, the question of the source of the heparin would still be an issue to be resolved in the underlying tort suits. As such, the "potentiality rule" is applicable even though the question goes to the issue of coverage under the terms and requirements of the insurance policy. *Pryseski*, 292 Md. at 193-94. Accordingly, the court held that the joint venture exclusion does not preclude coverage of the heparin litigation and did not relieve Plaintiffs of their duty to defend American Capital.

Plaintiffs have repeatedly challenged this holding, twice moving for reconsideration. (ECF Nos. 541; 672). Most recently, Plaintiffs have argued for the entry of summary judgment in their favor on the duty to defend because it is now undisputed that all of the contaminated heparin which was administered to patients originated from the joint venture.[12] (ECF No. 672). It was not, however, a disputed factual issue on the source of the contaminated heparin that prevented the entry of summary judgment in favor of Plaintiffs. Instead, the court entered judgment in favor of Defendants on the question of whether the joint venture exclusion relieved Plaintiffs of a duty to defend.[13] The questions that remained on Defendants' claims for trial were: (1) whether any other provisions in the policies relieved Plaintiffs of their duty to defend, and (2) if not, whether Plaintiffs breached their duty to defend.

---

[12] The evidence purportedly proving that the non-Changzhou lots of heparin which tested positive for contamination were not distributed was not admitted at trial, although Plaintiffs have requested that the court take judicial notice of this document. (ECF No. 817, at 2-3). As discussed during the pretrial hearing, however, Defendants do not dispute as a factual matter that all the contaminated lots which reached patients contained CZSPL heparin. (*See* ECF Nos. 711, at 8; 764, at 5).

[13] Plaintiffs' duty to indemnify Defendants is not at issue in this case, and the court need not determine whether the joint venture exclusion would have relieved Plaintiffs of the duty to indemnify.

### 2) Financial Services Exclusion

Although Plaintiffs raised in the pretrial order that the policies' financial services exclusion precluded coverage of American Capital in the heparin litigation (*see* ECF No. 661, at 6-7), such evidence was not presented at trial, and counsel explained in his closing argument that Plaintiffs did not contend that the exclusion applied to these claims (ECF No. 832, at 38). The suits against American Capital generally alleged that American Capital itself was negligent or liable under a theory of strict liability for injuries resulting from contaminated heparin. (*See, e.g.*, DTX 33). The claims alleged against American Capital were not premised on its provision of financial services to SPL or any other entity, and the financial services exclusion is therefore inapplicable here. It does not preclude coverage of the heparin claims against American Capital, and did not relieve Plaintiffs of their duty to defend American Capital in the heparin litigation.

Accordingly, Plaintiffs owed American Capital a duty to defend in the heparin litigation at the time this lawsuit was filed, when there existed the potentiality for covered judgments against American Capital given the allegations of at least some of the heparin complaints.

**b. Coverage of SPL**

Although not named in the 2007 and 2008 Primary Policies, SPL is also an insured under the policies because American Capital maintained a majority interest in SPL on the effective dates of the policies. The XTEND endorsement expands the policy declarations to include "any organization, other than a partnership or joint venture, over which [the insured] maintain ownership or majority interest on the effective date of the policy." (PTX 164, at TRAV0041759). It is undisputed that SPL is a limited liability corporation, and not a partnership or joint venture. The relevant question at trial was whether American Capital maintained an "ownership or majority interest" in SPL.

The undefined term "ownership" must be given its customary, ordinary, and accepted meaning. *Lloyd E. Mitchell, Inc.*, 324 Md. at 56-57. American Capital did not wholly own SPL, through intermediaries or directly, and the term "ownership" will not be read as "beneficial ownership." The term "majority interest" is not defined in the policies, and as held on summary judgment, is ambiguous, as reasonable people could disagree over its meaning and scope. Under Maryland law, where there is ambiguity in a contract, "the Court reviews extrinsic evidence to determine the parties' intent, including dictionaries, the history of the parties' negotiations, the parties' conduct and an

interpretation of the term used by one of the parties before the dispute arose," but if extrinsic evidence does not resolve the issue, then "the trier of fact decides the proper interpretation." *Ambling Mgmt. Co. v. Univ. View Partners, LLC*, 581 F.Supp.2d 706, 712-13 (D.Md. 2008). The extrinsic evidence examined on summary judgment was inconclusive, and this "'bona fide ambiguity' as to whether the parties intended the 'majority interest' clause to apply to the sort of indirect majority interest American Capital maintained over SPL" was reserved for trial. (ECF No. 545, at 19). As noted above, "Although Maryland does not follow the rule that insurance contracts should be construed against the insurer as a matter of course, any ambiguity will be 'construed liberally in favor of the insured and against the insurer *as drafter of the instrument*.'" *Blackstone Int'l*, 442 Md. at 695 (quoting *Dutta*, 363 Md. at 556-57).

The XTEND endorsement was drafted by Plaintiffs and included in the policies by Plaintiffs' underwriters. Its terms were not made known to American Capital until after Plaintiffs' insurance proposals were accepted and coverage was bound. Plaintiffs' expert Matthew Bialecki testified to the meaning of "majority interest," but admitted that he did not consider how that term is used in the insurance industry in an insuring clause. (ECF No. 802, at 38:5-10). Rather, he determined that

American Capital did not have a controlling financial interest in SPL from an accounting and financial perspective. (*Id.* at 13:17-22).

Plaintiffs take the position that "majority interest" extends coverage only to an organization in which an insured maintained a direct and/or controlling financial interest because of the possible outcome here, where its inclusion in a private equity company's policy potentially expands the policy's definition of insured significantly to include some or all of the insured's portfolio companies. Plaintiffs have shown that its underwriters did not appreciate the possible coverage implications of its policy forms and endorsements and included the XTEND endorsement in all insurance policies as a matter of course. (*See, e.g.*, ECF No. 784, at 24:1-8 (As Plaintiffs' underwriter on the 2007 and 2008 American Capital policy renewals, Maureen McEwen, testified, the XTEND endorsement is "a form that typically got attached automatically to all general liability policies[.]")). They have not shown, however, that this narrower definition of "majority interest" was intended when the widely-used endorsement was drafted. The term would be superfluous if it required absolute ownership, and there is insufficient evidence to conclude that it must be construed to require control, as the term "subsidiary," which is used elsewhere in the policies, does. Given the ambiguity of the

term, it must be construed against the insurer as its drafter, and "majority interest" is defined to mean a financial interest, either direct or indirect, of greater than 50% but less than 100%.

On August 10, 2006, American Capital acquired 97,236.33 shares of Series A Preferred Stock and 97,236.33 shares of Non-Voting Common Stock in SPL Acquisition Corp. for a purchase price of $47,160,870.86. (PTX 35). SPL Acquisition Corp. in turn held all 1,000 units authorized, issued, and outstanding in SPL Holdings, LLC, which in turn held all 1,000 units authorized, issued, and outstanding of SPL. (*Id.*). SPL Acquisition Corp. was formed by American Capital shortly before August 10, and acquired its interests in SPL Holdings, LLC from Arsenal Capital Partners. (ECF No. 816, at 6:24-7:15). Both SPL Acquisition Corp. and SPL Holdings, LLC were "strictly [] holding compan[ies]" without employees or other business. (*Id.* at 6:13-20, 7:16-23). In October 2007, SPL Holdings LLC was dissolved (*id.* at 7:24-8:11), and from October 29, 2007 and until at least July 1, 2009, SPL Acquisition Corp. held all units of SPL. (*See* ECF No. 823, at 25:20-27:21, 44:3-21; PTX 65; PTX 153). Throughout this time, American Capital held the majority of the convertible preferred stock in SPL Acquisition Corp., which was "unconditionally convertible" into voting common stock. (ECF No. 816, at 8:17-9:9; *see* ECF No. 823, at

25:20-27:21, 44:3-21; DTX 11; PTX 65; PTX 153). Had American Capital elected to convert to voting stock, it would have held the majority of the voting stock in SPL Acquisition Corp. (ECF No. 823, at 25:20-27:21). During the relevant time period, American Capital had a majority of the total equity value in SPL Acquisition Corp. on both a fully-diluted and a non-diluted basis. (ECF No. 816, at 12:17-13:19, 18:15-19:4).

The court concludes that American Capital maintained a majority interest in SPL on the effective dates of the 2007 and 2008 Primary Policies, and accordingly, SPL is a named insured under the terms of the policies. American Capital clearly held a majority interest in SPL Acquisition Corp., the holding company it formed, which in turn held all units of SPL. American Capital maintained this interest from August 10, 2006, until at least July 1, 2009. The heparin complaints named SPL as a defendant in civil suits alleging bodily injury under theories of negligence, strict liability, gross negligence, and failure to warn. (*See, e.g.*, DTX 33). Such suits were brought against SPL during each of the policy periods, and Plaintiffs were given notice of these suits. As explained above, these allegations plainly fell within the liability coverage afforded by the Primary Policies. Accordingly, Plaintiffs owed SPL a duty to defend in the heparin litigation.

### 3. Coverage of SPL Under the 2006 Umbrella Policy

The 2006 Umbrella Policy provides: "Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership or majority interest, will be deemed to be a Named Insured." (PTX 166, at TRAV0042139). The Umbrella Policy provides commercial excess liability insurance coverage for bodily injury claims, and defines "bodily injury" as the Primary Policies do. (*Id.* at 8, 18).

As explained above, American Capital acquired a majority interest in SPL on August 10, 2006, and maintained that interest during the remainder of the policy term. Accordingly, SPL was an insured under the 2006 Umbrella Policy, and was entitled to a defense to the heparin claims for bodily injury occurring after the date of its acquisition.

### 4. Breach

Plaintiffs owed a contractual obligation to defend American Capital under the 2006, 2007, and 2008 Primary Policies, and to defend SPL under the 2006 Umbrella Policy and 2007 and 2008 Primary Policies. To prove their claims, Defendants must also prove that Plaintiffs breached that obligation. It is undisputed that Plaintiffs did not offer, at any time, to defend American Capital or SPL in the heparin litigation or to fund their defense. Instead, Plaintiffs determined that the heparin

complaints did not allege covered claims; offered to return the premiums paid by American Capital for the Primary and Umbrella Policies; and filed the instant action for rescission, reformation, and declaratory judgment. (*See* PTX 576; ECF No. 1). Plaintiffs breached their contractual duty to defend.

A factual dispute as to the date of the breach arose prior to trial. On summary judgment, in rejecting Defendants' argument that their damages could be measured by the costs incurred in entering into the Agreement with Baxter, the court noted that Plaintiffs' duty to defend, if any, crystalized when the underlying heparin claims were made, but found that Plaintiffs did not have an opportunity to breach their duty to defend "until they actually denied coverage on January 16, 2009," and that Plaintiffs' "denial, and therefore potential breach, did not occur until January 16, 2009." (ECF No. 545, at 27-28). During the pretrial motions hearing on Defendants' motion *in limine* number 12 regarding the testimony of Plaintiffs' proposed expert Steven Plitt, Defendants' counsel argued that the court had determined that the January 16 letter was a denial letter. (ECF No. 764, at 123). Plaintiffs and their proposed expert characterized the letter as "reservation of rights" letter. (*See id.* at 25, 102, 123). As the court noted, Plaintiffs "obviously did not defend, have not funded the defense, and [January 16] was the time when they said: We are

not going to do it right now," but it was not the court's intent in the summary judgment ruling to say the January 16 letter was "a denial as opposed to a reservation of rights" if that was a critical factual dispute. (*Id.* at 124).

On January 16, Plaintiffs sent a letter to American Capital providing a "coverage position" on the heparin litigation (PTX 576), and filed this lawsuit seeking rescission, reformation, and declaratory judgment (ECF No. 1). Plaintiffs characterize their January 16 letter as a "reservation of rights" letter, meant to put the insured "on notice" of "various coverage issues," and not a denial of coverage. (ECF No. 790, at 51:1-4). Instead, Plaintiffs posit that they denied a defense on April 10, 2009, after American Capital and SPL tendered the lawsuits to them for a defense. (DTX 558A; *see* ECF No. 794, at 230:23-231:6).

The January 16 letter, sent by Plaintiffs' claims handler Edward Zawitoski, stated that the heparin lawsuits had not yet been tendered for defense and indemnity, but that Charter Oak and Travelers "give our position in this letter" in response to American Capital and SPL's request "for our coverage position on these suits." (PTX 576, at TRAV0000739). Plaintiffs "reserve[d] all their rights to disclaim defense and indemnity obligations with respect to the heparin lawsuits" on the grounds that: (1) "Charter Oak and Travelers are entitled to rescission

or reformation of the insurance policies with American Capital" because American Capital "did not seek insurance for any subsidiaries, and it affirmatively represented to Charter Oak and Travelers that it did not have subsidiaries," and 2) "The heparin lawsuits relate to the conduct of Changzhou SPL – a non-insured joint venture," and, "[a]s such, the heparin lawsuits fall outside the coverage of the primary and umbrella policies" under the joint venture exclusion. (*Id.* at TRAV0000740). In the same correspondence, Plaintiffs noted their contemporaneous filing of the instant action for rescission or reformation and a judicial declaration, and offered to return the premium payments in full, with interest. (*Id.*). The letter went on to state in more detail that Charter Oak and Travelers reserved their rights to disclaim defense and indemnity coverage for the heparin lawsuits on numerous grounds. (*Id.* at TRAV0000741-60).

On April 10, 2009, Mr. Zawitoski sent another letter, which characterized the January 16 letter as providing "preliminary coverage positions," and stated that "Charter Oak and Travelers do not have defense and indemnity obligations to American Capital and SPL with respect to the heparin lawsuits." (DTX 558A at TRAV0003308-09). The letter provides several grounds for this determination, and reiterates that Plaintiffs "reserve all of their rights under any contract or law to disclaim defense and indemnity obligations for the heparin lawsuits."

(*Id*. at TRAV0003309).  Plaintiffs returned the premiums paid by American Capital for the Primary and Umbrella Policies on May 15, 2009.  (PTX 600).

Upon consideration of the testimony and exhibits admitted during the trial, Plaintiffs' breach occurred on January 16, 2009.  Whereas other, earlier, "reservation of rights" letters sent by Mr. Zawitoski stated "that coverage may not exist or may be limited for the lawsuits" (PTX 558, at TRAV0048406), the January 16 letter for the first time made a coverage determination in stating that the heparin lawsuits "fall outside the coverage of the primary and umbrella policies" (PTX 576, at TRAV0000740).  The January 16 letter did reserve Plaintiffs' rights, but, particularly in combination with the filing of this litigation, was effectively a denial of coverage.  Plaintiffs reaffirmed this denial of coverage in April, but Plaintiffs' breach of the duty to defend occurred on January 16, 2009.

### 5.    2007 and 2008 Umbrella Policies

There is no need to reach Defendants' remaining claims for breach of contract regarding the 2007 and 2008 Umbrella Policies (Counts VIII and XII) because the court finds that SPL is an insured under the 2007 and 2008 Primary Policies and the duty to indemnify is not at issue.  The Primary Policies are "defense outside limits" policies, meaning that the policies' limits would not be exhausted by the insurer's payment of defense

36

costs. In light of the court's pretrial determination that Defendants did not plead a breach of the duty to indemnify in their counterclaims (*see supra* n.7), Defendants do not seek to recover damages for their payment of judgments or settlements in the heparin litigation. (*See* ECF No. 762, at 1 (noting that "the Court's 'no indemnity' ruling means that the 2007-08 and 2008-09 umbrella policies will not come into play at all" in the trial)). Any damages American Capital or SPL may recover under the Primary Policies for breach of the duty to defend will not exhaust the Primary Policy limits. Similarly, because the court determines that SPL qualifies as an insured under the Primary Policies' "majority interest" provision, there is no need to determine in this litigation whether SPL qualified as an insured "subsidiary" under the 2007 and 2008 Umbrella Policies.

### 6. Declaratory Judgment

In the Second Amended Complaint, Plaintiffs seek a declaration pursuant to 28 U.S.C. § 2201 that the insurance policies do not provide defense or indemnity coverage for the heparin lawsuits, the Nationwide Arena lawsuit, and other current or future lawsuits against American Capital or its portfolio companies. (ECF No. 67 ¶ 160).

The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . *may* declare the rights and other legal

relations of any interested party seeking such declaration, whether or not further relief is sought." 28 U.S.C. § 2201(a) (emphasis added). The United States Court of Appeals for the Fourth Circuit has further explained that a federal court may properly exercise jurisdiction where three criteria are met: "(1) the complaint alleges an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment; (2) the court possesses an independent basis for the jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction." *Volvo Constr. Equip. N. Am. v. CLM Equip. Co.*, 386 F.3d 581, 592 (4th Cir. 2004) (citing 28 U.S.C. § 2201; *Cont'l Cas. Co. v. Fuscardo*, 35 F.3d 963, 965 (4th Cir. 1994)).

"In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 296 (4th Cir. 2005) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995)). Accordingly, the court may, in the exercise of its "broad discretion," *S.C. Dept. of Health & Envtl. Control v. Commerce & Indus. Ins. Co.*, 372 F.3d 245, 260 (4th Cir. 2004), decline to exercise its jurisdiction and dismiss the action. *Volvo Constr.*

*Equip.*, 386 F.3d at 594. A court must be cautious, however, as it should only decline to exercise jurisdiction where there is a "good reason" to do so. *Id.* In particular, a court should normally entertain a declaratory action where the "relief sought (i) 'will serve a useful purpose in clarifying and settling the legal relations in issue,' and (ii) 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Fuscardo*, 35 F.3d at 965 (quoting *Nautilus Ins. Co. v. Winchester Homes, Inc.*, 15 F.3d 371, 375 (4th Cir. 1994)). "[C]onsiderations of federalism, efficiency, and comity" are also significant. *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 422–23 (4th Cir. 1998).

At the present time, there is no need formally to declare the parties' rights and duties. As discussed above, Plaintiffs' duty to indemnify Defendants is not at issue in this litigation, and there is no need to resolve coverage of SPL as a subsidiary under the 2007 and 2008 Umbrella Policies. To issue a declaratory judgment on those issues would not "serve a useful purpose in clarifying and settling the legal relations in issue," *Fuscardo*, 35 F.3d at 965 (quoting *Nautilus*, 15 F.3d at 375), and is not necessary to resolve this litigation. As the actual controversy will be resolved by the court's findings on Defendants' breach of contract counterclaims under the 2006, 2007, and 2008 Primary Policies and 2006 Umbrella Policy, the

court will, in the exercise of its discretion, decline to issue a broader declaration determining whether SPL was a subsidiary of American Capital; the extent of indemnity coverage for the heparin litigation under the policies; or the extent of defense coverage for the heparin litigation under the 2007 and 2008 Umbrella Policies.

Plaintiffs have not expressly withdrawn their request in the Second Amended Complaint for declarations as to defense or indemnity coverage for American Capital and SMG in the Nationwide Arena lawsuit and for any other potential claims against American Capital or its portfolio companies, although they appear to have abandoned the request. In any event, such a declaration necessarily would entail numerous factual findings for which there is insufficient evidence. Although SMG is nominally a party to this litigation, it asserts no counterclaim for damages relating to the Nationwide Arena litigation, and American Capital does not seek to recover damages relating to the Nationwide Arena litigation. Given the limited evidence presented on the relationship between American Capital and SMG, the court cannot determine whether defense or indemnity coverage may have been owed to either party under the policies for the Nationwide Arena claim. The court similarly cannot determine generally that coverage was or was not provided to American Capital's portfolio companies under the policies. Although the

resolution of SPL's claim provides the necessary framework for the analysis, such a determination would require evidence of American Capital's interests in each portfolio company. Without the necessary evidence, the court cannot proceed. Accordingly, Count III of the Second Amended Complaint will be dismissed.

## B. Rescission

Plaintiffs seek to rescind the 2006, 2007, and 2008 Primary and Umbrella Policies based on Defendants' purported misrepresentation that it was not seeking coverage for its subsidiaries or entities other than American Capital, such as SPL, when it applied for insurance.[14] (ECF No. 67 ¶¶ 137-141). To succeed on their rescission claim, Plaintiffs must prove that they:

> [I]ssued a policy in reliance on a material misrepresentation in the application. Materiality is determined by considering whether, given the circumstances of the case, the information omitted could reasonably have affected the determination of the acceptability of the risk. The misrepresentation must actually have been relied on in issuing the policy or setting the premium in order for it to be material.

*Mut. Benefit Ins. Co. v. Lorence*, 189 F.Supp.2d 298, 302 (D.Md. 2002) (citations omitted) (quoting *N. Am. Specialty Ins. Co. v.*

---

[14] Although the ACORD applications and schedules discussed below were submitted in connection with the package of six insurance policies purchased by American Capital in 2006, 2007, and 2008, Plaintiffs did not return the premiums paid and do not seek rescission of the other four policies from each policy year.

*Savage*, 977 F.Supp. 725, 728 (D.Md. 1997)). Plaintiffs must also prove that they acted promptly in seeking rescission after learning of "the facts that would *justify* rescission." *Monumental Life Ins. Co. v. U.S. Fid. & Guar. Co.*, 94 Md.App. 505, 541 (1993).

As the court explained in denying summary judgment on this claim: "The crux of Plaintiffs' argument is that American Capital made material misrepresentations to hide the fact that it was seeking coverage not only for itself, but also for at least some of its portfolio companies, such as SPL. Accordingly, the appropriate focus is on the totality of the alleged misrepresentations." (ECF No. 545, at 33). At trial, Plaintiffs identified the following allegedly material misrepresentations: (1) Two ACORD applications, submitted to Plaintiffs by McKee in connection with American Capital's 2006 application and 2008 renewal application, containing a checkmark in the "no" answer box for question 1.b. ("Does the applicant have any subsidiaries?"), and identifying only "American Capital" as the applicant; and (2) Schedules submitted to Plaintiffs in connection with the 2006 application and 2007 and 2008 renewal applications, which included office locations of American Capital and ACFS but not SPL or other portfolio companies. (PTX 325; PTX 352; PTX 539; PTX 413).

Considering the totality of the alleged misrepresentations, Plaintiffs have failed to prove that American Capital made material misrepresentations to hide the fact that it was seeking coverage for portfolio companies. It is undisputed that American Capital did not instruct Marsh to seek coverage for its portfolio companies, did not consider that its CGL and umbrella policies might cover its portfolio companies as named insureds, and did not seek such coverage. To the extent that there is coverage for companies other than American Capital under these policies, that coverage exists by virtue of the terms of Plaintiffs' policy forms and endorsements. Construing Plaintiffs' claim as an argument that they would not have made the same insurance proposal or offered the same policy forms and endorsements had they received accurate applications from American Capital, the specific alleged misrepresentations will be addressed in turn.

## 1. ACORD Applications

The parties dispute whether the ACORD applications may be attributed to American Capital as representations at all. Under Maryland law, an insured is bound by the representations of its agent. *See, e.g.*, *Commercial Cas. Ins. Co. v. Schmidt*, 166 Md. 562 (1934); *Serdenes v. Aetna Life Ins. Co.*, 21 Md.App. 453, 461 (1974) ("It is immaterial that it is the agent who inserts false statements about material matters in an application for

insurance, because if the [in]sured has the means to ascertain that the application contains false statements, he is charged with the misrepresentations just as if he had actual knowledge of them and was a participant therein.").

At least with respect to procuring insurance in 2006, 2007, and 2008, Christopher Wasko, an employee of Seabury & Smith who worked under the direction of Marsh employees, was acting as an agent of American Capital, and any representations he made in the insurance applications generally would be attributed to American Capital.[15] The facts of this case, however, give pause. Mr. Wasko testified that he regularly used a pre-filled and automatically digitally signed version of an ACORD form as simply a cover sheet. (*See* Wasko Dep., at 35:22-36:18, 50:9-51:22, 75:18-78:20). He did not necessarily change or verify the information provided on this form. Mr. Wasko verified the other information submitted in the applications with American

_____

[15] In 2004, Marsh was appointed by American Capital to act as its broker of record and to represent it in all matters pertaining to "Property/Casualty lines of insurance," and a broker of record letter was provided to The Hartford, American Capital's insurer at that time. (PTX 3). It is not clear from the record or the testimony at trial whether Mr. Wasko or Marsh was appointed as American Capital's broker of record during the relevant timeframe, nor was it shown that Plaintiffs knew Mr. Wasko was American Capital's broker of record. (*See* ECF No. 785, at 144:20-25). Moreover, a broker may be an agent of both the insured and the insurer at different points in a transaction. The evidence at trial proves, however, that Mr. Wasko was representing American Capital with respect to the placement of these policies.

Capital, but did not show the ACORD forms to American Capital prior to submitting them to McKee (ECF No. 785, at 119:7-120:18), and American Capital was unaware of the alleged misrepresentations contained therein until the filing of this lawsuit in January 2009 (ECF No. 785, at 46:19-47:12). Moreover, the ACORD form submitted in connection with the 2006 application, as sent by Mr. Wasko to McKee, was undated. (PTX 15). On the version sent by McKee to Plaintiffs, a date had been added and other changes may have been made. (PTX 325). It is not evident that American Capital had the means to discover the falsity of the representations on the ACORD form. However, even assuming *arguendo* that the ACORD forms contained representations attributable to American Capital, Plaintiffs have failed to prove they relied on a material misrepresentation in the forms.

### a. The ACORD Forms Contain a Misrepresentation

Plaintiffs have attempted to create a Catch-22, arguing that, if SPL is covered under the 2007 and 2008 Umbrella Policies as American Capital's subsidiary, then American Capital made a material misrepresentation in its ACORD application by representing that it did not have subsidiaries, and the policies must be rescinded. (ECF No. 832, at 21:6-20). This construction is overly complicated. Whether or not SPL is a subsidiary of American Capital, a relationship both parties have

45

advanced at times during this litigation when it would be to their advantage, American Capital did have at least one subsidiary, as understood by all the parties, in June 2006: its consolidated operating subsidiary, ACFS.[16] (*See, e.g.*, ECF No. 785, at 200:18-201:15). Thus, the "no" answer to the question of whether the applicant has "any subsidiaries" was a misrepresentation. The ACORD form's representation that American Capital did not have subsidiaries was factually inaccurate, but that is the extent of the misrepresentation on this form.

### b. Plaintiffs Have Not Proven the Misrepresentation in the 2006 ACORD Form Was Material

A misrepresentation must have been actually relied on in issuing the policy or setting the premium in order for it to be material. Plaintiffs cannot prove that they relied on the subsidiary misrepresentation in the 2006 ACORD application because Plaintiffs knew that it was a misrepresentation prior to issuing the policy and setting the premium. Gary Lovett, Plaintiffs' underwriter on the American Capital account in 2006, testified that he knew before making an insurance proposal to

---

[16] American Capital had not acquired its interests in SPL and SMG at the time the 2006 ACORD application was submitted. Accordingly, there could not have been a misrepresentation as to whether American Capital considered SPL or SMG its subsidiaries on the 2006 ACORD application, but Plaintiffs' argument will be construed to refer generally to American Capital's portfolio companies.

American Capital that American Capital had at least one subsidiary, ACFS, which was disclosed in American Capital's application materials.  Mr. Lovett explained that he could have relied on the "no" answer on the ACORD form as a material representation, even though he "nominally" knew that answer was incorrect, because he considered ACFS "acceptable, notwithstanding that answer to the question," as ACFS's "name began similarly with the words American Capital." (ECF No. 801, at 41:10-24).  Although he knew the "no" answer was not correct, Mr. Lovett did not investigate whether American Capital had other subsidiaries at that time.  (*Id.* at 41:25-42:4). Plaintiffs' underwriter on the American Capital account for the 2007 policy renewals, Maureen McEwen, issued the renewal policies in reliance upon the 2006 application materials.  (ECF No. 784, at 16:2-8, 17:6-19).  She similarly testified that she was aware that ACFS was a named insured under the policy and a subsidiary of American Capital prior to the 2007 policy renewals.  (PTX 18; ECF No. 784, at 69:11-21, 106:10-20).  Ms. McEwen acknowledged that the other information contained in the application itself as well as the research done by Plaintiffs in the course of putting together a proposal, such as reviewing American Capital's website and 2006 and 2007 Dun & Bradstreet reports, also revealed that there were many companies in American Capital's family tree.  (*See* ECF No. 784, at 73:4-

78:6).    She    testified,    however,    that    the    subsidiary misrepresentation would have been material to her decision if she had been aware that American Capital considered its portfolio companies to be subsidiaries. (*Id.* at 29:3-30:20, 106:10-20).

Plaintiffs' argument for materiality is, essentially, that they relied on their own interpretation of the misrepresentation.    They    contend    that    they    relied    on    a misrepresentation they knew was untrue — that American Capital did not have any subsidiaries — because they understood the misrepresentation to mean that American Capital did not consider its portfolio companies to be its subsidiaries.  It is far from clear that American Capital actually considered its portfolio companies to be its subsidiaries when it applied for insurance, and thus Plaintiffs have not shown that this would have been a misrepresentation had it been made.  More importantly, however, Plaintiffs    have    not    shown    that    American    Capital    made    any representation    in    its    insurance    application    regarding    its relationship with its portfolio companies.  Even assuming that American Capital's portfolio companies are its subsidiaries, the representation    that    American    Capital    did    not    have    any subsidiaries was not a representation that American Capital's only    subsidiary    was    the    unmentioned    ACFS.    Plaintiffs' assumption of *how* the subsidiary misrepresentation was false is

not a material misrepresentation made by American Capital or its agent. The ACORD form represented that American Capital did not have any subsidiaries, and Plaintiffs issued the policies with the knowledge that this representation was false. The misrepresentation accordingly cannot have been material, and the 2006 and 2007 policies will not be voided on this ground.[17]

### c. Plaintiffs Have Not Proven the Misrepresentation in the 2008 ACORD Form Was Material

An ACORD application was also submitted in connection with American Capital's 2008 policy renewals, which similarly contained a "no" answer to the subsidiary question. (PTX 539). This application was dated September 10, 2008, and received by Plaintiffs the same day. (*Id.*; DTX 624). The 2008 policies incepted on June 14, 2008, and the policies were delivered on September 5, 2008. (ECF No. 784, at 95:6-25). It is axiomatic that Plaintiffs could not have issued the 2008 Policies in

_____

[17] Plaintiffs also contend that there were other misrepresentations in the ACORD form justifying rescission, such as the answer "American Capital" in the ACORD form section "NAME (First Named Insured & Other Named Insureds)." (ECF No. 832, at 23:9-22). At most, this answer was a misrepresentation in that American Capital sought coverage for ACFS as a named insured, but Plaintiffs were aware of this from the application and could not have reasonably relied on this answer. (*See* ECF No. 784, at 106:10-20 ("I knew [ACFS] was a named insured under the policy."). As discussed, it was the insurers' inclusion of the XTEND endorsement, after receiving the ACORD application, which broadened the definition of "Named Insured" potentially to provide coverage to American Capital's portfolio companies. To the extent that endorsement created a misrepresentation in the application, it cannot be attributed to the applicant and cannot have been material.

reliance on a misrepresentation made after the policies were issued. (*Id.* at 96:12-97:8).

### 2. Schedules

Plaintiffs also contend that the schedules submitted in connection with the 2006 applications and 2007 and 2008 policy renewals contained material misrepresentations because they listed only office locations of American Capital and ACFS, not American Capital's portfolio companies. Plaintiffs have not proven either that this was a misrepresentation or that it was material. American Capital applied for coverage for itself and its operating subsidiary, and regardless of the extent to which Plaintiffs' policies extended that coverage to other insureds, the schedules American Capital submitted were not misrepresentations. Moreover, while the schedules were used to calculate American Capital's premiums, they could not reasonably have been relied on by Plaintiffs' underwriters regarding the extent of coverage sought. As the underwriters testified, they did not include a designated premises exclusion in the policies, and they understood that the coverage they were writing was not limited to the scheduled locations. (ECF Nos. 801, at 50:16-24; 784, at 63:11-64:4, 104:11-105:11; *see also* PTX 372).

Plaintiffs have not proven that they issued the policies in reliance on a material misrepresentation in the applications, and they are not entitled to rescission of the policies. This

finding resolves Defendants' parallel declaratory judgment counterclaims, which seek a declaration that Plaintiffs' unilateral rescission of the policies was without legal basis, and a separate declaration will not be issued.

### C. Reformation

In Count II of the Second Amended Complaint, Plaintiffs seek reformation of the insurance policies due to mutual mistake, alleging that the parties intended the policies to provide coverage only for American Capital and not for its portfolio companies, such as SPL, or "with respect to" its portfolio companies or other entities. (ECF No. 67 ¶¶ 142-46). For a party to obtain reformation of an insurance policy under Maryland law, "it is necessary that it appear, by appropriate proof, that a valid agreement exists, and that by reason of fraud, or by mutual mistake on the part of both parties to the agreement, it does not conform to the actual agreement of the parties." *Am. Cas. Co. of Reading v. Ricas*, 179 Md. 627, 634 (1941). In denying Defendants' motion for summary judgment on this claim, the court found that a genuine dispute of material fact remained as to the extent of coverage intended by the parties. The court also rejected Defendants' argument that Plaintiffs were required as a matter of law to provide a redline version of the policies.

As noted in denying Defendants' motion for summary judgment, Plaintiffs "made plain their belief that the parties intended the policies to cover only American Capital and any entity that was included in its application and exposure schedule, but not unreported portfolio companies such as SPL." (ECF No. 545, at 38-39). It was made clear at trial, however, that Plaintiffs also believe that the parties did not intend the policies to cover American Capital itself for any exposure arising out of its portfolio companies.

As to coverage of American Capital's portfolio companies as insureds themselves, Plaintiffs have not shown clear and convincing evidence sufficient for reformation. American Capital may not have sought coverage for its portfolio companies, and Plaintiffs' underwriters may not have intended to write the policies in a way that created that coverage obligation, but the parties intended the terms of the policies to be their actual and valid agreement. By their plain terms, the policies extended named insured status to those organizations in which the insured maintained an ownership or majority interest.

A party seeking reformation has the burden of proving "the precise agreement which the parties intended." *Emanuel v. Ace Am. Ins. Co.*, No. ELH-11-875, 2012 WL 2994285, at *7 (D.Md. July 20, 2012); *see also Lazenby v. F.P. Asher, Jr. & Sons, Inc.*, 266

Md. 679, 682-84 (1972). Plaintiffs were not required to provide a redline version of their proposed policies, but the difficulty the court would have in drafting a reformed policy illustrates the lack of evidence showing a different agreement. Assuming that excising the "broadened named insured" provision of the XTEND endorsement would achieve Plaintiffs' goal of excluding portfolio companies from the definition of named insured, there is no evidence to support this relief. The XTEND endorsement's broadened named insured provision was included in the policies by Plaintiffs' underwriters (ECF No. 784, at 80:24-81:15); it was included in the proposal reviewed by American Capital (DTX 37, at AMCA00663059); and it was paid for through a premium enhancement by American Capital (*see* ECF No. 784, at 81:16-18). There is no evidence of any agreement that the provision should not be included in the policies. Similarly, there is no evidence that the parties did not intend to abide by the "newly acquired" provisions of the policies. As it is the terms of the policy forms and endorsements which potentially extend coverage to portfolio companies as named insureds, Plaintiffs as their drafter cannot avoid the terms. The subjective intent of Plaintiffs' underwriters is not enough to show that the parties had a precise agreement which differed from the terms of the policies as they were written. (*Cf*. ECF No. 794, at 153:1-10 (As Plaintiffs' claims handler Edward Zawitoski testified,

53

coverage is determined "by the terms and conditions of the policy," and Plaintiffs did not consider the underwriter's intent regarding the policy in determining coverage)).

Plaintiffs have also emphasized an American Capital email in which the potential coverage under the policies for the heparin litigation was described as a "loophole." (PTX 566). This is not evidence that the parties had intended an agreement different from the actual policies. It is hardly surprising or suspicious that an insured would not review the terms of its insurance policies in detail until that coverage was needed. Again, the evidence shows that American Capital did not seek to purchase liability coverage for its portfolio companies, but Plaintiffs issued policies that potentially created such coverage. As shown at trial, there are numerous ways in which insurers typically avoid picking up the liability for a private equity firm's portfolio companies. Plaintiffs did not include those common exclusions and endorsements, and they cannot remedy that decision through reformation. They are bound by the terms of the policies they wrote.

In seeking reformation of the policies to foreclose coverage for liabilities "relating to" or "with respect to" American Capital's portfolio companies (ECF No. 67 ¶¶ 142-46), Plaintiffs essentially ask the court to rewrite the policies to remove the heparin litigation from coverage. Again, Plaintiffs

have not proven that this was the precise agreement intended by the parties. Plaintiffs have pointed to the policies' financial services exclusion, which certainly may limit coverage of American Capital's liabilities arising out of its provision of management services to its portfolio companies — for example, in a suit against American Capital by a portfolio company if its services allegedly caused bodily injury, property damage, or personal or advertising injuries. The financial services exclusion, however, does not prove that the parties intended to preclude coverage for liabilities relating to American Capital's portfolio companies.[18] Plaintiffs have not proven that reformation of the policies to preclude coverage of American Capital with respect to its portfolio companies is justified.

The parties intended the written policies to control coverage determinations, and Plaintiffs have not met their burden of clear and convincing evidence necessary to obtain reformation.

---

[18] Moreover, although American Capital renewed the policies with the exclusion in 2007 and 2008, the financial services exclusion was not included in the 2006 insurance proposal accepted by American Capital, but rather added by Plaintiffs' underwriters in a second proposal not sent to American Capital before ultimately being included in the policies. (ECF No. 801, at 50:25-53:19. *Compare* DTX 608, at TRAV0008189-90, *with* PTX 32, at TRAV0010690-91).

### D. Promissory Fraud

In this case, the counterclaim for promissory fraud mirrors the reformation claim. American Capital asserts that the policies, as written, provide coverage to American Capital for suits alleging bodily injury and extend coverage to American Capital's current and newly-acquired portfolio companies, but Plaintiffs never intended to carry out the provisions of the policies. (ECF No. 380 ¶¶ 295-300). In Maryland, the elements of fraud are:

> (1) that the defendant made a false representation to the plaintiff; (2) that its falsity was either known or that the representation was made with reckless indifference as to its truth; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Md. Envtl. Tr. v. Gaynor*, 370 Md. 89, 97 (2002).

American Capital has not proven that Plaintiffs made a false representation for the purpose of defrauding it. As the subjective understanding of Plaintiffs' underwriters of the scope of coverage is insufficient evidence of Plaintiffs' coverage intent for the purposes of reformation, so too is it insufficient to prove promissory fraud. The evidence shows that the parties intended the written terms of the policies to control at the time the policies were issued, and American

Capital has not proven that Plaintiffs misrepresented the policies' terms or did not intend to honor the policies as written at that time. Even though Plaintiffs later sought in this litigation to reform the policies, Plaintiffs' reformation claim itself is not evidence that Plaintiffs misrepresented the scope of coverage under the policies for the purpose of defrauding American Capital at the time the policies were bound. There is insufficient evidence to find that Plaintiffs did not intend to perform the policies as written at the time they were issued.

### E. Lack of Good Faith

Count XIII of the Third Amended Counterclaims is Defendants' statutory lack of good faith counterclaim, asserted under two Maryland statutes which require an insurer to make "an informed judgment based on honesty and diligence supported by evidence the insurer knew or should have known at the time the insurer made a decision on a claim." Md. Code, Cts. & Jud. Proc. § 3-1701; *see* Ins. § 27-1001(a). The remedies available under these statutes are recoverable only "if the trier of fact . . . finds in favor of the insured and finds that the insurer failed to act in good faith[.]" Md. Code, Cts. & Jud. Proc. § 3-1701. As discussed above, the court finds in favor of Defendants on their breach of contract counterclaims.

Assessing whether an insurer acted in good faith requires "an evaluation of the insurer's efforts to obtain information related to the loss, accurately and honestly assess this information, and support its conclusion regarding coverage with evidence obtained or reasonably available." *Cecilia Schwaber Tr. Two v. Hartford Accident & Indem., Co.*, 636 F.Supp.2d 481, 487 (D.Md. 2009). This "totality of the circumstances" standard has been summarized as requiring an insurer to meet "standards of reasonable investigation, honest assessment, and reasonable explanation." *All Class Constr., LLC v. Mut. Benefit Ins. Co.*, 3 F.Supp.3d 409, 416-18 (D.Md. 2014). The following factors are considered when determining if an insurer meets the aforementioned standards:

> [(1)] efforts or measures taken by the insurer to resolve the coverage dispute promptly or in such a way as to limit any potential prejudice to the insureds; [(2)] the substance of the coverage dispute or the weight of legal authority on the coverage issue; [and] [(3)] the insurer's diligence and thoroughness in investigating the facts specifically pertinent to coverage.

*Cecilia Schwaber*, 636 F.Supp.2d at 487 (alterations in original) (quoting *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So.2d 55, 63 (Fla. 1995)).

Notice of the first heparin complaint was sent to Plaintiffs on August 20, 2008 (PTX 98), and Plaintiffs denied coverage of the heparin suits on January 16, 2009 (PTX 576).

The evidence at trial did not paint Plaintiffs' employees' efforts during this time in the best light. Considering the totality of the circumstances, however, the court finds that Defendants have not met their burden of proof on this claim.

Although Plaintiffs reserved their rights to deny coverage on a number of grounds, the joint venture exclusion was the primary justification for the coverage determination made in January. (PTX 576). The first complaint noticed, the *Ash* complaint, alleged that the contaminated heparin originated with the Changzhou joint venture (PTX 98), but within a week, American Capital had provided nine other heparin complaints to Plaintiffs, including the joint venture-silent *Skidmore* complaint (DTX 33). Coverage for the *Skidmore* claim specifically was denied in the January 16 letter. (PTX 576, at TRAV0000764). Plaintiffs contend that, although the court has disagreed with them as to the applicability of the joint venture exclusion, their coverage determination was made in good faith.

During the 2017 trial, Tracey D. King Seitz, Plaintiffs' in-house counsel, and Robert Crivelli, a supervisor in Plaintiffs' complex claim unit in 2008, testified that they could recall only reading the *Ash* complaint (ECF Nos. 794, at 233:23-25; 805, at 24:4-13, 25:1-6), and Mr. Zawitoski testified that, while he had "generally" read all the complaints listed in his January 16 letter, he was unsure whether he knew at that

time that some of those did not reference a joint venture (ECF No. 794, at 119:24-121:23).[19]   Mr. Zawitoski believed at that time, however, that all of those complaints fell outside coverage.   (ECF No. 794, at 121:1-122:22).   In a September 3, 2008, email, Mr. Crivelli reported that American Capital had "a majority ownership of Scientific Protein Labs" and that a component of heparin was manufactured at a facility in China, but also noted that SPL owned "a US plant" which might be involved.   (DTX 791).   Mr. Crivelli testified that during the coverage evaluation he developed the understanding "that the Changzhou joint venture was involved in the actual manufacture of the component product of the heparin; that it was involved in a joint venture with SPL; and that that component part was imported into the United States and used by Baxter in the finished product."   (ECF No. 794, at 256:15-25).   Both he and Mr. Zawitoski also testified that, in their experience, the insurer could look to "the actual facts" rather than a complaint's allegations to determine if an entity was an insured

---

[19]   If Plaintiffs had denied coverage based on the allegations of only one out of dozens of complaints, while representing to the insured, as they did, that the coverage determination was based on the allegations of all the complaints, they could not have reached an informed judgment based on honesty and diligence.   Given the significant passage of time since these events and the contemporaneous records acknowledging the allegations of the other complaints, however, the court does not conclude that Plaintiffs failed to consider the joint venture-silent complaints in making their coverage determination.

under the policies (*id.* at 256:4-9; *see also id.* at 8:24-9:14), and that in this case, they considered the question of the involvement of a joint venture to be part of this determination.

The court disagreed on summary judgment, as discussed above, but an improper denial of coverage alone does not show a lack of good faith. *See All Class Constr.*, 3 F.Supp.3d at 418. The question of good faith turns not on what the policies actually cover, but what the insurer reasonably believed and articulated they covered at the time of denial. *See id.* Although Plaintiffs should not have looked beyond the allegations of the complaints in making their coverage determination as to the duty to defend, the issue is complicated and ambiguous enough that the court is not persuaded that Plaintiffs did not reasonably believe the joint venture exclusion precluded coverage at the time of the denial.

The evidence also does not prove that Plaintiffs had reached a contrary coverage position on the heparin litigation prior to January 16. The fact that Mr. Zawitoski set a reserve for the *Ash* claim on September 4, 2008 (DTX 655) does not show that Plaintiffs had made a coverage determination at that time. Mr. Crivelli wrote in an email on October 13, 2008, "We have confirmed coverage," (DTX 791), but without further context for this statement, and in light of his testimony that a coverage determination had not been reached in late December 2008 (ECF

No. 794, at 215:6-11), it is not clear that Plaintiffs had completed their investigation at that time. Mr. Crivelli's December 30, 2008, email suggesting that Plaintiffs may want to "reiterate" they would pay only reasonable defense costs in light of the law firm Defendants had retained suggests that a finding of coverage was possible at that time, but it is not proof that Plaintiffs had determined they had a duty to defend. (*See* PTX 842).

A draft of the January 16 letter, dated January 13 and prepared by Plaintiffs' counsel, was also admitted into evidence. (PTX 878). The draft letter would have offered a defense to American Capital, and possibly SPL, with a reservation of rights. (*Id.*). Defendants contend that this letter is evidence that a coverage determination was reached, and that the reversal of position two days later demonstrates that the coverage position was not made in good faith. It is true that neither Mr. Zawitoski, the claims handler on the account who signed the letter; Mr. Crivelli, his supervisor who approved the letter; nor Delores Cranston, Plaintiffs' Rule 30(b)(6) designee, could provide an explanation for the changes between the January 13 and January 16 positions. (*See* DTX 380; Cranston Dep., at 136:2-19, 145:12-146:4). Plaintiffs were not bound by the coverage position taken in a draft letter prepared by their counsel, however. Moreover, the draft letter advanced

the same arguments as the January 16 letter that Plaintiffs were entitled to rescission and that the joint venture exclusion precluded coverage, and would have reserved Plaintiffs' rights to disclaim defense and indemnity coverage and seek reimbursement of any defense or indemnity payments. (PTX 878). Accordingly, it does not show that the coverage position was not reached in good faith.[20]

It is clear from the evidence presented at trial that neither Plaintiffs nor American Capital had expected bodily injury claims like those made in the heparin litigation would be brought against American Capital, and that American Capital and SPL had not originally realized that SPL was an insured under American Capital's policies. Given the complexity of the coverage issues involved and considering the totality of the circumstances, Defendants have not met their burden to prove that Plaintiffs did not act in good faith.

---

[20] Defendants have also argued that Plaintiffs' offer to fund a defense of American Capital in the Nationwide Arena litigation is significant. (*See* ECF No. 832, at 91:13-94:4). The January 16, 2009, coverage position letter as to the Nationwide Arena litigation offered to provide a defense to American Capital subject to a full and complete reservation of rights to disclaim defense and indemnity obligations and seek reimbursement. (*See* DTX 607). The Nationwide Arena letter does not prove that Plaintiffs had determined that defense coverage was owed under the policies for either the Nationwide Arena or heparin litigation. Plaintiffs could have offered to provide a defense in the heparin litigation as well, as contemplated in the January 13 draft letter, but the fact that they did not do so does not prove that they acted with a lack of good faith.

**F.   Damages**

Defendants seek breach of contract damages in the amount of $62,717,069.00, representing attorneys' fees and other litigation expenses incurred in the defense of the heparin litigation between January 18, 2009, and June 14, 2016. (*See* DTX 868A).

Under Maryland law, an insurer is liable for the attorneys' fees the insured "incurred in defending against the underlying damage claim" due to the insurer's breach of its contractual duty to defend. *Bankers & Shippers Ins. Co. of N.Y. v. Electro Enters., Inc.*, 287 Md. 641, 648 (1980).[21]   As the Court of Appeals has explained, liability insurance "is 'litigation insurance' as well, protecting the insured from the expense of defending suits brought against him." *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 410 (1975).

> Therefore, whenever an insured must conduct
> his own defense at his own expense as a
> result of an insurer's breach of a
> contractual duty to defend its insured, the

_____

[21]   Under Maryland law, an insured also is entitled to recover attorney fees incurred in seeking coverage from an insurer that has breached its contractual duty to defend, *see, e.g.*, *Nolt v. U.S. Fid. & Guar. Co.*, 329 Md. 52, 66 (1993); *Cont'l Cas. Co. v. Bd. of Educ.*, 302 Md. 516, 537 (1985); *Electro Enters.*, 287 Md. at 648-49; *Cohen v. Am. Home Assurance Co.*, 255 Md. 334, 363 (1969), but the question presently before the court is the measure of damages incurred by the insureds in defending against the underlying litigation.   The parties have stipulated that the invoices underlying Defendants' damages claim do not relate to the insurance coverage litigation. (ECF No. 816, at 94:19-95:24).

> insured may recover the expenses of that
> defense from the insurer. 7C J. Appleman,
> Insurance Law and Practice § 4691, pp. 238–
> 240 (Berdal ed. 1979). Furthermore, the
> right of an insured to recover attorneys'
> fees in such a situation applies not only to
> the named insured of the policy but also to
> any person who is within the policy
> definition of an insured and against whom a
> claim alleging a loss within the policy
> coverage has been filed.

*Electro Enters.*, 287 Md. at 649. Where attorneys' fees and expenses are awarded to the insured as breach of contract damages, the insurer is "entitled to have the amount of fees and expenses proven with the certainty and under the standards ordinarily applicable for proof of contractual damages." *Id.* at 661 (holding that "informal fee and expense petitions" and "short, oral representations at the hearing of the amounts claimed" were insufficient, and instructing the trial court to conduct "a proper trial regarding the damages incurred" on remand). It is the insured's burden to produce sufficient evidence of the amount of defense costs sought, as well as the necessity and reasonableness thereof. *See Bd. of Trs., Cmty. Coll. of Balt. Cty. v. Patient First Corp.*, 444 Md. 452, 484–85 (2015).

### 1. Heparin Litigation Joint Defense Expenses

Defendants' Exhibit 868A is a summary exhibit tallying the 894 invoices introduced by Defendants. (*See* DTX 877–1417; DTX 1419–541; DTX 1544–51; DTX 1796–877; DTX 2108–09; DTX 2114–95;

DTX 2198; DTX 2200-49; DTX 2257-61). The parties agree that the information in the summary exhibit appears on the underlying invoices and is an accurate reflection of that information, and that the calculations are correct. (ECF No. 816, at 61:7-13, 61:20-62:20). Plaintiffs objected to the underlying 894 exhibits, but do not challenge their authenticity. (*Id.* at 63:1-20, 75:6-22). The parties stipulated that the law firm invoices reflected time recorded by attorneys in the law firms' recording mechanism from which the invoices were compiled, and that the vendor invoices were received from the vendors and prepared in the ordinary course of business. (ECF No. 823, at 8:12-11:22). Plaintiffs' counsel argued during closing argument that these invoices were prepared in anticipation of litigation and should not be admitted as business records. There was no credible evidence that the time records were prepared for the primary purpose of litigation. Instead, they are normal, routine billing records. Plaintiffs have not shown that the possible source of the information or other circumstances indicate a lack of trustworthiness. In light of the fact that Plaintiffs do not challenge the authenticity of the invoices or that they were prepared in the course of a regularly conducted business activity, and given the parties' stipulations during trial, any remaining objection to the exhibits is overruled and the invoices are admitted under Fed.R.Evid. 803. The parties

agree that the invoices generally were received by SPL and American Capital from Baxter.[22] (*Id.* at 3:9-6:21). Some of the underlying invoices are redacted, and the amount sought by Defendants has been reduced from the total of the invoices to account for those redactions. (*See* DTX 868A, at 32 (noting a reduction in damages claimed of $3,446,350.38 to account for redactions)).

Where attorneys' fees are sought as contractual damages, "the billings supporting the award should be 'as detailed as reasonably possible, so that the client, and any other person who might be called upon to pay the bill, will know with some precision what services have been performed.'" *Patient First*, 444 Md. at 485-86 (quoting *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 400 Md. 718, 760 (2007)). The opposing party must have "at least the opportunity to point out to the court anything it deemed questionable." *Id.* at 487; *accord Electro Enters.*, 287 Md. at 661 (holding that insurer must be given "a realistic opportunity to challenge those fees and expenses" claimed as duty to defend damages). "The sufficiency of the evidence presented as to attorneys' fees must be more

_____

[22] The parties agreed that a small percentage of the invoices were first received by SPL and sent to Baxter. (*See* ECF No. 816, at 75:23-76:4). From the invoices, it appears that some invoices were also sent directly to SPL and American Capital (*see, e.g.*, DTX 1435-43), and others were transmitted directly to SPL (*see, e.g.*, DTX 1446-50).

than simply the number of hours worked, but less than a line by line analysis of services rendered." *Royal Inv. Grp., LLC v. Wang*, 183 Md.App. 406, 458 (2008) (quoting *Long v. Burson*, 182 Md.App. 1, 26 (2008)); *see also Patient First*, 444 Md. at 487 (noting that the fee request must be more than "a mere compilation of hours multiplied by fixed hourly rates . . . a request for fees must specify the services performed" (alteration in original) (quoting *Maxima Corp. v. 6933 Arlington Dev. Ltd. P'ship*, 100 Md.App. 441, 453-54 (1994))).

There are 894 invoices detailing the expenses claimed as duty to defend damages in evidence. The invoices include detailed descriptions of the services performed on the heparin cases by each attorney to the tenth of an hour over seven-and-a-half years of litigation. While there are minimal redactions in the invoices, Defendants are not seeking fees for work that has been redacted.[23] (*See* DTX 868A); *cf. Patient First*, 444 Md. at 487-88 (finding evidence for fee award insufficient where "all description of the services rendered in the billing statements" had been redacted). Providing far more than a compilation of hours multiplied by hourly rates, they enabled Plaintiffs and

[23] Plaintiffs' counsel argued that these redactions were for "insurance issues" and are evidence that the invoices were prepared in anticipation of the coverage litigation. (ECF No. 832, at 62:15-19). There is no evidence to support this speculation, and as noted, the parties have stipulated that the invoices underlying Defendants' damages claim do not relate to insurance coverage matters.

the court to scrutinize the legal services provided in the defense of the heparin litigation to American Capital, SPL, and Baxter. Plaintiffs were given an opportunity at trial to contest the sufficiency of these invoices and their reasonableness, and had proposed an expert witness to testify on damages (*see* ECF No. 661, at 80), but chose not to introduce any rebuttal evidence on damages. Instead, Plaintiffs argue that Defendants have not proven that the litigation expenses were reasonable and necessary.

Daniel William Groskreutz, who primarily served as the chief financial officer of SPL during his tenure at the company from June 2004 until March 2015, testified that the heparin litigation presented "a bet-the-company type of exposure," and that SPL determined they "needed to have the best law firm that we could find [to] handle this." (ECF No. 816, at 34:21-23). When the first claims were filed, Mr. Groskreutz estimated that the claims could "escalate" into the "tens of millions of dollars." (*Id.* at 34:18-20). SPL chose Arnold & Porter LLP as its counsel in the summer of 2008 because "[t]hey were a nationally recognized firm that had handled large litigation like this before, particularly in products liability" (*id.* at 35:4-14), and the heparin litigation involved many "very complex cases . . . spread across the country" (*id.* at 39:4-16). He understood that Arnold & Porter's hourly rates for partners for

this type of work were "[u]p to $800 an hour" (*id.* at 35:15-17), and considered an upper limit of "$225 an hour for a senior partner" proposed by a different insurer "really pretty shocking" given the exposure the heparin litigation presented (*id.* at 34:21-25).

After a joint defense agreement was reached with Baxter and American Capital, Kirkland & Ellis LLP assumed the heparin litigation joint defense, although Arnold & Porter continued to represent SPL as well. Mr. Groskreutz testified that he did not review each invoice received from Baxter "one at a time" for reasonableness, but rather "did a cursory review of the invoices that we received primarily because Baxter had already reviewed them or Kirkland & Ellis had already reviewed them, if they were counsel and experts that they had hired, for reasonableness and necessity."[24]   (ECF No. 816, at 60:9-19).  His review "was to look through them to see that most of the names were familiar, that the topics were familiar, that the days looked right, and also to make sure that . . . the totals added up and just arithmetically that the invoices worked."  (*Id.* at 60:20-24). The hourly rates charged generally increased during the course

---

[24] As further discussed below, under the joint defense agreement between American Capital, SPL, and Baxter, Baxter was charged with the "responsibility to oversee and direct the day-to-day conduct of both the defense and settlement of the Heparin Litigation" (PTX 480 ¶ 3.2), and with advancing payment of the litigation expenses (*id.* ¶¶ 5.3-5.4).

of the heparin litigation, as reflected in the invoices, but, after discounts, Kirkland & Ellis appears generally to have charged hourly rates below or comparable to those Mr. Groskreutz testified he understood Arnold & Porter charged. (*See, e.g.*, DTX 1428; DTX 1526; DTX 1535).

Mr. Groskreutz testified that, beginning in 2009, "[w]hat seemed like a significant number of [heparin] cases, in the tens and maybe hundreds, kept growing and growing very, very rapidly. Before long, we were at 400, 500 cases. I believe the ultimate number was over 1,000 cases. So, the exposure grew just because the number of plaintiffs grew." (ECF No. 816, at 65:14-21). Furthermore, a bellwether trial took place, resulting in a $625,000 verdict for a single plaintiff, without a finding of negligence or punitive damages. (*Id.* at 65:22-66:2; DTX 1660). SPL was therefore concerned that its exposure "was getting into the hundreds of millions of dollars potentially" (ECF No. 816, at 66:3-8), particularly after a ruling in the consolidated state court action allowed the heparin complaints to be amended to add a count for punitive damages against SPL (*see id.* at 69:5-11).

Defendants waived their right to a jury for their breach of contract claims, and so it falls to the court to determine the measure of Defendants' damages as fact-finder. The role of the fact-finder is not transformed, however, because the court is

sitting without a jury. The evidence presented as to damages must be weighed factually, as the jury would have done. Defendants have shown that the detailed billing records introduced were reviewed contemporaneously by Baxter and SPL and received by American Capital. Given the circumstances facing the heparin defendants - "bet-the-company" stakes, more than a thousand underlying lawsuits, and on-going and uncertain coverage litigation – they had the incentive to scrutinize and question the invoices they were receiving if they were exorbitant. Moreover, if Charter Oak or Travelers was concerned about Defendants' "incentive or ability to economize on [their] legal costs, it could, while reserving its defense that it had no duty to defend, have assumed the defense and selected and supervised and paid for the lawyers defending [the insureds] . . . and could later have sought reimbursement if it proved that it had indeed had no duty to defend[.]" *Taco Bell Corp. v. Cont'l Cas. Co.*, 388 F.3d 1069, 1076 (7th Cir. 2004). Instead, "it declined to do so—gambling that it would be exonerated from a duty to defend—with the result that [the insureds] selected the lawyers." *Id.*

Plaintiffs also had the opportunity at trial, after receiving detailed billing records from the heparin litigation defense during discovery, to present expert testimony as to attorneys' fees, a detailed analysis of the heparin litigation

billing, or "concrete and admissible evidence to demonstrate that they would have been able to command lower rates or spur more efficient litigation[.]" *Baker's Express, LLC v. Arrowpoint Capital Corp.*, No. ELH-10-2508, 2012 WL 4370265, at *25 (D.Md. Sept. 20, 2012). They chose not to do so, instead relying on the arguments that Defendants' evidence was insufficient and that the rates charged in the heparin litigation were unreasonable.[25] The court therefore must consider Defendants' detailed billing records, witness testimony, and the other evidence in the record in the absence of any contradicting evidence.

In light of the complexity of the heparin litigation, the amount of time and labor involved over more than seven years, and the potential exposure the heparin defendants faced, the court finds that the heparin litigation defense costs

---

[25] Plaintiffs' counsel argued that Defendants should have introduced status reports "to describe what was being done, why it was being done, the cost at which it was being done, whether that cost met budgeting expectations." (ECF No. 832, at 63:4-9). The invoices here are sufficiently detailed, however, to show precisely what was being done to defend American Capital, SPL, and Baxter in the heparin litigation and the cost at which it was being done.

Plaintiffs' counsel also argued that the rates charged for attorneys were "regularly double what the Appendix B rates are here in the District of Maryland," and that there was no evidence justifying those rates. (ECF No. 832, at 63:10-15). The heparin litigation was not before the District of Maryland, however, and the presumptively reasonable rates in this district are not evidence as to the fee customarily charged for similar legal services.

represented in Defendants' Exhibit 868A were reasonable and necessary.

### 2. Incurrence of the Heparin Litigation Expenses

Plaintiffs have argued that Baxter, not Defendants, "incurred" the heparin litigation fees and costs, and that there is "no opportunity for recovery by American Capital or SPL" here. (ECF No. 832, at 55:22-56:12; *see id.* at 57:5-11). This issue was also raised in Plaintiffs' supplemental motion for summary judgment. (ECF No. 584-1, at 14-16). To address these arguments, it is necessary to revisit the Agreement entered into by American Capital, SPL, and Baxter on December 2, 2008. (PTX 480).

### a. The Agreement

The Agreement functioned, in part, as a joint defense agreement, specifying that Kirkland & Ellis "shall undertake to jointly represent and defend [American Capital, SPL, and Baxter] in the Heparin Litigation."[26] (PTX 480 ¶ 3.1). The Agreement provided that American Capital, SPL, Baxter, and their joint counsel "shall consult regularly on the work being performed in

---

[26] In addition, Dechert LLP was to be retained "to jointly represent [American Capital, SPL, and Baxter] as special settlement counsel to explore and, if possible, effectuate settlements of the claims . . . in the Heparin Litigation[.]" (PTX 480 ¶ 3.1). Kirkland & Ellis, Dechert, "and any other law firms jointly retained . . . in connection with the defense of the Heparin Litigation" were referred to as "joint counsel" in the Agreement. (*Id.*).

connection with the Heparin Litigation, including the definition and review of appropriate strategies for litigation and settlement as well as the assignment of appropriate counsel to do such work," but that "[i]t shall be Baxter's responsibility to oversee and direct the day-to-day conduct of both the defense and settlement of the Heparin Litigation[.]" (*Id.* ¶ 3.2). SPL and American Capital retained the right "to participate in both and to direct the Parties' Joint Counsel with respect to tasks that are of special concern to SPL and/or [American Capital]." (*Id.*). The Agreement also specified that costs occurring after December 2, including legal fees, "costs of settlements of claims and/or lawsuits in the Heparin Litigation," and "costs of satisfying final, non-appealable judgments for compensatory damages awarded" in the heparin lawsuits, were "joint costs." (*Id.* ¶ 5.1(b)).

The Agreement specified that Baxter was responsible for paying the first $20 million in joint costs, SPL was responsible for paying the next $15 million, and Baxter was responsible for paying all joint costs exceeding $35 million, provided that Baxter was entitled to be reimbursed in accordance with a separate Change of Control Agreement.[27] (*Id.* ¶ 5.3). Baxter

---

[27] Under the change of control agreement, American Capital agreed to reimburse a portion of the joint defense costs over $35 million paid by Baxter upon the sale of its interest in SPL.

agreed to advance the $15 million to be paid by SPL, and a reimbursement schedule for SPL to pay Baxter was outlined in the Agreement. (*Id.* ¶ 5.4). In addition to the $15 million for joint costs, SPL assigned to Baxter rights from its separate insurance policies and entered into an exclusive "below market" supply agreement with Baxter. (ECF No. 816, at 41:17-42:11; *see also* PTX 480 ¶ 4.4; DTX 53; PTX 154). American Capital and SPL also assigned to Baxter "the right, title and interest of SPL, [American Capital] and the SPL Companies in any proceeds or other insurance benefits that are payable, or may become payable, to them under the primary Commercial General Liability Policy issued to [American Capital] by The Charter Oak Insurance Company for the policy year June 14, 2007 to June 14, 2008 (policy no. P-630-5074A126-COF-07) . . . in connection with the Heparin Litigation[.]" (PTX 480 ¶ 4.7).

### b. Plaintiffs' Supplemental Motion for Summary Judgment

In their supplemental motion for summary judgment, Plaintiffs argued that "99%" of Defendants' damages, which included the heparin litigation defense costs, settlements, and a judgment, "is for the 'costs of the Agreement,' for which the Court has held 'Plaintiffs are not liable.'" (ECF No. 584-1, at 5 (citing ECF No. 545 at 29, 47)). On summary judgment, the

---

(PTX 153; *see also* PTX 480 ¶¶ 5.3(iii), 7.1; ECF No. 825, at 55:4-14).

court held that, under the voluntary payment provision of the policies, "Plaintiffs are not liable for the costs of the Agreement, *but* Defendants' entry into the Agreement did not void the policies or relieve Plaintiffs of a potential duty to defend." (ECF No. 545, at 30 (emphasis added)).

As the court explained in denying the supplemental motion for summary judgment during the pretrial hearing, the summary judgment opinion's language must be interpreted in the context of the evidence and arguments advanced in the initial motions for summary judgment. At that time, Defendants relied on a damages report prepared by Mark Gallagher, which calculated Defendants' damages using two methods. One method calculated "breach of contract" damages by calculating "the sum of all consideration paid by [American Capital] and SPL (in cash or in-kind) to obtain alternative funding for the heparin litigation in lieu of the coverage that was to be provided by the Plaintiffs." (ECF No. 510-18, at 9, 23).[28] This calculation included: invoiced defense costs predating the Agreement; the $15 million SPL was contractually obligated to pay in joint costs under the Agreement; defense costs not covered by the Agreement; the $20 million in-kind payment made by Defendants

---

[28] The other method, which purported to "represent[] damages due to payments covered under the insurance policies," summed defense costs, based on invoices for legal services and estimates for outstanding invoices, with allegedly covered settlements and judgments. (ECF No. 510-18, at 14-16, 23).

through the assignment of other insurance policies to Baxter; the $15 million agreed to be paid to Baxter pursuant to the change of control agreement; and the value of the Agreement's exclusivity clause, estimated at more than $37 million, for a total of $137 million in damages related to the Agreement. (*Id.* at 16-23). Defendants' expert opined that these damages "flow from the Plaintiffs' breach of the insurance contracts," because they represent the "far larger cost" of the replacement coverage Defendants were required to purchase from Baxter after Plaintiffs denied coverage. (*Id.* at 9, 24).

It was this calculation of damages that the court rejected on summary judgment in finding Plaintiffs not liable for the "costs of the Agreement." The court held that, because the denial of coverage, "and therefore potential breach, did not occur until January 16, 2009," "Defendants 'voluntarily [made] a payment' without Plaintiffs' consent *before* any alleged breach occurred." (ECF No. 545, at 28 (alteration in original)). Therefore, "[t]he Agreement was not the *result* of Plaintiffs' alleged breach because no potential breach had yet happened." (*Id.*). Accordingly, Plaintiffs were not liable for the "costs of the Agreement" — that is, the actual and in-kind consideration Defendants paid to enter the Agreement — because those costs were voluntary payments, exempted from coverage

under the voluntary payment provisions of the policies.[29]   The court also held that those costs of the Agreement could not be used as a measure of consequential damages for the alleged breach of contract because they predated the alleged breach. But the court rejected Plaintiffs' argument that the Agreement voided the policies and cut off their duty to defend:   "The Agreement does not, however, void the entire policy because it is not a *breach* of the voluntary payment provision.   The provision does not *ban* voluntary payments, but instead mandates that the insured, rather than the insurer, cover the cost of such voluntary payments." (*Id.* at 29).

In sum, the court's summary judgment holding was that Defendants could not recover from Plaintiffs the consideration paid for their Agreement with Baxter, not that Defendants could not recover any damages that also fit the definition of "joint costs" under the Agreement.   In accordance with the summary judgment order, Defendants have not sought damages under a "costs of the Agreement" theory of recovery, and as was discussed at length during trial, any evidence of payments made by SPL or American Capital to Baxter pursuant to the Agreement were not considered as evidence of breach of contract damages.

---

[29]   The court also held that defense costs incurred before Plaintiffs' alleged breach of contract were voluntary payments. Defendants have withdrawn their claim for those costs.

### c. American Capital and SPL Incurred the Heparin Litigation Expenses

During closing arguments, Plaintiffs' counsel argued that American Capital and SPL were not "legally obligated to pay" any amount for attorneys' fees associated with the heparin litigation – other than SPL's $15 million payment of joint costs, which was a voluntary payment and not recoverable under the policies – because Baxter agreed to advance the joint defense costs under the Agreement. (ECF No. 832, at 54:13-56:4).

As previously noted, under Maryland law, an insurer is liable for "attorneys' fees *incurred* by an insured as a result of the insurer's breach of its contractual obligation to defend the insured against a claim potentially within the policy's coverage[.]" *Electro Enters., Inc.*, 287 Md. at 648 (emphasis added). Unless otherwise provided by the policies, an insured is not required to prove that it *paid* the fees and expenses itself. *Dutta v. State Farm Ins. Co.*, 363 Md. 540, 562-63 (2001) (holding that where statute and insurance policy "require only for expenses to be incurred," expenses were incurred on the insured's behalf when he "received medical treatment and signed an agreement to pay expenses," "regardless of whether it is the insured, the insured's health insurer, the insured's health maintenance organization, or any other collateral source of

benefits, who ultimately pays the bill");[30] *see also Worsham v. Greenfield*, 435 Md. 349, 357 (2013) (collecting cases); *Weichert Co. of Md., Inc. v. Faust*, 419 Md. 306, 330-31 (2011) (holding that "a general obligation to pay for incurred attorney's fees refers to those fees incurred on behalf of the prevailing party" and the fact that the prevailing party "may not be personally responsible for the payment of the attorney's fees . . . is not relevant to our determination of whether she 'incurred' the fees" where she had provided consideration for her indemnification (citing *Dutta*, 363 Md. at 561-62)); (ECF No. 764, at 164-66).

Under the terms of the Agreement, the joint defense expenses were clearly incurred on behalf of American Capital and SPL. (*See* PTX 480 ¶¶ 3.1-3.2). American Capital and SPL were obligated to reimburse Baxter for a portion of the expenses advanced by Baxter under the Agreement (*id.* ¶¶ 5.3(ii)-(iii),

---

[30] In *Dutta*, the Court of Appeals found that an insured incurred medical expenses when he received medical treatment and signed an agreement to pay for those services, but specifically noted:

> We do not mean to imply that whether an individual incurs expenses depends on whether that individual signed an agreement to pay. We merely point out that, under the facts of the case *sub judice*, petitioner acknowledged his personal financial responsibility for the hospital expenses when he signed the Consent to Treat form.

363 Md. at 557 n.16.

5.4), and assigned to Baxter "any proceeds or other insurance benefits that are payable, or may become payable, to them" under the 2007 Primary Policy. Had Baxter failed to pay the joint defense expenses, American Capital and SPL would have been responsible for those legal expenses, as Mr. Groskreutz and Bowen Slayden Diehl, formerly a managing director of American Capital and SPL board member, testified. (ECF Nos. 816, at 60:1-7 ("My understanding was that if, for whatever reason, Baxter wasn't able to pay, that SPL would still be obligated to pay because we were receiving a service from them, namely, our defense, and that was a service that provided value to us. And we knew that they were doing it, and so we would be obligated to pay them."); 823, at 31:2-14 (testifying that American Capital and SPL jointly retained Kirkland & Ellis to defend them), 32:7-14 ("[A]s from SPL's perspective and from American Capital's perspective, you know, Kirkland & Ellis was representing us all. . . . So, if someone wasn't going to make the payment, the other people could absolutely be liable for that, yes.")). Moreover, under *Weichert*, whether or not Defendants were themselves liable for the joint defense invoices is not relevant to whether they incurred the fees because they provided consideration for the Agreement, pursuant to which Baxter advanced the joint defense expenses. Defendants have proven

that they incurred the legal expenses that they seek to recover.[31]

### d. Motion to Certify Question of Law to Court of Appeals of Maryland

Following the conclusion of trial, the Court of Appeals of Maryland issued an opinion in *Eastern Shore Title Co. v. Ochse*, __ Md. __, 2017 WL 2361793 (May 31, 2017), *reconsideration denied* (July 10, 2017), which Plaintiffs argue is controlling and dispositive of Defendants' claims for damages. The parties filed correspondence with the court regarding this decision (ECF Nos. 835; 836; 837; 838), and Plaintiffs have filed a motion to certify a question of law to the Court of Appeals of Maryland (ECF No. 839). This motion, which Defendants oppose (ECF No. 840), is conditional upon whether the court agrees with Plaintiffs that *Ochse* is controlling. In the event this court does not, Plaintiffs request certification of the following question:

---

[31] Because the court finds that American Capital and SPL incurred the heparin litigation joint defense expenses, it is not necessary to determine whether Plaintiffs were liable to Baxter for the defense costs as SPL's indemnitee and a third-party beneficiary under the policies' supplementary payments provisions.

> When a third party has already paid an insured's defense costs pursuant to a settlement entered into without the insurer's prior consent, has the insured incurred those same defense costs for purposes of calculating the damages recoverable from its liability insurer?

(ECF No. 839, at 1).

### 1) *Eastern Shore Title Co. v. Ochse*

Plaintiffs argue that, under *Ochse*, "for purposes of calculating damages, attorney's fees and costs were not 'incurred' when the plaintiffs had already received payment from a third party who was also responsible for the same fees and costs." (ECF No. 835, at 1). They contend that American Capital and SPL cannot have incurred any attorneys' fees and costs if the fees and costs were paid by Baxter.

*Ochse*, a negligence action, concerned the award of attorneys' fees incurred in collateral litigation as damages under the collateral litigation doctrine and is inapposite. The court held:

> [A] party may recover attorney's fees actually incurred, as damages, pursuant to the collateral litigation doctrine, when the expenses were the proximate result of the complained-of injury, incurred necessarily and in good faith, and the amount is reasonable. However, the plaintiff has the burden in any negligence action to demonstrate actual injury. If a plaintiff seeks to recover attorney's fees as damages pursuant to the collateral litigation doctrine, then the plaintiff must

> demonstrate that he or she actually incurred
> the attorney's fees.

*Ochse*, 2017 WL 2361793, at *19. The court found that the Ochses could not recover their collateral litigation attorneys' fees under the collateral litigation doctrine where a judgment for the same fees had been satisfied pursuant to a fee-shifting provision because the Ochses could not demonstrate that they "actually incurred the attorney's fees," or that they were "incurred necessarily," as required by the collateral litigation doctrine in a negligence action. *Id*. The collateral litigation doctrine has no bearing on the recovery of the heparin litigation defense expenses sought by Defendants in this breach of contract action pursuant to the duty to defend, and *Ochse* is not relevant to whether those expenses were incurred.

### 2) Motion to Certify Question of Law

Although the court does not agree with Plaintiffs as to the effect of *Ochse*, Plaintiffs' motion for certification will be denied. A court should certify an issue to the state court "[o]nly if the available state law is clearly insufficient[.]" *Roe v. Doe*, 28 F.3d 404, 407 (4th Cir. 1994). Plaintiffs chose to file this action in federal court more than eight years ago. Throughout this lengthy litigation, which included multiple dispositive motions and a bench trial, Plaintiffs have never suggested that the available Maryland case law provided

insufficient guidance for this court to resolve the parties' dispute. Indeed, not even in their motion for certification do they do so; instead, they argue that the recently-decided *Ochse* is controlling, and submit certification as an alternative. If Plaintiffs disagree with the court's interpretation of *Ochse*, they may raise the issue on appeal to the United States Court of Appeals for the Fourth Circuit, but that is not a reason to certify an issue to the state court. Existing Maryland law on damages for an insurer's breach of its contractual obligation to defend its insured is sufficient here, as discussed above. *See Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F.Supp.2d 612, 622 (D.Md. 2013) ("Certification is unnecessary when existing authority permits the court to reach a 'reasoned and principled conclusion.'" (quoting *Simpson v. Duke Energy Corp.*, Nos. 98-1906, 98-1950, 1999 WL 694444, at *3 (4th Cir. 1999))).

Moreover, Plaintiffs' proposed question appears to raise issues previously decided by this court as to the effect of the "settlement entered into without the insurer's prior consent," meaning the Agreement discussed above, and Plaintiffs suggest that the court may also want to certify a question regarding the application of Maryland's eight corners rule. (ECF No. 839-1, at 3, 5 n.4). Again, Plaintiffs may be able to challenge the court's prior decisions on appeal to the Fourth Circuit, but it would not be appropriate to invite the Court of Appeals of

Maryland to opine on those decisions at this time. Finally, the parties and the court have expended considerable resources to resolve the issues in this case, and "[c]ertification would involve an unnecessary 'imposition on the time and resources of the [state court]' and 'an increase in the expenditure of time and resources by the parties.'" *Lynn*, 953 F.Supp.2d at 622 (alteration in original) (quoting *West Am. Ins. Co. v. Bank of Isle of Wight*, 673 F.Supp. 760, 764 (E.D.Va. 1987)). Certification is not warranted, and accordingly, Plaintiffs' motion will be denied.

### 3. Allocation

Finally, Plaintiffs contend that the heparin litigation expenses must be allocated (1) between covered and uncovered claims, and (2) between covered and uncovered parties.

The Court of Appeals of Maryland has held that, outside the conventional liability insurance duty to defend context, an "insured has the burden of establishing that a given item of legal service or expense [for an uncovered claim] was reasonably related to the defense" of the covered claims. *Baker's Express*, 2012 WL 4370265, at *21 (alteration in original) (quoting *Cont'l Cas. Co. v. Bd. of Educ. of Charles Cty.*, 302 Md. 516, 536 (1985)). Where the insured's claim is "a breach of the contractual duty to defend the entire suit under a policy and under a state of facts like those presented in *Brohawn*,"

however, damages are measured "by the reasonable cost of defending the entire [] suit." *Cont'l Cas.*, 302 Md. at 531. Attorneys' fees awarded for breach of a liability policy's duty to defend are not allocated between covered and uncovered claims because, "[u]nder Maryland's potentiality rule, if 'any claims potentially come within the policy coverage, the insurer is obligated to defend all claims notwithstanding alternative allegations outside the policy's coverage, until such times [sic] . . . that the claims have been limited to ones outside the policy coverage.'" *Baker's Express*, 2012 WL 4370265, at *20 (alterations in original) (quoting *Utica Mut. Ins. Co. v. Miller*, 130 Md.App. 373, 383 (2000)).

Defendants' claims in this case are for a breach of the contractual duty to defend under commercial general liability and excess liability policies. Assuming *arguendo* that individual heparin complaints alleged both potentially covered and uncovered claims against American Capital or SPL, Plaintiffs had a duty to defend the entire heparin suit under the policies, and allocation of the attorneys' fees would not be called for under Maryland law.

Plaintiffs argue that the "reasonably related" standard should be extended to require allocation of attorneys' fees between covered and uncovered *suits*, rather than claims within a suit, and that the court must allocate the heparin litigation

defense costs between those suits which alleged that the Changzhou joint venture was the source of the contaminated heparin and those that did not. This argument is unsound. Even if the reasonably related standard was applicable to the duty to defend under general liability policies like those in this case, there would be no basis for the court to find that Plaintiffs' duty to defend was limited to only the joint venture-silent heparin suits. As held on summary judgment and as discussed above, the joint venture exclusion did not relieve Plaintiffs of their duty to defend the heparin litigation. At the time the duty to defend crystallized, heparin suits had been filed against Defendants which were silent as to the source of the contaminated heparin and therefore clearly alleged potentially covered claims.[32] The heparin suits, which not only involved interrelated facts but were consolidated in a multidistrict litigation and a consolidated state action, had to be considered collectively.

In *Federal Realty Investment Trust v. Pacific Insurance Co.*, 760 F.Supp. 533 (D.Md. 1991), which, like *Continental Casualty*, concerned the award of defense costs under a directors

---

[32] It is not evident that the joint venture exclusion would have relieved Plaintiffs of their duty to defend even if all of the heparin suits had alleged that the Changzhou joint venture was the source of the heparin, particularly in light of the evidence presented at trial regarding the relationship between SPL and the Changzhou joint venture, but that question is not before the court.

and officers insurance policy rather than a general liability policy, the court applied the *Continental Casualty* allocation standard to covered and uncovered parties. Plaintiffs argue, without identifying particular expenses, that Baxter is not a covered party, and the fees sought by American Capital and SPL should be reduced to account for defense costs that were not reasonably related to their defense. They suggest that there is insufficient evidence in the record to allocate the defense costs "among covered and uncovered suits among the parties to see what work was done for which parties" because "underlying privileged materials between Baxter and Kirkland & Ellis" were not produced. (ECF No. 832, at 66:16-22). Even if allocation of defense costs between covered and uncovered parties were called for when determining damages for a breach of the contractual duty to defend under a general liability policy, Defendants have shown that the claims against Baxter, SPL, and American Capital were not only reasonably related but inextricably intertwined.

### 4. Prejudgment Interest

Defendants seek prejudgment interest under Maryland common law or a Texas statute as incorporated by the policies.[33] The parties briefed this issue in response to Plaintiffs' motion *in*

---

[33] Defendants also sought prejudgment interest at a statutory rate of 10% under Maryland statutory law with respect to their lack of good faith claim. (ECF No. 380 ¶ 294).

*limine* number 5, which requested that the court either bar Defendants from seeking prejudgment interest or instruct the jury that September 13, 2016, was the earliest possible date on which prejudgment interest could have begun to accrue. (ECF No. 655).

Under Maryland common law, there are "three basic rules governing the allowance of pre-judgment interest." *Buxton v. Buxton*, 363 Md. 634, 656-57 (2001).

> Pre-judgment interest is allowable as a matter of right when "the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date." *First Va. Bank v. Settles*, 322 Md. 555, 564 (1991); *State Highway Admin. v. Kim*, 353 Md. 313, 326 (1999); *United Cable v. Burch*, 354 Md. 658, 668 (1999). As we explained in *I.W. Berman Props. v. Porter Bros.*, 276 Md. [1,] 16-17 [(1975)], the right to pre-judgment interest as of course arises under written contracts to pay money on a day certain, such as bills of exchange or promissory notes, in actions on bonds or under contracts providing for the payment of interest, in cases where the money claimed has actually been used by the other party, and in sums payable under leases as rent. Pre-judgment interest has been held a matter of right as well in conversion cases where the value of the chattel converted is readily ascertainable. *See Robert C. Herd & Company v. Krawill Machinery Corp.*, 256 F.2d 946 (4th Cir. 1958), *aff'd*, 359 U.S. 297 (1959).

> On the other hand, in tort cases where the recovery is for bodily harm, emotional

> distress, or similar intangible elements of damage not easily susceptible of precise measurement, the award itself is presumed to be comprehensive, and pre-judgment interest is not allowed.  In *Taylor v. Wahby*, 271 Md. 101, 113 (1974), we held that, in a tort action in which the claim is unliquidated and not reasonably ascertainable until the verdict, interest runs from the time of verdict.  Between these poles of allowance as of right and absolute non-allowance is a broad category of contract cases in which the allowance of pre-judgment interest is within the discretion of the trier of fact. *See Crystal v. West & Callahan*, 328 Md. 318, 343 (1992); *I.W. Berman Props. v. Porter Bros.*, *supra*, 276 Md. 1.

*Id.*

Defendants argue that prejudgment interest should be awarded as a matter of right because Plaintiffs were obligated to pay reasonable defense cost invoices as they were issued and came due and the dates and amounts of these obligations can be ascertained from the invoices.  (ECF No. 697, at 3–11). Plaintiffs argue that the amount due was not liquidated or ascertainable until at least the date on which Defendants produced the defense cost invoices and their damages calculations to Plaintiffs, and that any common law award of prejudgment interest therefore would be discretionary.

Defendants are entitled to prejudgment interest as a matter of right.  The court has found that Plaintiffs had an obligation to fund the defense of the Defendants in the heparin litigation, and the costs of that defense were "calculable, and thus fixed

and ascertainable," *Harford Cty. v. Saks Fifth Ave. Distribution Co.*, 399 Md. 73, 95 n.20 (2007), as of the dates of the underlying invoices. "An unliquidated claim is 'one, the amount of which has not been fixed by agreement or cannot be exactly determined by the application of rules of arithmetic or of law.'" *Balt. Cty. v. Balt. Cty. Fraternal Order of Police, Lodge No. 4*, 220 Md.App. 596, 664 (2014) (quoting 3 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 7:34 (4th ed. 2008)), *aff'd sub nom. Balt. Cty. v. Fraternal Order of Police, Balt. Cty. Lodge No. 4*, 449 Md. 713 (2016). Here, the costs of the defense Plaintiffs were obligated to fund can be exactly determined.

Plaintiffs argue that *they* did not know the amount due until they received the invoices, but that is irrelevant to whether the amount due was fixed and ascertainable. *See Ash Grove Cement Co. v. Liberty Mut. Ins. Co.*, No. 09-00239, 2014 WL 837389, at *20 (D.Or. Mar. 3, 2014), *aff'd*, 649 F.App'x 585 (9th Cir. 2016). Plaintiffs knew that that defense costs were accruing, and they did not know the specifics of those costs only because they breached their duty to defend. "The purpose of the allowance of prejudgment interest is to compensate the aggrieved party for the loss of the use of the principal liquidated sum found due it and the loss of income from such funds." *I. W. Berman Props.*, 276 Md. at 24. Plaintiffs were

obligated to fund the heparin litigation defense during the pendency of the heparin litigation. By denying that defense, Plaintiffs not only deprived their insureds of their defense costs but had the use of that amount and its income for themselves during the years of litigation that followed. An award of prejudgment interest is allowable as a matter of right.

The legal rate of prejudgment interest under Maryland law is six percent per annum. Md. Const. Art. III § 57. Defendants argue for a rate of eighteen percent under the Texas Insurance Code section 542.060 because the Primary Policies contain Form IL TO 16 08 04. This form states: "Underwriters at The Travelers Lloyd's Insurance Company have complied with the laws of the State of Texas regulating Lloyd's plan insurance and said statutes are hereby made part of this policy." (PTX 163, at TRAV0041484). Chapter 941 of the Texas Insurance Code contains the Texas statutes regulating Lloyd's plan insurance. The "Prompt Payment of Claims" statute under which Defendants seek prejudgment interest is codified as Chapter 542, sections 542.051–.061. Because the subchapter applies to "any insurer authorized to engage in business as an insurance company or to provide insurance in this state, including . . . a Lloyd's plan," Tex. Ins. Code § 542.052(6), Defendants argue that it too is a "law[] of the State of Texas regulating Lloyd's plan insurance" and was incorporated into the Primary Policies. They

contend that the parties have made "Texas's prompt-payment requirements and interest rate 'part of the policy' terms and conditions." (ECF No. 697, at 16).

Defendants admit they did not plead a claim under the Texas prompt-payment statute, which is a distinct substantive cause of action that must be separately pleaded. See *Classic Performance Cars, Inc. v. Acceptance Indem. Ins. Co.*, 464 F.Supp.2d 652, 665 n.4 (S.D.Tex. 2006); *Int'l Sec. Life Ins. Co. v. Redwine*, 481 S.W.2d 792, 793 (Tex. 1972). Moreover, although the Supreme Court of Texas has held that the prompt-payment statute can be applied to an insured's claim under a defense benefit, "the insured would have to submit his legal bills to the insurance company, as received, to mature its rights under the prompt-payment statute." *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 19 (Tex. 2007). Instead, Defendants argue that, if they prevail on their Maryland law claims, then they are entitled to prejudgment interest at the rate set under the Texas statute. (ECF No. 697, at 16).

Defendants' arguments are unpersuasive. While the parties could have made a prejudgment interest rate part of the policy terms and conditions, they did not do so here. Defendants cannot cherry-pick the remedy from a substantive state law claim they have neither pleaded nor proven. The generic language in the policy form relating to Texas statutes regulating Lloyd's

plans is far from sufficient evidence that the parties contracted for an eighteen percent prejudgment interest rate found in an unmentioned statute.

Accordingly, the court will award Defendants prejudgment interest calculated at the legal rate of six percent per annum, accruing from the date of each invoice until the date of judgment.

### 5. Conclusion

For the foregoing reasons, the court will award breach of contract damages to American Capital and SPL in the amount of $62,717,069.00, plus prejudgment interest calculated as described above, for the attorneys' fees and litigation expenses they incurred to defend against the heparin litigation between January 18, 2009, and June 14, 2016.

## IV. The Parties' Motions *in Limine*

In advance of trial, the parties filed motions *in limine*, many of which were resolved at a pretrial hearing held on February 28, 2017. (ECF No. 764). The court's rulings were "no more than [] preliminary or advisory opinion[s] that [fell] entirely within the discretion of the district court. The primary purpose of an in limine ruling is to streamline the case for trial and to provide guidance to counsel regarding evidentiary issues." *Adams v. NVR Homes, Inc.*, 141 F.Supp.2d 554, 558 (D.Md. 2001). Some motions constituted objections to

proposed evidence and were reserved for further discussion at trial. Many of those and other objections were raised during trial and resolved. Other objections were not made or renewed at trial and are waived. A few evidentiary objections remained at the conclusion of trial. To the extent that those objections have not been addressed above, they are not germane to the rulings announced in this opinion. Accordingly, to the extent any pending motions or objections remain, they are denied as moot.

## V.   The Parties' Motions to Seal

There are 65 pending and uncontested motions to seal. As ordered at the pretrial motions hearing on February 28, 2017, the motions to seal related to the motions *in limine* will be granted. (ECF No. 764, at 170). The court found that there were specific factual representations to justify the sealing and no alternative to sealing that would provide sufficient protection, in accordance with Local Rule 105.11. The parties have also filed three uncontested motions to seal the briefing and exhibits related to the supplemental motion for summary judgment (ECF No. 584). (ECF Nos. 585; 616; 652). The court finds that there are sufficient factual representations to justify the sealing and no alternative to sealing that would provide sufficient protection, in accordance with Local Rule 105.11, and the parties' motions to seal will be granted.

## VI. Conclusion

For the foregoing reasons, judgment will be entered in favor of Defendants/Counter-Plaintiffs American Capital and SPL on some of their breach of contract counterclaims and the rescission and reformation claims. Judgment will be entered in favor of Plaintiffs/Counter-Defendants Charter Oak and Travelers on the lack of good faith and promissory fraud counterclaims. The declaratory judgment claim of the Second Amended Complaint and the declaratory judgment counterclaims of the Third Amended Counterclaims will be dismissed. The motion to certify a question of law to the Court of Appeals of Maryland filed by Plaintiffs/Counter-Defendants Charter Oak and Travelers will be denied. The parties' motions to seal will be granted, and the motions *in limine*, Plaintiffs' motion to strike the jury demand, and any other outstanding motions will be denied as moot. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
